## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SASHADA MAKTHEPHARAK,
     Plaintiff,

vs.

LAURA KELLY, Governor of Kansas;
JEFF ZMUDA, Kansas Secretary of
Corrections; JONATHAN OGLETREE,
Chair, Kansas Prisoner Review Board;
JEANNIE WARK, Member, Kansas
Prisoner Review Board; and MARK
KEATING, Member, Kansas Prisoner
Review Board.
     Defendants.

Case No. 2:23-cv-02121-DDC-RES

## FIRST AMENDED CIVIL COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Sashada Makthepharak alleges the following for his cause of action against Defendants:

### Jurisdiction and Venue

1.     Plaintiff brings these claims under 42 U.S.C. § 1983. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as well as under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.* Additionally, it has supplemental jurisdiction over the state law claims asserted in this complaint under 28 U.S.C. § 1367.

2.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all acts and omissions giving rise to these claims occurred or are to be performed in the State of Kansas.

3.     This Court has personal jurisdiction over all Defendants because all Defendants are residents of the State of Kansas.

## The Parties

4.     Plaintiff adopts and incorporates every allegation in the paragraphs above.

5.     Plaintiff Sashada Makthepharak is an inmate in the custody of the Kansas Department of Corrections ("DOC"), DOC ID #73697, confined in the Lansing Correctional Facility located at 301 East Kansas Street, Lansing, Kansas 66043.  Plaintiff was born December 14, 1984.  In October 2001, when Plaintiff was a 16-year-old juvenile, a jury in the District Court of Sedgwick County, Kansas convicted him of first-degree murder under a felony-murder theory in violation of K.S.A. § 3401(b) (2001), aggravated burglary in violation of K.S.A. § 21-3716, and criminal possession of a firearm in violation of K.S.A. § 21-4204(a)(3).  The offenses occurred in May 2001, when Plaintiff was a 16-year-old juvenile, and a juvenile court referred the case to the district court.  In December 2001, Plaintiff was sentenced under K.S.A. §§ 21-6806(c) and 22-3717(a)(2) (2001) to life in prison without eligibility for parole for 20 years for the felony murder count, the statutorily mandatory sentence for that offense.  The court sentenced him to 64 months in prison on the other counts, to be served consecutively.

6.     Defendant Laura Kelly is the Governor of the State of Kansas and in her official capacity was working under color of state law when the allegations in this complaint arose.  Governor Kelly is a resident of the State of Kansas.  In her capacity as Governor, Governor Kelly appoints the Kansas Secretary of Corrections, subject to confirmation by the Kansas Senate, who serves at her pleasure.  K.S.A. § 75-5205.  In her capacity as Governor, Governor Kelly decides whether any individual will receive a grant of executive clemency.  Governor Kelly is sued in her official capacity.

7.     Defendant Jeff Zmuda is the Kansas Secretary of Corrections and in his official capacity was working under color of state law when the allegations in

this complaint arose.  Mr. Zmuda is a resident of the State of Kansas.  Mr. Zmuda was appointed by Governor Kelly in 2019 and confirmed by the Senate in 2020.  Mr. Zmuda serves at Governor Kelly's pleasure.  Mr. Zmuda is sued in his official capacity.  In his capacity as Secretary of Corrections, Mr. Zmuda is the chief executive of the DOC, and is responsible, among other things, for:

a. managing the state-operated prisons in which prisoners serving life sentences are housed, and for the education, training, vocational education, rehabilitation and recreation of prisoners under the jurisdiction of the DOC, as well as the transfer of prisoners from one penal institution to another, including how individuals are assigned to any particular security status or facility;

b. appointing the Prisoner Review Board consisting of three members who are existing employees of the DOC and serve at his pleasure, and for administering the Prisoner Review Board under his supervision, a majority vote of which is necessary to grant parole to a prisoner serving a life sentence, K.S.A. § 75-52152;

c. designating the chairperson and vice-chairperson of the Prisoner Review Board, K.S.A. § 22-3709;

d. putting together agreements with inmates specifying those educational, vocational, mental health or other programs which he determines the inmate must satisfactorily complete in order to be prepared for release on parole supervision, K.S.A. § 75-5210a(a), completion of which is a requirement for the Prisoner Review Board to grant an inmate parole, K.S.A. § 22-3713(g); and

e. providing the Prisoner Review Board with necessary personnel and accounting services, K.S.A. § 22-3713(b).

8.      Defendant Jonathan Ogletree is the Chair of the Prisoner Review Board and one of three members of the Prisoner Review Board, and in his official capacity was working under color of state law when the allegations in this complaint arose.  Mr. Ogletree is a resident of the State of Kansas.  Mr. Ogletree has been an employee of the Kansas DOC since 1989, was appointed to the Prisoner Review Board by Mr. Zmuda's predecessor and designated the Prisoner Review Board's chair, and serves at Mr. Zmuda's pleasure.  In his capacity as Chair of the Prisoner Review Board, Mr. Ogletree is responsible for organizing and administering the activities of the Prisoner Review Board, which requires a majority vote to grant parole to a prisoner serving a life sentence.  K.S.A. § 22-3709.  Mr. Ogletree is sued in his official capacity.

9.      Defendant Jeannie Wark is one of three members of the Prisoner Review Board, and in her official capacity was working under color of state law when the allegations in this complaint arose.  Ms. Wark is a resident of the State of Kansas.  Ms. Wark has been an employee of the Kansas DOC since 1991, was appointed to the Prisoner Review Board by Mr. Zmuda's predecessor, and serves at Mr. Zmuda's pleasure.  Ms. Wark is sued in her official capacity.

10.     Defendant Mark Keating is one of three members of the Prisoner Review Board, and in his official capacity was working under color of state law when the allegations in this complaint arose.  Mr. Keaing is a resident of the State of Kansas.  Mr. Keating has been an employee of the Kansas DOC since 1999, was appointed to the Prisoner Review Board by Mr. Zmuda's predecessor, and serves at Mr. Zmuda's pleasure.  Mr. Keating is sued in his official capacity.

**Introduction**

11.     Plaintiff adopts and incorporates every allegation in the paragraphs above.

12.     This challenge is brought by Mr. Makthepharak, an inmate who was sentenced to a life sentence in Kansas state court for acts committed when he was a juvenile, without appropriate consideration of his youth and its attendant characteristics.  Mr. Makthepharak has been, and continues to be, denied a meaningful and realistic opportunity for release, in violation of U.S. Const. Amend. VIII and Section 9 of the Kansas Bill of Rights.

13.     In a series of decisions, the U.S. Supreme Court has forbidden as unconstitutional imprisonment for life without parole ("LWOP"), or its equivalent, for all juveniles but the "rare juvenile whose crime reflects irreparable corruption," and declared this substantive constitutional rule retroactive.  *Montgomery v. Louisiana*, 577 U.S. 190, 208 (2016) (quoting *Miller v. Alabama*, 567 U.S. 460, 474, 479-80 (2012)); *see also Graham v. Florida*, 560 U.S. 48, 82 (2010).

14.     In these decisions, the Supreme Court held young people are constitutionally different than adults for sentencing purposes due to three distinctive attributes that mitigate their culpability: transient immaturity, vulnerability to external forces, and character traits that are still being formed. *Montgomery*, 577 U.S. at 207 (quoting *Miller*, 567 U.S. at 471); *see also Graham*, 560 U.S. at 68; *Roper v. Simmons*, 543 U.S. 551, 569-570 (2005).

15.     The "penological justifications for life without parole collapse in light of 'the distinctive attributes of youth,'" rendering LWOP an unconstitutionally "disproportionate" punishment as to "all but the rarest of juvenile offenders, whose crimes reflect permanent incorrigibility." *Montgomery,* 577 U.S. at 208-09.

16.     Accordingly, the Supreme Court has forbidden as unconstitutional LWOP sentences – or their equivalent – for youth who have committed non-

homicide offenses *(Graham),* and for any youth whose homicide crime reflects "unfortunate yet transient immaturity." *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 479). These decisions establish that only in the "rarest" cases of "irreparable corruption" will such a penalty be appropriate. So, by definition, criminal sentencing schemes that *mandate* life fail to allow adequate consideration of youth to make this assessment. *Montgomery*, 577 U.S. at 207-08; *Miller,* 567 U.S. at 483.

17.     The Supreme Court defines "life without parole" as a sentence of life that denies an individual a "meaningful" and "realistic" opportunity for release upon demonstrated maturity and rehabilitation. *Graham*, 560 U.S. at 75, 82; *Miller*, 567 U.S. at 479. It expressly has rejected executive clemency as affording that opportunity. *Graham,* 560 U.S. at 70 (citing *Solem v. Helm*, 463 U.S. 277, 300-01 (1983)).

18.     Together, these decisions establish that the Eight Amendment forbids a statutory scheme that (a) imposes life sentences upon minors without appropriate consideration of their distinctive attributes as youth, and then (b) fails to provide them a meaningful and realistic opportunity for release. The law of Kansas fails this test on both counts.

19.     In Kansas, many individuals, including Mr. Makthepharak, are serving life sentences for offenses committed as juveniles. Mr. Makthepharak was sentenced under Kansas's mandatory sentencing scheme, which requires judges to impose life sentences in first-degree felony murder cases without adequate consideration of youth to determine whether an individual is among the rare minors whose offense reflects "irreparable corruption." Mr. Makthepharak is serving a life sentence that *in theory* is parole eligible.

20.     Mr. Makthepharak now has served more than 20 years on his life sentence. Yet, no matter the level of maturity or rehabilitation or lack of it that he

may demonstrate, he is and will be denied parole principally due to the fact that he denies responsibility for the offense in the first place, which occurred when he was a juvenile.

21.     As a matter of Kansas law, the authority to parole any person sentenced to life lies first in the hands of the Secretary of Corrections, an appointee of the Governor, who must make an agreement and plan for the prisoner to meet in order to be paroled, and then exclusively the Prisoner Review Board, who serves at the Secretary of Corrections' pleasure and also is responsible for recommending pardons and other clemency to the Governor.  But rather than affording Mr. Makthepharak a meaningful and realistic opportunity for release, Kansas's parole scheme functions as a system of *ad hoc* clemency in which grants of release are exceptionally rare, are governed by no substantive, enforceable standards, and are unreviewable.  Furthermore, Kansas and the defendants named in this complaint lack policies that protect the constitutional rights of Mr. Makthepharak and similarly situated juveniles sentenced to life, to a meaningful and realistic opportunity for release, instead relying on risk assessment tools to make recommendations about release that discriminate against those who were minors at the time of offense and prohibit youth from progressing through the Kansas DOC system to demonstrate their rehabilitation.

22.     As a result of these practices, Mr. Makthepharak and others similarly situated who have matured, reformed, and demonstrated rehabilitation, and who the Supreme Court says deserve an opportunity for a second chance to live outside prison walls, are far more likely to die in prison in Kansas than ever receive a second chance.  Mr. Makthepharak's sentence has been converted into a *de facto* LWOP sentence by virtue of the denial of a meaningful and realistic opportunity for release.

23.     In this respect, the Kansas parole system violates the Kansas and United States Constitutions as applied to individuals like Mr. Makthepharak serving life sentences for offenses committed as youth, and subjects them to unconstitutionally disproportionate punishment.

24.     Mr. Makthepharak is an individual who was sentenced to life imprisonment for an offense committed as a juvenile without adequate consideration of his youth, who has been incarcerated for decades, who has matured and demonstrated his rehabilitation during his incarceration through his behavior and institutional accomplishments, but who is nonetheless denied any fair opportunity for release by the defendants.

25.     Defendants are state officials responsible for the Kansas policies and practices that deny Mr. Makthepharak, as well as others similarly situated, the requisite meaningful and realistic opportunity for release, thereby converting his life sentence to a *de facto* LWOP sentence without regard for his youth.

26.     This complaint seeks declaratory and injunctive relief: (1) to declare unconstitutional Kansas's parole process to the extent that it fails to provide adequate consideration of youth status, (2) to remedy Kansas's unconstitutional failure to provide a meaningful and realistic opportunity for release to Mr. Makthepharak, as well as others similarly situated, and (3) to provide relief for Mr. Makthepharak, who received neither adequate consideration of his youth at sentencing nor any meaningful and realistic opportunity for release over the decades since, resulting in grossly disproportionate punishment in violation of the Eighth Amendment to the Constitution of the United States and § 9 of the Kansas Bill of Rights.

<u>**Factual Allegations**</u>

**I.   Youth have diminished culpability and greater prospects for reform than adults and the state cannot, except in the rarest of cases, condemn young offenders to die in prison without a meaningful and realistic opportunity for release.**

**A. The Supreme Court has confirmed youth are different than adults in ways that diminish the penological justifications for the harshest punishments.**

27.   Plaintiff adopts and incorporates every allegation in the paragraphs above.

28.   A series of Supreme Court decisions have established that "children are constitutionally different from adults for purposes of sentencing." *Montgomery*, 577 U.S. at 206 (quoting *Miller*, 567 U.S. at 471 (citing *Roper*, 543 U.S. at 569-70; *Graham*, 560 U.S. at 68 (2015))).

29.   "These differences result from children's diminished culpability and greater prospects for reform, and are apparent in three primary ways." *Id.* (internal quotation marks and citations omitted).

30.   "First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking." *Id.* (internal quotation marks and citations omitted).

31.   "Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings." *Id.* (internal quotation marks and citations omitted).

32.     "And third, a child's character is not as well-formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity." *Id.* (internal quotation marks and citations omitted).

33.     "The Eighth Amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions.  That right ... flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller,* 567 U.S. at 469 (internal quotation marks and citations omitted).

34.     A LWOP sentence, or its functional equivalent, "'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.'" *Graham,* 560 U.S. at 70 (quoting *Naovarath v. State*, 779 P.2d 944 (Nev. 1989)).

35.     "[T]he penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.'" *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 472).

36.     "Because retribution 'relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult.'" *Id.* at 207 (quoting *Miller*, 567 U.S. at 472).

37.     "The deterrence rationale likewise does not suffice, since 'the same characteristics that render juveniles less culpable than adults-their immaturity, recklessness, and impetuosity-make them less likely to consider potential punishment.'" *Id.* (quoting *Miller*, 567 U.S. at 472).

38.     "The need for incapacitation is lessened, too, because ordinary adolescent development diminishes the likelihood that a juvenile offender 'forever will be a danger to society.'" *Id.* (quoting *Miller*, 567 U.S. at 472).

39.     "Rehabilitation cannot justify the sentence, as life without parole 'foreswears altogether the rehabilitative ideal.'"  *Id.* at 207-08 (quoting *Miller*, 567 U.S. at 473).

40.     Therefore, "the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate" to juvenile offenders' culpability for crimes they commit, which violates the Eighth Amendment's prohibition against grossly excessive punishment. *Miller*, 567 U.S. at 472-77.

**B.  As a result of these differences, the Supreme Court has forbidden LWOP as unconstitutionally disproportionate punishment for all but the rarest of youth who demonstrate "irreparable corruption."**

41.     Plaintiff adopts and incorporates every allegation in the paragraphs above.

42.     In 2010, the Supreme Court held LWOP sentences for juvenile offenders in nonhomicide cases are unconstitutionally disproportionate punishments that violate the Eight Amendment.  *Graham,* 560 U.S. at 82.

43.     In 2012, the Supreme Court held LWOP sentences for juvenile offenders in homicide cases are an unconstitutionally disproportionate punishment that violates the Eighth Amendment.  *Miller*, 467 U.S. at 472-77.  Rather, the Supreme Court required sentencing courts to "consider a child's 'diminished culpability and heightened capacity for change' before condemning him or her to die in prison[,]" and to "take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Montgomery*, 577 U.S. at 195, 208 (quoting *Miller*, 467 U.S. at 479-80).

44.     "Because *Miller* determined that sentencing a child to life without parole is excessive for all but the rarest juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty

for a class of defendants because of their status-that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Id.* at 208 (internal quotation marks and citations omitted).

45.     In 2016, the Supreme Court held *Miller* announced a substantive rule of constitutional law and therefore was retroactive. *Id.* at 208-09.

46.     "[A] lifetime in prison is a disproportionate sentence for all but the rarest of juveniles, those whose crimes reflect 'irreparable corruption.'" *Id.* at 195 (quoting *Miller,* 567 U.S. at 479-80 (quoting *Roper,* 543 U.S. at 573).

47.     "*Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.'" *Id.* at 208 (quoting *Miller*, 567 U.S. at 479).

48.     "*Miller*'s conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." *Id.* at 212.

## C. For those who are not "irreparably corrupt," there must be a meaningful and realistic opportunity to obtain release, and Kansas's parole system fails to meet this standard.

49.     Plaintiff adopts and incorporates every allegation in the paragraphs above.

50.     The Eighth Amendment forbids for all but the rarest juveniles a "sentence [that] guarantees he will die in prison, without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes." *Graham,* 560 U.S. at 79.

51.     To avoid this unconstitutionally disproportionate punishment for juveniles, a state must provide "some meaningful opportunity to obtain release

based on demonstrated maturity and rehabilitation.'" *Miller*, 567 U.S. at 479 (quoting *Graham,* 560 U.S. at 75).

52.     "The 'remote possibility' of [executive clemency] does not mitigate the harshness of the [LWOP] sentence." *Graham,* 560 U.S. at 70 (citing *Solem v. Helm,* 463 U.S. 277, 300-01 (1983)).

53.     In *Solem*, the Supreme Court explained the differences between clemency and parole: "As a matter of law, parole and commutation are different concepts, despite some surface similarities.  Parole is a regular part of the rehabilitative process.  *Assuming good behavior, it is the normal expectation in the vast majority of cases.*  The law generally specifies when a prisoner will be eligible to be considered for parole, and details the standards and procedures applicable at that time.  Thus it is possible to predict, at least to some extent, when parole might be granted.  Commutation, on the other hand, is an *ad hoc* exercise of executive clemency.  A Governor may commute a sentence at any time for any reason without reference to any standards."  (internal citations omitted; emphasis added).  *Id.*

54.     "Allowing [juvenile] offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity-and who have since matured will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, 577 U.S. at 212.

55.     Mr. Makthepharak "must be given the opportunity to show [his] crime did not reflect irreparable corruption; and, if it did not, [his] hope for some years of life outside prison walls must be restored." *Id.* at 213.

56.     "Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation.  A young person who knows that he or she has no [expectation other than to die in] prison … has little incentive to become a responsible individual." *Graham,* 560 U.S. at 79.

57.    "In some prisons, moreover, the system itself becomes complicit in the lack of development. … [I]t is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration.  A categorical rule against [LWOP] for juvenile nonhomicide offenders avoids the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term."  *Id.* (citation omitted).

58.    Accordingly, the Tenth Circuit has recognized that when a juvenile is sentenced to a life term with the theoretical possibility of some form of parole, if that possibility does not actually provide a meaningful opportunity to demonstrate maturity and rehabilitation, it violates the Eighth Amendment.  *Rainer v. Hansen*, 952 F.3d 1203, 1210 (10th Cir. 2020).  In 2022, the Tenth Circuit reversed the dismissal of a 42 U.S.C. § 1983 petition for declaratory and injunctive relief challenging such a sentence in Oklahoma on those grounds, that Oklahoma's discretionary parole system for juveniles sentenced to life in prison is insufficient to provide that meaningful opportunity.  *Thomas v. Stitt*, No. 21-6011, 2022 WL 289661 (10th Cir. Feb. 1, 2022).

## II. Kansas's policies and practices subject Mr. Makthepharak to unconstitutionally disproportionate punishment by denying a meaningful and realistic opportunity for release regardless of individual merit.

### A. Overview of how Kansas violates Mr. Makthepharak's constitutional rights.

59.    Plaintiff adopts and incorporates every allegation in the paragraphs above.

60.    Kansas's current practices effectively guarantee that Mr. Makthepharak and those similarly situated, whose sentences encompass a theoretical opportunity for parole, will die in prison no matter how thoroughly he has been reformed, all without adequate consideration of his youth status.

61.     Currently, and at the time of Mr. Makthepharak's conviction, Kansas law permits life sentences for youth in certain non-homicide cases, *see, e.g.*, K.S.A. § 21-6627, and mandates life sentences in all cases of murder.  *See* K.S.A. § 21-6806(c).  In practice, Kansas denies those sentenced under these law any meaningful opportunity for release on parole regardless of demonstrated rehabilitation.  This violates the rights of Mr. Makthepharak under the Eighth Amendment and Section 9 of the Kansas Bill of Rights.

62.     Although Kansas law describes life sentences as "parole-eligible," in practice Mr. Makthepharak will never be paroled, regardless of his demonstrated maturity, rehabilitation, or other individual aspects of his record.

63.     Kansas's parole scheme for people like Mr. Makthepharak sentenced to life in prison for murders as juveniles is a system of parole in name only.  In all significant respects, it is an *ad hoc* system of executive clemency in which opportunities for release are all but non-existent.  It fails to afford Mr. Makthepharak and those similarly situated to a meaningful and realistic opportunity for release upon demonstrated maturity or rehabilitation.

64.     As a matter of law, the authority to parole Mr. Makthepharak is exclusively in the hands of the Secretary of Corrections, a gubernatorial appointee, and three of his appointees, without any transparency, constraints, standards, or mechanisms for review and without regard for an individual's juvenile status at time of offense.

65.     Moreover, the state's parole policies and practices make no distinction between youth and adults, fail to adequately consider the attributes of youth, and rely on risk assessment tools that penalize those who were young at the time of offense, all while fundamentally impeding individuals from vindicating their rights to a meaningful opportunity for release.

66.     By categorically barring those sentenced to life for homicides, including juveniles, from progression to security classifications within the DOC below medium-high, Kansas denies opportunities to progress through the DOC system to demonstrate their maturity and rehabilitation, in violation of the Eighth Amendment and § 9 of the Kansas Bill of Rights.

67.     By operating a scheme in which the only opportunity for release is *ad hoc* and unreviewable executive action, devoid of standards, by which it is nearly impossible to actually obtain release regardless of individual merit, Kansas's policies and practices convert life sentences into *de facto* LWOP sentences.  As applied to Mr. Makthepharak, as well as those similarly situated, this subjects him to unconstitutionally disproportionate punishment in violation of the Eighth Amendment and § 9 of the Kansas Bill of Rights.

### B. Kansas mandates life (i.e., "imprisonment for life") sentences for juveniles whose crimes do not reflect irreparable corruption.

68.     Plaintiff adopts and incorporates every allegation in the paragraphs above.

69.     Mr. Makthepharak is serving a life sentence in Kansas that purports to be parole-eligible.

70.     Just like Mr. Makthepharak, many other juveniles in Kansas were sentenced under a mandatory sentencing scheme that mandates life sentences in any case of murder regardless of a person's juvenile status.  *See* K.S.A. § 21-6806(c).

71.     As a matter of law, both now and at the time of Mr. Makthepharak's conviction, a conviction for murder and subsequent punishment of life imprisonment means "imprisonment for life and shall not be subject to statutory provisions for suspended sentence, community service or probation," as prescribed in K.S.A. § 21-6806(c).  This ensures Mr. Makthepharak will spend the remainder of his natural life in the custody of the DOC.  Under Kansas law, "a life sentence

mean[s] [defendant] could spend 'the rest of [his] natural life' in prison." *State v. Denmark-Wagner*, 292 Kan. 870, 880, 258 P.3d 960 (2011).

72.     At the same time, and also as a matter of law, there is no protectable liberty interest in parole in Kansas. *Gilmore v. Kansas Parole Board*, 243 Kan. 173, 180, 756 P.2d 410 (1988).  Rather, under Kansas law, because parole is entirely discretionary, "the Kansas parole statute does not give rise to a liberty interest when the matter before the Board is the granting or denial of parole to one in custody." *Id.*

73.     There is no minimum age for being charged with murder or receiving a mandatory life sentence in Kansas.  Additionally, Kansas law gives judges absolute discretion in deciding whether or not sentences are to be served concurrently or consecutively with any other sentence.  *See* K.S.A. § 21-6606(a).

74.     At the time of Mr. Makthepharak's conviction and his sentencing to life imprisonment, an offender's youth generally was only considered in passing in life-sentence cases, if ever considered at all, as the life sentence was mandatory and considered to be for the duration of the defendant's natural life.

75.     At the time Mr. Makthepharak was convicted and sentenced to be in the custody of the DOC for the duration of his natural life, the sentencing court did not consider his youth status or attendant characteristics before imposing that sentence.  Moreover, without a liberty interest in meaningful consideration for parole, in which no due process attaches, Mr. Makthepharak continues to be subjected to cruel and unusual punishment under Kansas's mandatory sentencing scheme.

**C. Kansas's parole scheme operates as a system of clemency that fails to afford Mr. Makthepharak and those similarly situated a meaningful and realistic opportunity for release upon demonstrated maturity and rehabilitation.**

**1. The Secretary of Corrections' authority is exclusive and devoid of standards.**

76.     Plaintiff adopts and incorporates every allegation in the paragraphs above.

77.     In Kansas, by statute, parole for an indeterminate or off-grid sentence, such as a life sentence that Mr. Makthepharak has, is effectively solely at the discretion of the Secretary of Corrections.  *See* K.S.A. §§ 22-3717(g) and 75-5210a.

78.     Within "a reasonable time after a defendant is committed to the custody of the secretary of corrections," solely at the discretion of the Secretary of Corrections, "the secretary shall enter into a written agreement with the inmate specifying those educational, vocational, mental health or other programs which the secretary determines the inmate must satisfactorily complete in order to be prepared for release on parole supervision."  § 75-5210a.

79.     Whether the inmate has satisfied this is further entirely at the Secretary of Corrections' discretion, who may revise the agreement at any time without any standards or oversight: "The agreement shall be conditioned on the inmate's satisfactory conduct, employment and attitude while incarcerated.  If the secretary determines that the inmate's conduct, employment, attitude or needs require modifications or additions to those programs which are set forth in the agreement, the secretary shall revise the requirements.  The secretary shall agree that, when the inmate satisfactorily completes the programs required by the agreement, or any revision thereof, the secretary shall report that fact in writing to the prisoner review board.  If the inmate becomes eligible for parole before

satisfactorily completing such programs, the secretary shall report in writing to the board the programs which are not completed." *Id.*

80.    The Secretary of Corrections appoints the Prisoner Review Board and names its Chair and Vice-Chair, all of whom serve solely at the discretionary pleasure of the Secretary.  K.S.A. §§ 22-3709, 75-5205, and 75-52152.

81.    *Only* if "the secretary of corrections has reported to the board in writing that the inmate has satisfactorily completed the programs required by any agreement entered under K.S.A. 75-5210a, and amendments thereto, or any revision of such agreement," may the Prisoner Review Board proceed to consider the parole further.  K.S.A. § 22-3717(g)(2).

82.    There are no substantive statutory or regulatory factors guiding, limiting, or in any way constraining the Secretary of Corrections' decision-making regarding the content of the agreement with the inmate, whether the inmate has satisfied it, or whether it needs revision.

83.    Nothing requires the Secretary of Corrections to consider an individual's youth at the time of offense in exercising his or her discretion for parole, and all evidence suggests youth is never a fact considered, given that Mr. Makthepharak was denied parole solely because he did not take responsibility for the offense.

84.    The Secretary of Corrections is under no obligation to announce the bases upon which he fashions the content of the agreement with the inmate or decides  whether the inmate has satisfied it or whether it needs modification, and neither the Secretary of Corrections nor any other department has promulgated or issued any written, publicly available guidance about any such criteria.  Even if a Secretary of Corrections did announce such criteria, he or she would not be bound by them and would be under no obligation to adhere to them, and could change them at any time without notice or explanation.

85.     Notably, under the unambiguous text of Kansas law, the Secretary of Corrections possesses unfettered discretion to determine an inmate's agreement has not been satisfied or needs further modification for any reason whatsoever or for no reason at all.  Additionally, there is no process for appeal or review of the Secretary's decision by anyone in either case.

86.     This statutory framework has remained largely unchanged since at least 1993.

### 2. Prisoner Review Board policies and practices, combined with the scheme of executive clemency, deny Mr. Makthepharak and those similarly situated a meaningful and realistic opportunity for release.

87.     Plaintiff adopts and incorporates every allegation in the paragraphs above.

88.     The policies and practices of the Prisoner Review Board exacerbate Kansas's unconstitutional parole scheme, which functions as a system of executive clemency rather than parole with respect to those who were juveniles at the time of the commission of their crimes, including Mr. Makthepharak.

89.     The Prisoner Review Board's policies and practices make no distinction between youth and adults, fail to consider adequately the attributes of youth, and in some respects disproportionately penalize those who were youth at the time of the offense, all while fundamentally impeding individuals from vindicating their right to a meaningful and realistic opportunity for release.

90.     The Prisoner Review Board's policies make no distinction between those whose offenses occurred as youth and those whose offenses occurred as adults.

91.     Even if the Secretary of Corrections reports to the Prisoner Review Board that a juvenile sentenced to life has satisfied his agreement, none of the further statutory factors to be considered in determining whether an individual is

20

suitable for parole includes consideration of youth at the time of the offense. *See* K.S.A. § 22-3717(g)(2) and (h)(2). Upon information and belief, Mr. Makthepharak avers that Prisoner Review Board members receive no training pertaining to adolescent psychological development or any other training that would assist members in contextualizing offenses committed by youth in accordance with the requirements of *Roper, Graham, Miller,* and *Montgomery.*

92. The discretionary parole process in Kansas provides no evidentiary rules, no right to obtain expert assistance or testimony, no cross-examination, no compulsory process, no right to the assistance of counsel, and cannot meet the meaningful requirements under the constitution and enforce *Miller's* concerns. *See* KAR 45-200-1. In Kansas, for any inmate serving a life sentence, the parole process occurs in two stages. The first stage is a report from the Secretary of Corrections whether the inmate has satisfied his agreement. The vast majority of inmates are denied at that point. And the inmate has no right to challenge the Secretary's unilateral determination.

93. The Prisoner Review Board is not required to provide any verbal or written explanation of its decision, though it sometimes does so perfunctorily, as it did to Mr. Makthepharak.

94. Moreover, Prisoner Review Board practices penalize Mr. Makthepharak and others similarly situated by relying on risk assessment tools that assess the individual as if frozen in time upon their arrival to the DOC rather than who he or she is at the time of assessment. These tools take no account of Mr. Makthepharak's maturation over time, accomplishments, or institutional record. Rather, they penalize those whose were youth on arrival to the DOC by assessing them as they were when they were most risky and too young to have developed factors that the tools deem "protective" against recidivism. By utilizing these tools, the Prisoner Review Board virtually ensures Mr. Makthepharak will demonstrate a

moderate to high level of risk even when he is thoroughly rehabilitated and presents little or no risk.

95.     The Prisoner Review Board takes the position that its recommendations and communications with the Secretary of Corrections are privileged, regardless of whether they are recommendations for parole or commutation.

### 3. DOC policies automatically deny Mr. Makthepharak, as well as those similarly situated, rehabilitative opportunities that affect his opportunity for release.

96.     Plaintiff adopts and incorporates every allegation in the paragraphs above.

97.     The Secretary of Corrections has adopted policies that bar those serving life sentences from moving below medium-high security status regardless of the individual's institutional record.  The Secretary of Corrections further has adopted policies that categorically bar those serving life sentences, including juveniles, from eligibility for work release and community corrections.

98.     In the DOC, security classifications determine virtually all aspects of an individual's conditions of confinement.  An individual's security classification determines in which institutions he or she may be housed, the level of restriction upon his or her freedom of movement, and all aspects of programmatic eligibility, including access to treatment, training, and employment.

99.     The Secretary of Corrections has promulgated a regulation that an inmate's security classification is determined by the Security Classification Manual. KAR 44-5-104.  The Security Classification Manual is available online on the DOC's website.  *See* https://www.doc.ks.gov/publications/kdoc-facilities-management/custody_manual.

100. From lowest to highest, the DOC's security classification levels are Minimum, Medium Low, Medium High, and Maximum. The classification scheme is a score-based system that assigns and increases points based on certain factors to determine at which security level an individual may be safely assigned. To carry out this scheme, the DOC assesses an inmate's score and then periodically reassesses it.

101. Under the Security Classification Manual, a juvenile with prior convictions convicted of murder and sentenced to life will always score no less than 12, meaning he will never be able to move below medium high.

102. Yet, because of their differences from adults, juveniles arrive at the DOC more susceptible to being assaulted and preyed upon, and with greater need for supportive programming and for opportunities that will enable them to be rehabilitated. Categorically assigning Mr. Makthepharak and those serving life sentences to no lower than medium high security, and barring them from any further progression through the DOC system regardless of any individualized determination or merit, unlawfully denies them a core component of a meaningful and realistic opportunity for release.

103. As noted above, the DOC's security classification assessment automatically scores juveniles serving life sentences higher by virtue of their mandatory life sentences and the nature of their offenses. The same is true for the re-classification assessment. No matter how Mr. Makthepharak scores on the assessment, he is categorically barred from moving below medium high security regardless of his record of accomplishment. In this way, the DOC's scheme reinforces the inability to attain opportunities for release for juveniles serving life sentences.

104. Because virtually every aspect of programming is determined by an individual's classification level, the prohibition against movement below medium

high security prevents Mr. Makthepharak from progressing through the DOC and properly demonstrating his maturity and rehabilitation regardless of individual merit. Similarly, he is severely limited in his ability to demonstrate rehabilitation through the gradual earning of additional privileges and the ability to demonstrate success in lower security settings.

### IV. Mr. Makthepharak's rights have been violated and he suffers grave harms as a result of Kansas's system of *de facto* life without parole.

105. Plaintiff adopts and incorporates every allegation in the paragraphs above.

106. As a result of the policies and practices of Defendants, and illustrated by their refusal to recommend parole simply because of factors associated with Mr. Makthepharak's convicted offense, principally that he did not take responsibility for the offense, Mr. Makthepharak has been and consistently will be denied any meaningful and realistic opportunity to obtain release based on demonstrated maturity and rehabilitation.

107. Mr. Makthepharak, as well as every inmate within the DOC in his position, has come to regard parole proceedings as futile and meaningless, and the idea of parole as completely illusory. No matter how well he may behave, how consistently he may demonstrate his trustworthiness, or how much he matures, he can never progress below medium high security to lesser classifications that will allow him to demonstrate further his readiness for release.

108. Similarly, the risk assessment tools penalize Mr. Makthepharak and others similarly situated for their youthfulness at the time of their offense and totally fail to consider their institutional history and record of accomplishment since incarceration.

109.    As such, Mr. Makthepharak has suffered, and continues to suffer, violation of his rights under the Eighth Amendment and § 9 of the Kansas Bill of Rights.

110.    Mr. Makthepharak was a juvenile at the time the offenses were committed and was sentenced to imprisonment for life, where this sentence guarantees death behind bars for crimes committed as a child under Kansas's mandatory sentencing scheme and without adequate consideration of his youth status, for his role in a murder that occurred when he was 16 years old, and decades later is being deprived of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation, in contravention of his federal constitutional rights.

111.    Mr. Makthepharak is now 38 years old.  He has spent 22 years, more than half of his lifetime, incarcerated for these offenses.

112.    Mr. Makthepharak was sentenced to life in prison under Kansas's mandatory sentencing scheme for felony murder.  Nothing in Mr. Makthepharak's record suggests, nor was any finding ever made, that his crime reflected that he was among the "rarest juvenile[s] whose crime reflects permanent incorrigibility."

113.    At his parole consideration date, the Prisoner Review Board denied Mr. Makthepharak at the outset, based on his failure to take responsibility for the offense.  It is unknown what the Secretary's position was, but on information and belief it was – and always will be – that Mr. Makthepharak has not satisfactorily completed his illusory and changeable "agreement."

114.    When Mr. Makthepharak first arrived in the DOC, because he was serving a life sentence, and because of his young age, he was automatically designated as "maximum" security despite his youth.  Mr. Makthepharak is categorically prohibited from moving below medium high security.

115.    Mr. Makthepharak has been denied, continues to be denied, and unless remedied by this Court will continue to be denied, a meaningful and realistic opportunity for release, in that: (1) he is unable to move below medium high security regardless of his institutional record, and thus he is barred from developing skills that allow him to demonstrate his rehabilitation; (2) he is denied any explanation for what additional steps he must take to be recommended for parole; (3) he has been discriminated against with respect to his opportunities for rehabilitation and release by Defendants' use of risk assessment tools that hold his youth at the time of offense against him; (4) he is subjected to a parole system that operates no differently than a system of executive clemency; and (5) he is subjected to parole practices that penalize him for his offense, as well as for his young age at the time of his offense.

**Causes of Action**

**Count One:**

**Violation of the Eighth Amendment's prohibition against cruel and unusual punishment and 42 U.S.C. § 1983**

(Mr. Makthepharak against all Defendants)

116.    Plaintiff adopts and incorporates every allegation in the paragraphs above.

117.    The Eighth Amendment forbids a statutory scheme that mandates life imprisonment for juveniles or permits life sentences for juveniles in non-homicide cases without adequate regard for their status as minors, and then denies them a meaningful opportunity for release upon demonstrated maturity and rehabilitation. A meaningful opportunity for release includes the opportunity to demonstrate rehabilitation.

118.    Defendants operate a parole scheme that is indistinguishable from a system of *ad hoc* executive clemency in which grants of release are exceptionally

26

rare, are governed by no substantive or enforceable standards, and are masked from view by the public and the inmate whose liberty is at stake.

119.    Kansas's illusory parole system, in which Mr. Makthepharak's life sentence is *de facto* without parole, as applied to Mr. Makthepharak, has not afforded him a meaningful and realistic opportunity for release, in violation of the Eighth Amendment.

120.    Moreover, the Prisoner Review Board's application here of risk assessment tools that discriminate against youth has denied Mr. Makthepharak a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of the Eighth Amendment.

121.    The DOC's practice of automatically classifying all those in Mr. Makthepharak's position sentenced to life as juveniles as no lower than medium high security denies Mr. Makthepharak critical rehabilitative opportunities that are essential to his ability to demonstrate maturity and rehabilitation.

122.    Mr. Makthepharak has been injured by Defendants' policies and practices by being denied his right to a meaningful opportunity for release from imprisonment notwithstanding his youth at the time of his offense and despite his demonstration of rehabilitation, in violation of the Eighth Amendment, giving rise to his claims for relief under 42 U.S.C. § 1983.

### Count Two

### Violation of Section 9 of the Kansas Bill of Rights' prohibition against cruel or unusual punishment

(Mr. Makthepharak Against all Defendants)

123.    Plaintiff adopts and incorporates every allegation in the paragraphs above.

124.    Section 9 of the Kansas Bill of Rights forbids a system that mandates life imprisonment for juveniles without adequate regard for their status as minors,

and then denies them a realistic and meaningful opportunity for release. A meaningful opportunity for release includes the opportunity to demonstrate maturity and rehabilitation.

125. Defendants operate a parole scheme that is indistinguishable from a system of *ad hoc* executive clemency in which grants of release are exceptionally rare, are governed by no substantive or enforceable standards, and are masked from view by the public and the inmate whose liberty is at stake.

126. Moreover, the Prisoner Review Board's application here of risk assessment tools that discriminate against youth has denied Mr. Makthepharak a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of Section 9 of the Kansas Bill of Rights.

127. Moreover, the Prisoner Review Board's application here of risk assessment tools that discriminate against youth has denied Mr. Makthepharak a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of Section 9 of the Kansas Bill of Rights.

128. The DOC's practice of automatically classifying all those in Mr. Makthepharak's position sentenced to life as juveniles as no lower than medium high security denies Mr. Makthepharak critical rehabilitative opportunities that are essential to his ability to demonstrate maturity and rehabilitation.

129. Mr. Makthepharak has been injured by Defendants' policies and practices by being denied his right to a meaningful opportunity for release from imprisonment notwithstanding his youth at the time of his offense and despite his demonstration of maturity and rehabilitation, in violation of the Eighth Amendment and Section 9 of the Kansas Bill of Rights.

### Count Three

**For declaratory judgment that K.S.A. §§ 22-3717(g)-(h) and 75-5210a are unconstitutional as applied to Mr. Makthepharak**

(Mr. Makthepharak Against all Defendants)

130.    Plaintiff adopts and incorporates every allegation in the paragraphs above.

131.    The Eighth Amendment requires youth status to be considered and a finding of "irreparable corruption" before juveniles may be sentenced to life without a meaningful opportunity for release.

132.    K.S.A. §§ 22-3717(g)-(h) and 75-5210a violate the prohibition against cruel and unusual punishment under the Eighth Amendment and § 9 of the Kansas Bill of Rights because they mandate what the Secretary of Corrections and the Prisoner Review Board consider in order to parole individuals sentenced to life irrespective of any consideration of the youth status of the offender.

133.    Mr. Makthepharak has been injured by parole consideration under these statutes by being denied adequate consideration of his youth before being denied parole without a meaningful and realistic opportunity for release upon his demonstrated maturity and rehabilitation, in violation of the Eighth Amendment and Section 9 of the Kansas Bill of Rights.

### **Prayer for Relief**

**WHEREFORE,** Mr. Makthepharak requests the Court to:

(1) Declare under 28 U.S.C. §§ 2201-2202 that Defendants have operated, and continue to operate, a parole scheme that denies individuals, such as Mr. Makthepharak, who are serving parole-eligible life sentences for offenses committed as a juvenile, a meaningful and realistic opportunity for release, in violation of the prohibition against cruel and unusual punishment in the Eighth Amendment to the

Constitution of the United States and the prohibition against cruel or unusual punishment in § 9 of the Kansas Bill of Rights;

(2) Declare under 28 U.S.C. §§ 2201-2202 that Mr. Makthepharak is serving a *de facto* LWOP sentence under which he has not been afforded any meaningful or realistic opportunity for release, in violation of the prohibitions against cruel and unusual punishment in the Eighth Amendment and § 9 of the Kansas Bill of Rights;

(3) Declare under 28 U.S.C. §§ 2201-2202 that K.S.A. § 75-5210a, which grants the Secretary of Corrections the exclusive authority to fashion the conditions of parole-ability for an inmate serving a parole-eligible life sentence, is unconstitutional as applied to individuals, including Mr. Makthepharak, who were juveniles at the time of their offenses;

(4) Declare under 28 U.S.C. §§ 2201-2202 that K.S.A. § 22-3717(g)-(h), precluding the Parole Review Board from granting parole to an inmate serving a parole-eligible life sentence without the approval of the Secretary of Corrections, and setting the further factors the Parole Review Board should consider, is unconstitutional as applied to individuals, including Mr. Makthepharak, who were juveniles at the time of their offenses;

(5) Declare under 28 U.S.C. §§ 2201-2202 that Defendants' reliance on risk assessment tools that discriminate against those who were juveniles at the time of their offense to assess opportunities for release has denied Mr. Makthepharak a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of the Eighth Amendment and § 9 of the Kansas Bill of Rights;

(6) Declare under 28 U.S.C. §§ 2201-2202 that Defendants have denied Mr. Makthepharak and those similarly situated, a meaningful and realistic opportunity for release by denying him access to critical rehabilitative opportunities through policies and practices automatically classifying him as no lower than medium high security and prohibiting him from progressing to security levels below medium high

regardless of individual merit, in violation of the prohibitions against cruel and unusual punishment in the Eighth Amendment and § 9 of the Kansas Bill of Rights;

(7) Enjoin Defendants immediately to discontinue these practices and to take remedial steps to address their past illegal conduct, by granting Mr. Makthepharak, and those similarly situated, a meaningful and realistic opportunity to demonstrate his readiness for release, including fashioning what Defendants must meet in order to do so, which includes but is not limited to:

- Ending the Secretary of Corrections' unilateral determination of the conditions of parole-ability for an inmate sentenced as a juvenile to a parole-eligible life sentence;

- Requiring the Parole Review Board to disclose to the inmate all evidence to be considered before a parole hearing;

- Requiring the Parole Review Board to provide the inmate an opportunity to be heard and present evidence in support of release;

- Requiring the Parole Review Board to provide the inmate a right to hear and confront adverse witnesses as necessary;

- Requiring the Parole Review Board to make a recording of every parole interview for the purposes of administrative and judicial review;

- Requiring the Parole Review Board to prepare a written decision that is comprehensible and sufficiently detailed for a reviewing court to evaluate;

- Requiring the Secretary of Corrections and the Parole Review Board to focus their parole inquiry as to these inmates on rehabilitation rather than the crime severity or older institutional disciplinary history, make the mitigation of youth central to the parole interview and decision, and create a presumption of relief for inmates sentenced as juveniles to parole-eligible life sentences;

- Requiring the Governor, the Secretary of Corrections and the Parole Review Board to institute a meaningful administrative and judicial process to review decisions of the Parole Review Board;

(8) Award Mr. Makthepharak his costs, expenses, and attorney fees under 28 U.S.C. § 1988; and

(9) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*Jonathan Sternberg, Attorney, P.C.*

by /s/Jonathan Sternberg
    Jonathan Sternberg, Kan. #25902
    2323 Grand Boulevard #1100
    Kansas City, Missouri 64108
    Telephone: (816) 292-7020
    Facsimile: (816) 292-7050
    jonathan@sternberg-law.com

    COUNSEL FOR PLAINTIFF

Certificate of Service

I certify that on April 12, 2023, I mailed a true and accurate copy of the foregoing to each of the following defendants:

Hon. Laura Kelly, Governor
Kansas State Capitol
300 SW 10th Avenue, Suite 241S
Topeka, Kansas 66612

Mr. Jeff Zmuda,
    Secretary of Corrections
Kansas Department of Corrections
714 Southwest Jackson, Suite 300
Topeka, Kansas 66603

Mr. Jonathan Ogletree,
    Chair, Prisoner Review Board
Kansas Department of Corrections
714 Southwest Jackson, Suite 300
Topeka, Kansas 66603

Ms. Jeannie Wark,
    Member, Prisoner Review Board
Kansas Department of Corrections
714 Southwest Jackson, Suite 300
Topeka, Kansas 66603

Mr. Mark Keating,
    Member, Prisoner Review Board
Kansas Department of Corrections
714 Southwest Jackson, Suite 300
Topeka, Kansas 66603

/s/Jonathan Sternberg
Attorney