UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SASHADA MAKTHEPHARAK,

      Plaintiff,

      v.

LAURA KELLY, ET AL,

      Defendants.

Case No. 23-2121-DDC-RES

**PRETRIAL ORDER**

On October 8, 2024, U.S. Magistrate Judge Rachel E. Schwartz conducted a pretrial conference in this case by phone. Plaintiff Sashada Makthepharak appeared through counsel Jonathan Sternberg. Defendants Governor Laura Kelly, Secretary of Corrections Jeff Zmuda, current members of the Kansas Prisoner Review Board ("KPRB") Jeannie Wark and Mark Keating, and former member of the KPRB Jonathan Ogletree ("Defendants") appeared through counsel Matthew L. Shoger and Shon D. Qualseth.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

1.     **PRELIMINARY MATTERS.**

     a.     **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343, and 2201, and is disputed. Defendants object to § 2201 being invoked because the Tenth Circuit has stated "the Declaratory Judgment Act does not confer jurisdiction upon federal courts." *Devon Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012). Defendants assert Eleventh Amendment immunity, contest that Plaintiff

has constitutional standing, contest that Plaintiff's claims are ripe, and assert that Plaintiff's claims are moot as outlined in Defendant's Defenses, *infra*.

      **b.**    **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

      **c.**    **Venue.**  Venue in this court is not disputed.

      **d.**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law: 42 U.S.C. § 1983 and the Eighth Amendment.

**2.**    **STIPULATIONS.**

      **a.**    The following facts are stipulated:

            **i.**    Plaintiff Sashada Makthepharak is an inmate in the custody of the Kansas Department of Corrections ("DOC"), DOC ID #73697, confined in the Lansing Correctional Facility located at 301 East Kansas Avenue, Lansing, Kansas 66043.  Plaintiff was born 1984.  In October 2001, when Plaintiff was a 16-year-old juvenile, a jury in the District Court of Sedgwick County, Kansas convicted him of first-degree murder under a felony-murder theory in violation of K.S.A. § 21-3401(b) (1995), aggravated burglary in violation of K.S.A. § 21-3716, and criminal possession of a firearm in violation of K.S.A. § 21-4204(a)(3).  The offenses occurred in May 2001, when Plaintiff was a 16-year-old juvenile, and a juvenile court referred the case to the criminal court.  In December 2001, Plaintiff was sentenced under K.S.A. §§ 21-4706(c) (2001 Supp.) and 22-3717(b)(2) (2001 Supp.) to life in prison without eligibility for parole for 20 years for the felony murder count, the statutorily mandatory sentence for that offense.  The court sentenced him to 64 months in prison on the other counts, to be served consecutively.

            **ii.**    Plaintiff was tried as an adult.

            **iii.**    Plaintiff is currently incarcerated at Lansing Correctional Facility.

            **iv.**    KDOC currently uses the Custody Classification Manual for Men, revised March 2024, which is located at: https://www.doc.ks.gov/publications/kdoc-facilities-management.

            **v.**    On March 31, 2021, Plaintiff had a parole hearing before the Kansas Prisoner Review Board (KPRB) that lasted approximately 55 minutes.

vi.      The KPRB allows inmates to have an attorney attend the inmate's parole hearing. Counsel is not appointed.

vii.      An audio recording was made of the parole hearing.

viii.      Plaintiff participated in the parole hearing.

ix.      All three members of the KPRB (Jonathan Ogletree, Jeannie Wark, and Mark Keating) participated in the parole hearing.

x.      Plaintiff was interviewed during his parole hearing.

xi.      Secretary Zmuda did not personally appear at or participate in the parole hearing.

xii.      Governor Kelly did not personally appear at or participate in the parole hearing.

xiii.      Plaintiff received and signed a written action notice on April 16, 2021, regarding his denial of parole. The action notice included a "decision of the Prisoner Review Board" regarding Plaintiff's parole. The action notice stated that parole would be passed to May 1, 2024.

xiv.      Plaintiff did not contest the parole decision through a habeas corpus action.

xv.      The process for pardons and commutations is separate from the parole process.

xvi.      Plaintiff applied for a pardon from Governor Kelly, but received notice that he was denied a pardon in a letter from the Governor's office dated June 22, 2022.

xvii.      Plaintiff had another parole hearing on April 4, 2024.

xviii.      Plaintiff received a written action notice in late April 2024 regarding his denial of parole.

xix.      The action notice stated that parole would be passed to May 2025.

b.      The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment:

i.      Action Notice for Plaintiff's 2021 parole hearing, dated as received by Plaintiff April 16, 2021

3

    **ii.**    Packet of information provided to Plaintiff prior to his March 31, 2021 parole hearing, including Youthful Offender Information Acknowledgement, dated February 25, 2021

    **iii.**    Letter from Plaintiff to the Prisoner Review Board, dated March 2, 2021

    **iv.**    Plaintiff's Inmate Program Plan, dated February 7, 2002

    **v.**    KDOC Custody Classification Manual for Men, dated March 2024

    **vi.**    Letter from the Governor's office denying Plaintiff's request for clemency, dated June 22, 2022

    **vii.**    Action Notice issued after Plaintiff's April 4, 2024, parole hearing

    **viii.**    Plaintiff's Response to Defendants' First Set of Requests for Admission to Plaintiff

    **ix.**    Plaintiff's Response to Defendants' First Set of Interrogatories to Plaintiff

    **x.**    Defendants' Response to Plaintiff's First Requests for Production of Documents and Things to Defendants

    **xi.**    Defendants' Response to Plaintiff's First Interrogatories to Defendants

**3.**    **FACTUAL CONTENTIONS.**

    **a.**    **Plaintiff's Factual Contentions.**

        **i.**    **The Defendants**

Defendant Laura Kelly is the Governor of the State of Kansas and a resident of Kansas, and in her official capacity was working under color of state law when the allegations in this complaint arose.  In her capacity as Governor, Governor Kelly appoints the Kansas Secretary of Corrections, subject to confirmation by the Kansas Senate, who serves at her pleasure.  K.S.A. § 75-5205.  In her capacity as Governor, Governor Kelly decides whether any individual will receive a grant of executive clemency.  Governor Kelly is sued in her official capacity.

Defendant Jeff Zmuda, a resident of Kansas, is the Kansas Secretary of Corrections and in his official capacity was working under color of state law when the allegations in this complaint arose.  Mr. Zmuda was appointed by Governor Kelly in 2019 and confirmed by the Senate in 2020.

Mr. Zmuda serves at Governor Kelly's pleasure.  Mr. Zmuda is sued in his official capacity.  In his capacity as Secretary of Corrections, Mr. Zmuda is the chief executive of the DOC, and is responsible, among other things, for:

- managing the state-operated prisons in which prisoners serving life sentences are housed, and for the education, training, vocational education, rehabilitation and recreation of prisoners under the jurisdiction of the DOC, as well as the transfer of prisoners from one penal institution to another, including how individuals are assigned to any particular security status or facility;

- appointing the Prisoner Review Board consisting of three members who are existing employees of the DOC and serve at his pleasure, and for administering the Prisoner Review Board under his supervision, a majority vote of which is necessary to grant parole to a prisoner serving a life sentence, K.S.A. § 75-52152;

- designating the chairperson and vice-chairperson of the Prisoner Review Board, K.S.A. § 22-3709;

- putting together agreements with inmates specifying those educational, vocational, mental health or other programs which he determines the inmate must satisfactorily complete in order to be prepared for release on parole supervision, K.S.A. § 75-5210a(a), completion of which is a requirement for the Prisoner Review Board to grant an inmate parole, K.S.A. § 22-3713(g); and

- providing the Prisoner Review Board with necessary personnel and accounting services, K.S.A. § 22-3713(b)

Defendant Jonathan Ogletree, a resident of Kansas, is the Chair of the Prisoner Review Board and one of three members of the Prisoner Review Board, and in his official capacity was

working under color of state law when the allegations in this complaint arose.  Mr. Ogletree has been an employee of the Kansas DOC since 1989, was appointed to the Prisoner Review Board by Mr. Zmuda's predecessor and designated the Prisoner Review Board's chair, and serves at Mr. Zmuda's pleasure.  In his capacity as Chair of the Prisoner Review Board, Mr. Ogletree is responsible for organizing and administering the activities of the Prisoner Review Board, which requires a majority vote to grant parole to a prisoner serving a life sentence.  K.S.A. § 22-3709. Mr. Ogletree is sued in his official capacity.

Defendant Jeannie Wark, a resident of Kansas, is one of three members of the Prisoner Review Board, and in her official capacity was working under color of state law when the allegations in this complaint arose.  Ms. Wark is a resident of the State of Kansas.  Ms. Wark has been an employee of the Kansas DOC since 1991, was appointed to the Prisoner Review Board by Mr. Zmuda's predecessor, and serves at Mr. Zmuda's pleasure.  Ms. Wark is sued in her official capacity.

Defendant Mark Keating, a resident of Kansas, is also one of three members of the Prisoner Review Board, and in his official capacity was working under color of state law when the allegations in this complaint arose.  Mr. Keaing is a resident of the State of Kansas.  Mr. Keating has been an employee of the Kansas DOC since 1999, was appointed to the Prisoner Review Board by Mr. Zmuda's predecessor, and serves at Mr. Zmuda's pleasure.  Mr. Keating is sued in his official capacity.

### ii.     Mr. Makthepharak's conviction

Kansas has a mandatory sentencing scheme that requires judges to impose life sentences in first-degree felony murder cases without adequate consideration of youth to determine whether an individual is among the rare minors whose offense reflects "irreparable corruption."  Plaintiff

Sashada Makthepharak was convicted under that scheme.  Indeed, at the time Mr. Makthepharak was convicted and sentenced to be in the custody of the DOC for the duration of his natural life, the sentencing court did not consider his youth status or attendant characteristics before imposing that sentence.  Nothing in Mr. Makthepharak's record suggests, nor was any finding ever made, that his crime reflected that he was among the "rarest juvenile[s] whose crime reflects permanent incorrigibility."

The sentencing scheme is that as a matter of law, both now and at the time of Mr. Makthepharak's conviction, a conviction for murder and subsequent punishment of life imprisonment means "imprisonment for life and shall not be subject to statutory provisions for suspended sentence, community service or probation," as prescribed in K.S.A. § 21-6806(c).  This "life sentence mean[s] [defendant] could spend 'the rest of [his] natural life' in prison."  *State v. Denmark-Wagner*, 292 Kan. 870, 880, 258 P.3d 960 (2011).  There is no minimum age for being charged with murder or receiving a mandatory life sentence in Kansas, and Kansas law gives judges absolute discretion in deciding whether or not sentences are to be served concurrently or consecutively with any other sentence.  *See* K.S.A. § 21-6606(a).

At the same time, both currently and at the time of Mr. Makthepharak's conviction, Kansas law permits life sentences for youth in certain non-homicide cases, *see, e.g.*, K.S.A. § 21-6627, and mandates life sentences in all cases of murder.  *See* K.S.A. § 21-6806(c).

Mr. Makthepharak now has served more than 20 years on his life sentence.  He is now 39 years old.  He has spent 23 years, more than half his lifetime, incarcerated for offenses committed at age 16.

### iii.    Kansas's parole scheme and its application to Mr. Makthepharak

Mr. Makthepharak's life sentence is parole-eligible after 20 years of incarceration.

But in Kansas, as a matter of law, there is no protectable liberty interest in parole in Kansas. *Gilmore v. Kansas Parole Board*, 243 Kan. 173, 180, 756 P.2d 410 (1988).  Rather, under Kansas law, because parole is entirely discretionary, "the Kansas parole statute does not give rise to a liberty interest when the matter before the Board is the granting or denial of parole to one in custody." *Id.*

Kansas law states that parole is governed by an agreement system in which the Secretary of Corrections enters into a written agreement with the inmate, which the Secretary can revise at any time and unilaterally determines the inmate met, and only if the Secretary determines the inmate has satisfied the agreement may he be paroled.

K.S.A. § 75-5210a provides that within "a reasonable time after a defendant is committed to the custody of the secretary of corrections," "the secretary shall enter into a written agreement with the inmate specifying those educational, vocational, mental health or other programs which the secretary determines the inmate must satisfactorily complete in order to be prepared for release on parole supervision."  It further provides that "[t]he agreement shall be conditioned on the inmate's satisfactory conduct, employment and attitude while incarcerated.  If the secretary determines that the inmate's conduct, employment, attitude or needs require modifications or additions to those programs which are set forth in the agreement, the secretary shall revise the requirements.  The secretary shall agree that, when the inmate satisfactorily completes the programs required by the agreement, or any revision thereof, the secretary shall report that fact in writing to the prisoner review board.  If the inmate becomes eligible for parole before satisfactorily completing such programs, the secretary shall report in writing to the board the programs which are not completed."  And to be sure, the Secretary of Corrections appoints the Prisoner Review

Board and names its Chair and Vice-Chair, all of whom serve solely at the discretionary pleasure of the Secretary.  K.S.A. §§ 22-3709, 75-5205, and 75-52152.

Whether an inmate has satisfied the Secretary of Corrections' agreement is entirely at the Secretary of Corrections' discretion, who may revise the agreement at any time without any standards or oversight.  Then, *only* if "the secretary of corrections has reported to the board in writing that the inmate has satisfactorily completed the programs required by any agreement entered under K.S.A. 75-5210a, and amendments thereto, or any revision of such agreement," may the Prisoner Review Board proceed to consider the parole further.  K.S.A. § 22-3717(g)(2).  There are no substantive statutory or regulatory factors guiding, limiting, or in any way constraining the Secretary of Corrections' decision-making regarding the content of the agreement with the inmate, whether the inmate has satisfied it, or whether it needs revision.  The Secretary of Corrections is under no obligation to announce the bases upon which he fashions the content of the agreement with the inmate or decides whether the inmate has satisfied it or whether it needs modification, and neither the Secretary of Corrections nor any other department has promulgated or issued any written, publicly available guidance about any such criteria.  Even if a Secretary of Corrections did announce such criteria, he or she would not be bound by them and would be under no obligation to adhere to them, and could change them at any time without notice or explanation.

This means that the Secretary of Corrections possesses unfettered discretion to determine an inmate's agreement has not been satisfied or needs further modification for any reason whatsoever or for no reason at all.  Additionally, there is no process for appeal or review of the Secretary's decision by anyone in either case.

Therefore, as a matter of Kansas law, the authority to parole any person sentenced to life lies first in the hands of the Secretary of Corrections, an appointee of the Governor, who must make an agreement and plan for the prisoner to meet in order to be paroled, and then exclusively the Prisoner Review Board, who serves at the Secretary of Corrections' pleasure and also is responsible for recommending pardons and other clemency to the Governor.  The authority to parole Mr. Makthepharak is exclusively in the hands of the Secretary of Corrections, a gubernatorial appointee, and three of his appointees, without any transparency, constraints, standards, or mechanisms for review and without regard for an individual's juvenile status at time of offense.

Rather than affording Mr. Makthepharak a meaningful and realistic opportunity for release, Kansas's parole scheme functions as a system of *ad hoc* clemency in which grants of release are exceptionally rare, are governed by no substantive, enforceable standards, and are unreviewable. In fact, in Mr. Makthepharak's case, no matter the level of maturity or rehabilitation or lack of it that he may demonstrate, he is and will be denied parole principally due to the fact that he denies responsibility for the offense in the first place, which occurred when he was a juvenile.

As a result of this system, Kansas and the defendants named in this action lack policies that protect the constitutional rights of Mr. Makthepharak and similarly situated juveniles sentenced to life, to a meaningful and realistic opportunity for release, instead relying on risk assessment tools to make recommendations about release that discriminate against those who were minors at the time of offense and prohibit youth from progressing through the Kansas DOC system to demonstrate their rehabilitation.  This means that Mr. Makthepharak's sentence has been converted into a *de facto* life without parole (LWOP) sentence by virtue of the denial of a meaningful and realistic opportunity for release, for Kansas's current practices effectively guarantee that Mr.

Makthepharak and those similarly situated, whose sentences encompass a theoretical opportunity for parole, will die in prison no matter how thoroughly he has been reformed, all without adequate consideration of his youth status.

Therefore, although Kansas law describes life sentences as "parole-eligible," in practice Mr. Makthepharak will never be paroled, regardless of his demonstrated maturity, rehabilitation, or other individual aspects of his record.

Moreover, Kansas's parole policies and practices make no meaningful distinction between youth and adults, fail to adequately consider the attributes of youth, and rely on risk assessment tools that penalize those who were young at the time of offense, all while fundamentally impeding individuals from vindicating their rights to a meaningful opportunity for release.  Except for the furnishing of a "Youthful Offender Packet" to inmates whose offenses occurred while they were juveniles, the Prisoner Review Board's policies make no distinction between those whose offenses occurred as youth and those whose offenses occurred as adults.

Even if the Secretary of Corrections reports to the Prisoner Review Board that a juvenile sentenced to life has satisfied his agreement, none of the further statutory factors in K.S.A. § 22-3717(g)(2) and (h)(2) to be considered in determining whether an individual is suitable for parole includes consideration of youth at the time of the offense, and the Prisoner Review Board does not consider any factors outside the statute.  To the extent maturity is considered, it is not considered any differently for those whose offenses occurred as youth as opposed to those whose offenses occurred as adults.  Members of the Prisoner Review Board do not even receive any training pertaining to adolescent psychological development or any other training that would assist members in contextualizing offenses committed by youth, other than occasional programming they may choose to view at conferences.

At the same time, the discretionary parole process in Kansas provides no evidentiary rules, no right to obtain expert assistance or testimony, no cross-examination, no compulsory process, and no right to the assistance of counsel. *See* KAR 45-200-1. The Prisoner Review Board is not required to provide any verbal or written explanation of its decision, though it sometimes does so.

As well, Prisoner Review Board practices penalize Mr. Makthepharak and others similarly situated by relying on risk assessment tools that assess the individual as if frozen in time upon their arrival to the DOC rather than who he or she is at the time of assessment. These tools take no account of Mr. Makthepharak's maturation over time, accomplishments, or institutional record. Rather, they penalize those whose were youth on arrival to the DOC by assessing them as they were when they were most risky and too young to have developed factors that the tools deem "protective" against recidivism. By utilizing these tools, the Prisoner Review Board virtually ensures Mr. Makthepharak will demonstrate a moderate to high level of risk even when he is thoroughly rehabilitated and presents little or no risk.

As a result of the policies and practices of Defendants, and illustrated by their refusal to recommend parole simply because of factors associated with Mr. Makthepharak's convicted offense, principally that he did not take responsibility for the offense, Mr. Makthepharak has been and consistently will be denied any meaningful and realistic opportunity to obtain release based on demonstrated maturity and rehabilitation. Indeed, after his 2021 parole hearing, Mr. Makthepharak was denied parole principally because the Prisoner Review Board members found he did not take responsibility for the offenses of which he was convicted.

Therefore, as Mr. Makthepharak was a juvenile at the time the offenses were committed and was sentenced to imprisonment for life, this sentence guarantees death behind bars for crimes committed as a child under Kansas's mandatory sentencing scheme and without adequate

consideration of his youth status, for his role in a murder that occurred when he was 16 years old, and decades later is being deprived of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation

      **iv.**    **Effect of Department of Corrections Regulations**

The Department of Corrections' regulations also go toward preventing Mr. Makthepharak from having a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation.

The Secretary of Corrections has promulgated a regulation that an inmate's security classification is determined by the Security Classification Manual.  KAR 44-5-104.  The Security Classification Manual is amended from time to time, with the current version being in place as of March 2024.

From lowest to highest, the DOC's security classification levels are Minimum, Medium Low, Medium High, and Maximum.  The classification scheme is a score-based system that assigns and increases points based on certain factors to determine at which security level an individual may be safely assigned.  To carry out this scheme, the DOC assesses an inmate's score and then periodically reassesses it.

When Mr. Makthepharak first arrived in the DOC, because he was serving a life sentence, and because of his young age, he was automatically designated as "maximum" security despite his youth.  The current Security Classification Manual makes it impossible for an inmate in Mr. Makthepharak's position to ever have minimum security status.  Mr. Makthepharak is categorically prohibited from moving to minimum security.

This means that the Secretary of Corrections has adopted policies that bar those serving life sentences from ever being able to achieve minimum security status regardless of the

individual's institutional record.  As a result, the Secretary of Corrections further has adopted policies that categorically bar those serving life sentences, including juveniles, from eligibility for work release and community corrections.

In the DOC, security classifications determine virtually all aspects of an individual's conditions of confinement.  An individual's security classification determines in which institutions he or she may be housed, the level of restriction upon his or her freedom of movement, and all aspects of programmatic eligibility, including access to treatment, training, and employment.  Yet, because of their differences from adults, juveniles arrive at the DOC more susceptible to being assaulted and preyed upon, and with greater need for supportive programming and for opportunities that will enable them to be rehabilitated.  Categorically assigning Mr. Makthepharak and those serving life sentences to be barred from minimum security regardless of any individualized determination or merit, unlawfully denies them a core component of a meaningful and realistic opportunity for release.  The same is true for the re-classification assessment.  No matter how Mr. Makthepharak scores on the assessment, he is categorically barred from achieving minimum security regardless of his record of accomplishment.  In this way, the DOC's scheme reinforces the inability to attain opportunities for release for juveniles serving life sentences.  This prevents Mr. Makthepharak from progressing through the DOC and properly demonstrating his maturity and rehabilitation regardless of individual merit.  Similarly, he is severely limited in his ability to demonstrate rehabilitation through the gradual earning of additional privileges and the ability to demonstrate success in lower security settings.

Therefore, the Department of Corrections' risk assessment tools penalize Mr. Makthepharak and others similarly situated for their youthfulness at the time of their offense and totally fail to consider their institutional history and record of accomplishment since incarceration.

**b.      Defendants' Factual Contentions.**

Plaintiff's parole was denied (or in the jargon of the KDOC, "passed") in 2021 primarily because of Plaintiff's disciplinary reports, which included disciplinary reports that were both severe and recent. Plaintiff's conduct included possession of dangerous contraband, interference with the operation of his cell, and for being where he was not supposed to be.

Plaintiff's parole was again passed in 2024 because of Plaintiff's disciplinary reports, which also included disciplinary reports that were both severe and recent. Plaintiff was caught possessing a cell phone four times.  Inmates are not allowed unmonitored contact with persons outside the correctional facility.  Inmates frequently use cell phones to threaten and intimidate witnesses, organize criminal gang activity, coordinate smuggling into a correctional facility, or coordinate escape attempts. When asked at his 2024 hearing if he would be willing to give up his cell phone knowing that it would have a favorable impact on the parole decision, Plaintiff said "No."

Kansas law does not mandate life sentences in all cases of murder. Kansas law mandates a life sentence only for capital murder and first-degree murder. For a juvenile, this only occurs when the juvenile is tried and convicted as an adult of one of those offenses. It is not uncommon for an inmate who committed homicide while a juvenile to be granted parole.

In February 2002, Plaintiff entered into an "Inmate Program Plan" with KDOC staff. The program plan conditioned the application of good-time credits on participation in the program plan. It did not condition the granting of parole on participation in the program plan. No agreement was made between Plaintiff and the Secretary of Corrections (or his representatives) to condition the granting of parole on the completion of programs. The agreement process in K.S.A. 75-5210a is not mandatory upon the Secretary of Corrections, but is directory in nature. The existence of an

agreement is not required for parole to be granted by the KPRB. Plaintiff's parole was not passed due to failure to complete any programs required under any agreement with the Secretary of Corrections (or his representatives).

Plaintiff has been classified as "medium-low" custody classification while serving his current sentence. The meaning of medium-low has stayed substantially the same since at least April 2008. Plaintiff was classified as medium-low from December 15, 2009, to June 3, 2010. Plaintiff was classified as medium-low from April 17, 2013, to February 10, 2014. After being on "special management" status for a day, Plaintiff was again classified as medium-low from February 11, 2014, to July 9, 2014.  However, his current, higher classification level is due at least in part to his disciplinary history.

Although the Custody Classification Manual uses a score-based system as a baseline, it includes some non-point-based items and allows for exceptions from the general classification criteria. Plaintiff has not been barred from moving to minimum security, although it would require a recommendation from the KPRB. Those serving life sentences have not been categorically barred from eligibility for work release and community corrections. Maturity and rehabilitation can be demonstrated for purposes of parole regardless of an inmate's security classification or participation in work release or community corrections.

Plaintiff's parole was passed because of severe and recent misconduct. Plaintiff's parole was not passed due to failure to participate in any programs such as work release or community corrections. Plaintiff's parole was not passed due to the severity or serious nature of the crime for which he was convicted. Plaintiff's parole was not passed due to his current age or his age at the time of the offense.

The members of the KPRB that decided on whether Plaintiff should be paroled are well-trained.  They regularly attend the Association of Paroling Authorities International's (APAI) annual training conference to both receive and provide training on all aspects of the parole process, including training regarding inmates who were juveniles at the time of their offense.  Current members Mark Keating and Jeannie Wark and past member Jonathan Ogletree each have over two decades of experience serving in corrections and the criminal justice system.

Informal in-house guidance was also provided years ago by Attorney General counsel when certain court decisions were released related to individuals who committed offenses while still juveniles.  This information included brief descriptions of those decisions and recommended modifications to the KPRB hearing processes that were adopted and are in use today.

Plaintiff's 2021 hearing was handled differently than typical parole hearings because Plaintiff was a youth when his crime was committed.  For inmates who committed their offense while a juvenile, the following procedural differences apply in the parole process that do not apply to adult offenders:

1)      the full board participates in the parole hearings (at least two members, but usually all three);

2)      the hearings are recorded; and

3)      the inmate is provided a packet of information to be considered at the parole hearing 30 days prior to the hearing.

Further, the following grounds for denying parole are not used by the KPRB for inmates who committed their offense while a juvenile: criminal history, objections by members of the public, and the serious nature of the offense. And, most crucially for this case, the inmate's youth at the time of the offense *is* considered when making the discretionary parole decision.

Plaintiff received a packet of information related to the 2021 parole hearing more than 30 days before the hearing. This packet provided notice of what might be considered at the hearing and contained evidence regarding what might be considered. Plaintiff reviewed the materials in the packet prior to the hearing.

A member of the KPRB is assigned as a lead for each parole hearing. The lead puts a packet of relevant information together related to the hearing. The KPRB does not deliberate regarding the information prior to the hearing. At least two KPRB members participate in the hearing, either in person or by video conference. The hearing is treated as a conversation with the inmate. The lead directs the conversation to relevant topics. Generally, a KDOC staff member familiar with the resident will also comment during a part of the hearing based on the staff member's experiences with the resident. An inmate's accomplishments and institutional record are reviewed and are discussed with the inmate at a hearing, which allows the inmate an opportunity to comment.

Plaintiff had an opportunity during the 2021 hearing to comment on the evidence being considered, and Plaintiff did in fact comment on the evidence being considered. The written evidence discussed during the hearing was contained in the packet Plaintiff had received. During the hearing, Plaintiff's institutional history, including his disciplinary history, was discussed. Plaintiff commented on his institutional history, including his disciplinary history.

During the 2021 hearing, the offenses for which Plaintiff was imprisoned were discussed. Plaintiff commented on those offenses. Plaintiff was given opportunities during the parole hearing, near the beginning and end of the hearing, to bring up anything that Plaintiff wanted to be considered during the parole process. Ms. Wilson-Raw, a KDOC employee, participated in the parole hearing. She made comments during the parole hearing in the Plaintiff's presence that were favorable toward Plaintiff.

Attorneys are permitted to participate in parole hearings, and this sometimes occurs. During a parole hearing, an inmate (or an attorney) may give opening and closing statements. The inmate has an opportunity to discuss matters raised by the KPRB and may present additional relevant information. An attorney may ask questions of the inmate to help clarify the inmate's comments, to prompt the inmate to discuss additional matters, or even to conduct a direct examination of the inmate. Plaintiff did not request to have an attorney participate in either the 2021 or 2024 hearings.

Inmates are free to reach out to an expert and ask the expert to submit a written report to the KPRB. The KPRB takes into consideration any such written comments by an expert. Plaintiff did not request any expert assistance or testimony for either the 2021 or 2024 hearings. Further, Plaintiff did not request to introduce any other evidence during either hearing.

Although the inmate does not personally have subpoena authority, the inmate can request that the KPRB issue a subpoena. The KPRB can do so if requested.  Plaintiff did not request for the KPRB to issue any subpoenas related to the 2021 or the 2024 hearings.

After a parole hearing, the KPRB reviews its notes and has a full-board deliberation within a week of the hearing. Two members of the KPRB have to agree on the parole decision, and usually the decision is reached by consensus. The KPRB aims to decide the matter within 30 days of the parole hearing. Once a decision is reached, a written Final Action Notice is prepared reflecting the decision, any reasons parole was passed, and any recommendations for the resident to improve the chances of parole in the future. The Final Action Notice is delivered to the inmate.

The KPRB looks at both static and dynamic factors that change over time and include current behaviors and attitudes. Other factors, such as custody classification, disciplinary records, programming participation records, employment, and others are all based on both historical and

current, up-to-date information to allow for the KPRB to gauge and measure an individual's degree of maturation and change over time.

The KPRB has previously provided written explanations of its decisions to Plaintiff, clearly stating the pass reasons and providing recommendations to him.  It did just that after the 2021 hearing.  A decision on Plaintiff's parole was made days after the hearing. The action notice Plaintiff received stated the reasons why Plaintiff's parole was passed. The reasons stated were "Denies responsibility" and "Disciplinary reports." The action notice included "Recommendations," which included "DR Free." "DR Free" means to not receive disciplinary reports in the future.

Disciplinary reports penalize an inmate for breaking a rule in a correctional facility. They come in three classes of offenses. Class 1 offenses are designated as "very serious in nature." Class 2 offenses are designated as "of moderate seriousness." Class 3 offenses are designated as "of a less serious nature."

Prior to his March 31, 2021 hearing, Plaintiff received disciplinary reports for the following conduct:

1.  Class 1 disciplinary report on November 2, 2020, for "Dangerous Contraband."

2.  Class 1 disciplinary report on March 7, 2020, for "Interf W/Cell Oper/Visibility."

3.  Class 2 disciplinary report on December 24, 2019, for "Restr Area/Unauth Presence."

4.  Class 1 disciplinary report on May 25, 2019, for "Interf W/Cell Oper/Visibility."

5.  Class 1 disciplinary report on May 25, 2019, for "Dangerous Contraband."

6.  Class 1 disciplinary report on February 25, 2019, for "Dangerous Contraband."

The packet of information Plaintiff received before the hearing included information on each of these disciplinary reports.

An inmate can request reconsideration of a parole decision by the KPRB on the basis of new evidence. Plaintiff did not request reconsideration of the 2021 parole decision by the KPRB. Parole decisions are also reviewable by the judiciary through a habeas corpus action. Plaintiff did not file a habeas action.

The 2024 hearing followed the same procedures as the 2021 hearing. The 2024 decision on Plaintiff's parole was also made days after the hearing. The action notice Plaintiff received stated "Pass Reasons" why Plaintiff's parole was passed. The reason stated was "Disciplinary reports."

Prior to his April 4, 2024 hearing, Plaintiff received disciplinary reports for the following conduct:

1.     Class 1 disciplinary report on August 26, 2023, for possession of an unauthorized communications device.

2.     Class 1 disciplinary report on September 27, 2021, for possession of an unauthorized communications device.

The action notice included "Pass Recommendations," which stated "Remain Free of Disciplinary Reports." Plaintiff was caught with a cell phone again on July 1, 2024 – just twelve weeks after his hearing when he told the KPRB he would not be willing to give up a cell phone.

Secretary Zmuda has not had any involvement with any grant or denial of parole for Plaintiff or any other inmate. The KPRB is the sole decision-making authority for parole decisions. Secretary Zmuda has not appointed or terminated any member of the KPRB. Secretary Zmuda's predecessors appointed Jonathan Ogletree as the chair of the KPRB in 2016, Jeannie Wark as a member in 2015, and Mark Keating as a member in 2016.

Secretary Zmuda has never entered into an agreement or plan with any inmate regarding conditions for parole, such as under K.S.A. 75-5210a(a). Secretary Zmuda has never revised an agreement or plan with any inmate regarding conditions for parole. Secretary Zmuda has never sent a report to the KPRB regarding the appropriateness of parole for any inmate. Secretary Zmuda has never been involved in the decision-making process regarding parole for any inmate. Secretary Zmuda has not otherwise been involved in the parole process regarding any inmate.

Governor Kelly took no actions related to the matters in this case other than to appoint the Secretary of Corrections. Secretary Zmuda took no actions related to the matters in this case other than accept the Governor's appointment as the Secretary of Corrections. Neither Governor Kelly nor Secretary Zmuda participated in the parole process with regard to Plaintiff's denial of parole in either 2021 or 2024. Neither Governor Kelly nor Secretary Zmuda personally enforced any parole laws with regard to Plaintiff. Neither Governor Kelly nor Secretary Zmuda appear likely to personally enforce any parole laws in the future with regard to Plaintiff or anyone else.

## 4.    LEGAL CLAIMS AND DEFENSES.

### a.    Plaintiff's Claims.

Plaintiff asserts that he is entitled to recover upon the following theories:[1]

> **i.**    Violation of 42 U.S.C. § 1983 per the Eighth Amendment's prohibition against cruel and unusual punishment (Count I).  Kansas's parole scheme, as applied to Mr. Makthepharak, violates 42 U.S.C. § 1983 because it violates the Eighth Amendment's prohibition against cruel and unusual punishment as explained in *Montgomery v. Louisiana*, 577 U.S. 190 (2016), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Graham v. Florida*, 560 U.S. 48 (2010), as it is illusory and operates as a *de facto* life without parole scheme for Mr. Makthepharak that prevents him from having a meaningful

---

[1]    The Court granted Defendants judgment on the pleadings on Mr. Makthepharak's claim under the Kansas Bill of Rights in Count II of his First Amended Complaint.  ECF No. 20. That claim therefore is not included in this recitation.

and realistic opportunity for release upon demonstrated maturity and rehabilitation.

**b.     Defendants' Defenses.**

Defendant asserts the following defenses:

    **i.**    Eleventh Amendment immunity

        a.  Eleventh Amendment immunity bars claims for injunctive and declaratory relief when a plaintiff lacks constitutional standing to raise the *Ex Parte Young* exception. *Johnston v. Prairie View, Inc.*, No. 19-2041-HLT, 2020 WL 1984287, at *3 (D. Kan. Apr. 27, 2020); *see also James v. Hegar*, 86 F.4th 1076, 1078 (5th Cir. 2023). Here, Plaintiff lacks constitutional standing to raise the *Ex Parte Young* exception as outlined below.

    **ii.**   Lack of constitutional standing

        a.  Defendants contest that Plaintiff has constitutional standing with regard to claims against Governor Kelly and Secretary Zmuda because they lack legal authority over parole decisions, which means they do not present a credible threat of enforcement as would be necessary to establish causation nor do they have the ability to provide redress.

        b.  Defendants contest that Plaintiff has standing with regard to any Defendants to request declaratory or injunctive relief unrelated to any established, ongoing injuries.

        c.  Defendants contest that Plaintiff has standing with regard to any Defendants to assert claims for declaratory or injunctive relief on behalf of other persons.

    **iii.**  Lack of ripeness

        a.  Plaintiff's claims against Governor Kelly and Secretary Zmuda are not ripe because they rely on "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1097 (10th Cir. 2006).

    **iv.**  Mootness

        a.  Due to a superseding parole decision, Defendants assert that Plaintiff's claims are moot to the extent they complain of an earlier parole decision having been based on Plaintiff denying responsibility.

        b.  Due to Ogletree's retirement from the KPRB, Defendants assert that Plaintiff's claims for declaratory and injunctive relief against him are

moot. Ogletree lacks legal authority over parole decisions, which means he does not present a credible threat of enforcement as would be necessary to establish causation for any ongoing injuries nor does he have the ability to provide redress.

    **v.**    Lack of personal participation

        a.  Governor Kelly and Secretary Zmuda did not personally participate in any past or imminent alleged wrongful actions.

    **vi.**    Plaintiff has failed to meet his burden to establish an Eighth Amendment violation.

        a.  *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016) – cases about criminal sentencing – do not apply to the facts of this case because parole decisions and procedures are not punitive under the Eighth Amendment.

        b.  Plaintiff has not demonstrated that the parole process was a sham such that he did not enjoy a meaningful and realistic opportunity for release.

        c.  Plaintiff did in fact enjoy a meaningful and realistic opportunity for release.

    **vii.**    The requested injunctive relief would exceed the Court's authority:

        a.  to the extent it would attempt to grant Defendants authority beyond that granted to them by state law (such as by requiring executive officials to legislate a new "judicial process," in Plaintiff's words, or by requiring officials to direct other officials in ways they do not have authority under state law to do); or

        b.  to the extent it would attempt to "dictat[e] precisely what course the State should follow." *Lewis v. Casey*, 518 U.S. 343, 362 (1996); *see also id.* ("[T]he strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.").

## 5.    DAMAGES AND NON-MONETARY RELIEF REQUESTED.

No monetary damages are requested.

Under 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201-2202, Mr. Makthepharak requests the

Court to declare:

- that Defendants have operated, and continue to operate, a parole scheme that denies individuals, such as Mr. Makthepharak, who are serving parole-eligible life sentences for offenses committed as a juvenile, a meaningful and realistic opportunity for release, in violation of the prohibition against cruel and unusual punishment in the Eighth Amendment;

- that Mr. Makthepharak is serving a *de facto* LWOP sentence under which he has not been afforded any meaningful or realistic opportunity for release, in violation of the prohibitions against cruel and unusual punishment in the Eighth Amendment;

- that K.S.A. § 75-5210a, which grants the Secretary of Corrections the exclusive authority to fashion the conditions of parole-ability for an inmate serving a parole-eligible life sentence, is unconstitutional as applied to individuals, including Mr. Makthepharak, who were juveniles at the time of their offenses;

- that K.S.A. § 22-3717(g)-(h), precluding the Parole Review Board from granting parole to an inmate serving a parole-eligible life sentence without the approval of the Secretary of Corrections, and setting the further factors the Parole Review Board should consider, is unconstitutional as applied to individuals, including Mr. Makthepharak, who were juveniles at the time of their offenses;

- that Defendants' reliance on risk assessment tools that discriminate against those who were juveniles at the time of their offense to assess opportunities for release has denied Mr. Makthepharak a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of the Eighth Amendment; and

- that Defendants have denied Mr. Makthepharak and those similarly situated, a meaningful and realistic opportunity for release by denying him access to critical rehabilitative opportunities through policies and practices automatically barring him from minimum security classification regardless of individual merit, in violation of the prohibitions against cruel and unusual punishment in the Eighth Amendment.

Additionally, under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202, Mr. Makthepharak requests the Court to enjoin Defendants immediately to discontinue these practices and to take remedial steps to address their past illegal conduct, by granting Mr. Makthepharak, and those similarly situated, a meaningful and realistic opportunity to demonstrate his readiness for release, including fashioning what Defendants must meet in order to do so:

- Ending the Secretary of Corrections' unilateral determination of the conditions of parole-ability for an inmate sentenced as a juvenile to a parole-eligible life sentence;

- Requiring the Parole Review Board to disclose to the inmate all evidence to be considered before a parole hearing;

- Requiring the Parole Review Board to provide the inmate an opportunity to be heard and present evidence in support of release;

- Requiring the Parole Review Board to provide the inmate a right to hear and confront adverse witnesses as necessary;

- Requiring the Parole Review Board to make a recording of every parole interview for the purposes of administrative and judicial review;

- Requiring the Parole Review Board to prepare a written decision that is comprehensible and sufficiently detailed for a reviewing court to evaluate;

- Requiring the Secretary of Corrections and the Parole Review Board to focus their parole inquiry as to these inmates on rehabilitation rather than the crime severity or older institutional disciplinary history, make the mitigation of youth central to the parole interview and decision, and create a presumption of relief for inmates sentenced as juveniles to parole-eligible life sentences; and

- Requiring the Governor, the Secretary of Corrections and the Parole Review Board to institute a meaningful administrative and judicial process to review decisions of the Parole Review Board.

Mr. Makthepharak also requests an award of his costs and attorney's fees under 42 U.S.C. § 1988. He so far has incurred approximately $38,000 in costs and attorney's fees and anticipates an additional $30,000 through trial.

## 6.    AMENDMENTS TO PLEADINGS.

None.

## 7.    DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by September 6, 2024. Discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do

so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.     MOTIONS.**

      **a.     Pending Motions.**

None.

      **b.     Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

      Defendants' Motion for Summary Judgment; and

      Both parties anticipate filing motions in limine before trial.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **November 1, 2024**.  The parties should follow the summary-judgment guidelines on the court's website:

      *http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages.  *See* D. KAN. RULE 7.1(d)(2).  Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline.  *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

      **c.     Motions Regarding Expert Testimony.**  Not applicable, i.e., the parties have stipulated that no expert testimony will be used in this case.

**9.     TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **July 1, 2025, at 9:00 a.m., in Kansas City, Kansas**.  This case will be tried by the court sitting without a jury.  Trial is expected to take approximately 2 trial days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are

timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.     ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The status of settlement negotiations is as follows: The parties currently believe the prospects for settlement of this case are poor and they do not believe that further court-ordered ADR would be helpful. The parties explained, as they did at the scheduling conference, that because this is a civil rights action that does not seek damages, they do not believe there is a reason to use ADR in this case.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties.  Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

**IT IS SO ORDERED.**

Dated: October 18, 2024, at Topeka, Kansas.

/s/ Rachel E. Schwartz
Rachel E. Schwartz
United States Magistrate Judge