## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SASHADA MAKTHEPHARAK, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 23-2121-DDC-RES** |
| | ) | |
| LAURA KELLY, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Governor Laura Kelly, Secretary of Corrections Jeff Zmuda, and members of

the Kansas Prisoner Review Board (KPRB) Jonathan Ogletree, Jeannie Wark and Mark Keating

("Defendants"), respectfully request that this Court grant summary judgment in their favor under

Fed. R. Civ. P. 56. Defendants attach twelve new exhibits, outlined in the table below, and state

the following in support.

## INDEX OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | KASPER Information Sheet |
| B | Packet of information provided to Plaintiff prior to his March 31, 2021 parole hearing, including Youthful Offender Information Acknowledgement, dated February 25, 2021 |
| C | KDOC Custody Classification Manual for Men, dated March 2024 |
| D | Letter from the Governor's office denying Plaintiff's request for clemency, dated June 22, 2022 |
| E | Plaintiff's Response to Defendants' First Set of Requests for Admission to Plaintiff |
| F | Plaintiff's Response to Defendants' First Set of Interrogatories to Plaintiff |
| G | Defendants' Response to Plaintiff's First Interrogatories to Defendants |
| H | Transcript of Deposition of Plaintiff |
| I | Transcript of Deposition of Jonathan Ogletree |
| J | Declaration of Mark Keating |
| K | Declaration of Melissa Waldock |
| L | Declaration of Jeff Zmuda |

## NATURE OF THE CASE

Plaintiff Sashada Makthepharak, an inmate currently incarcerated at Lansing Correctional Facility (LCF), alleges that he, after being convicted of homicide while a juvenile, has been effectively sentenced to life without parole in violation of the prohibition on cruel and unusual punishment in the Eighth Amendment. (Doc. 44 at 22-23, 6-14.)

Plaintiff filed this lawsuit on March 21, 2023, and filed an Amended Complaint on April 12, 2023. (Docs. 1, 9.) Plaintiff brings this action under 42 U.S.C. § 1983 (Doc. 44 at 22) and the Kansas Constitution (Doc. 44 at 22 n.1; Doc. 9 at ¶ 1, pgs. 27-28) and requests declaratory and injunctive relief. (Doc. 44 at 24-26.) Plaintiff named as defendants the Governor, the Secretary of Corrections, and the three members of the Kansas Prisoner Review Board (KPRB), all in their official capacities. (Doc. 44 at 4-6; Doc. 9 at ¶¶ 6-10.) Plaintiff originally brought three broad counts: (I) violations of the Eighth Amendment for denying him "a meaningful opportunity for release," (II) violations of the Kansas Bill of Rights for the same, and (III) an assertion that certain Kansas statutes are unconstitutional as applied to him. (Doc. 9 at 26-29.) On March 25, 2024, the Court dismissed Count II. (Doc. 27 at 19.) Discovery has been completed, and a pretrial order has been entered. (Doc. 44 at 26.) In the pretrial order, Plaintiff consolidated his remaining claims into one. (Doc. 44 at 22-23.)

Contrary to Plaintiff's unsupported assertions, the uncontested evidence shows that the KPRB denied Plaintiff's parole due to Plaintiff's own serious misconduct while incarcerated, including incidents that were both severe and recent. (Exhibit J at ¶¶ 44-46, 60-61, 63, 65, pgs. 71-73; Doc. 12-1; Exhibit E at ¶ 41; Exhibit G at ¶ 9; Exhibit H at 27:17-19, 28:2-5, 29:16-22, 30:4-19, 32:5-11; Exhibit I at 56:25-58:22, 66.) Further, Plaintiff has not made any allegations of wrongdoing specific to his latest parole hearing in April 2024 and therefore has waived the ability to do so. (*See* Doc. 44 at 5-14, 22-23; *see also* Doc. 9.)

The Court should grant summary judgment to Defendants based on the uncontested evidence showing lack of subject-matter jurisdiction due to Eleventh-Amendment immunity (because Plaintiff lacks standing to invoke the *Ex Parte Young* exception), lack of constitutional standing, lack of ripeness, and mootness. Alternatively, the Court should grant summary judgment to Defendants because Plaintiff has failed to meet his burden to establish an Eighth-Amendment violation and because the uncontested evidence shows that Governor Kelly and Secretary Zmuda did not participate in any violation. Further in the alternative, the Court should provide state officials the first opportunity to correct any errors.

## STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE ISSUE EXISTS

### *Admissibility of Exhibits*

1. The admissibility of Exhibits B through Exhibit G, Exhibit J-2, Exhibit J-3, Doc. 12-1, and Doc. 12-2 has been stipulated to. (Doc. 44 at 3-4.)

### *Plaintiff's Conviction and Sentence*

2. Plaintiff Sashada Makthepharak is an inmate in the custody of the Kansas Department of Corrections ("KDOC"), KDOC ID #73697, confined in the Lansing Correctional Facility located at 301 East Kansas Avenue, Lansing, Kansas 66043.  Plaintiff was born 1984.  In October 2001, when Plaintiff was a 16-year-old juvenile, a jury in the District Court of Sedgwick County, Kansas convicted him of first-degree murder under a felony-murder theory in violation of K.S.A. § 21-3401(b) (1995), aggravated burglary in violation of K.S.A. § 21-3716, and criminal possession of a firearm in violation of K.S.A. § 21-4204(a)(3).  The offenses occurred in May 2001, when Plaintiff was a 16-year-old juvenile, and a juvenile court referred the case to the criminal court.  In December 2001, Plaintiff was sentenced under K.S.A. §§ 21-4706(c) (2001 Supp.) and 22-3717(b)(2)

(2001 Supp.) to life in prison without eligibility for parole for 20 years for the felony

murder count, the statutorily mandatory sentence for that offense.  The court sentenced

him to 64 months in prison on the other counts, to be served consecutively. (Doc. 44 at 2

(stipulation i); Exhibit A at 3; Exhibit E at ¶¶ 61-63; Exhibit H at 6:14-19, 6:22-7:3;

Exhibit J at ¶¶ 40-41, pgs. 19:15-20:2; 52:22-53:2.)

3.  Plaintiff was tried as an adult. (Doc. 44 at 2 (stipulation ii); Exhibit H at 6:20-21.)

4.  Kansas law does not mandate life sentences in all cases of murder.

   a.  Kansas law, both at the time of Plaintiff's offense and currently, mandates a life

       sentence only for capital murder and first-degree murder. K.S.A. 21-4706(c)

       (2001 Supp.) (life sentence for off-grid crimes); 21-6806(c)-(d) (2022 Supp.)

       (same); 21-3401(b) (1995) (first-degree murder is an off-grid crime); 21-

       5402(a)(2), (b) (2022 Supp.) (same); 21-3439(c) (1995) (capital murder is an off-

       grid crime); 21-5401(c) (2022 Supp.) (same).

   b.  For a juvenile, this only occurs when the juvenile is tried and convicted as an

       adult of one of those offenses. K.S.A. 38-16,129(a)(1) (2000) (minimum sentence

       for off-grid felonies for juveniles not tried as an adult); K.S.A. 38-2369 (2021)

       (same); K.S.A. 38-1636 (2000) (procedure for prosecuting a juvenile as an adult);

       K.S.A. 38-2347 (2021) (same).

   c.  Second-degree murder is not an off-grid crime and, for offenders tried as adults,

       the presumptive sentence ranges in the sentencing guidelines apply for this

       offense, not a life sentence. K.S.A. 21-3402 (2001 Supp.) (second degree murder

       is a person felony with severity level 1 or 2); 21-5403(b) (2022 Supp.) (same); 21-

       4704 (2001 Supp.) (sentencing grid); K.S.A. 21-6804(a) (2022 Supp.) (same).

5.  Plaintiff has contested his conviction through direct appeal, through a motion to correct illegal sentence under K.S.A. 22-3504 in 2010, and through a habeas corpus action in 2019, all of which were denied. *State v. Makthepharak*, 276 Kan. 563, 563, 573 (2003) (appeal); *Makthepharak v. State*, 298 Kan. 573, 574 (2013) (motion to correct illegal sentence); *Makthepharak v. State*, 472 P.3d 1148 (table opinion), 2020 WL 5994108, at *1 (Kan. Ct. App. Oct. 9, 2020) (habeas action).

6.  Plaintiff is currently incarcerated at Lansing Correctional Facility. (Doc. 44 at 2 (stipulation iii); Exhibit A at 2-3; Exhibit H at 1:19-20.)

7.  Plaintiff is serving an indeterminate life sentence. (Exhibit K at ¶ 27.)

### *Inmate Program Plan*

8.  In February 2002, Plaintiff entered into an "Inmate Program Plan" with KDOC staff. (Doc. 12-2; Exhibit E at ¶ 48; Exhibit H at 7:5-9:6.)

9.  The program plan conditioned the application of good-time credits on participation in the program plan. (Doc. 12-2; Exhibit E at ¶ 49.)

10. It did not condition the granting of parole on participation in the program plan. (Doc. 12-2; Exhibit J at ¶ 21.) Plaintiff has no admissible evidence to the contrary.

11. No agreement was made between Plaintiff and the Secretary of Corrections (or his representatives) to condition the granting of parole on the completion of programs. (Exhibit E at ¶ 50; Exhibit I at 24:24-25:2; Exhibit J at ¶ 21; Exhibit L at ¶¶ 7-10.) Plaintiff has no admissible evidence to the contrary.

12. The existence of an agreement under K.S.A. 75-5210a is not required for parole to be granted by the KPRB. (*See* Exhibit G at ¶¶ 1-3, pg. 8; Exhibit I at 24:24-25:2; Exhibit J at ¶¶ 21-22, 24-28; Exhibit L at ¶¶ 7-10); K.S.A. 22-3717(g)(2) (referring to "any agreement," implying one may not exist), (h)(1) (same), (j)(1) (providing procedures for

denials of parole when "no agreement has been entered into with the inmate under K.S.A. 75-5210a"); Doc. 12-3 at 2 (minutes and testimony from the Senate Judiciary Committee, Apr. 5, 1988, including the question, "what if the prisoner refuses to sign this agreement?").

13. Plaintiff's parole was not passed due to failure to complete any programs required under any agreement with the Secretary of Corrections (or his representatives). (Exhibit J at ¶¶ 22, 50, 70; *see also* Doc. 12-1; Exhibit H at 28:19-29:12; Exhibit J at 71.)

### *Custody Classification*

14. KDOC currently uses the Custody Classification Manual for Men, revised March 2024, which is located at: https://www.doc.ks.gov/publications/kdoc-facilities-management. (Doc. 44 at 2 (stipulation iv); Exhibit E at ¶ 60; Exhibit K at ¶¶ 7, 9.)

15. Plaintiff has been classified as "medium-low" custody classification while serving his current sentence. (Exhibit K at ¶ 28; *see also* Exhibit B at 17; Exhibit E at ¶¶ 52, 54, 56; Exhibit K at ¶¶ 32-34, 82, 85-86.)

16. The meaning of medium-low has stayed substantially the same since at least April 2008. (Exhibit K at ¶ 29.)

17. His current, higher classification level – as "special management," housed in restrictive housing – is due to his disciplinary history. (Exhibit A at 2; Exhibit H at 11:19-13:14, 37:7-15; Exhibit K at ¶¶ 87, 89-91, pg. 239; *see also* Exhibit K at ¶¶ 15-19, 35-83.)

18. Makthepharak is also considered by KDOC to be an active and validated security threat group member, which increases his reclassification score for purposes of custody classification. (Exhibit K at ¶¶ 37, 92; *see also* Exhibit H at 11:19-13:2.)

19. The Custody Classification Manual allows for departure from the general classification criteria when it states "if the criteria do not accurately reflect the level or types of risks

presented by the individual, when supported by objective documentation, an exception may raise or lower the scored custody level." (Exhibit C at 4.)

20. The offender's institutional adjustment and disciplinary reports are considered as part of the general classification criteria in the section of the Custody Classification Manual titled "Item 5: Institutional Adjustment." (Exhibit C at 19-20.)

21. Although the Custody Classification Manual uses a score-based system as a baseline, it includes some non-point-based items described in the section titled "Non-Point-Based Items." (Exhibit C at 24-25; Exhibit K at ¶ 10.)

22. For purposes of the non-point-based items, the phrase "years to serve to projected release" is interpreted for offenders serving indeterminate sentences (like Plaintiff) to mean the years to serve until "the earliest of the following dates – PE (Parole Eligibility), CR (Conditional Release), or SDD (Sentence Discharge Date)." (Exhibit C at 24-25; Exhibit K at ¶ 11; *see also* Exhibit K at ¶¶ 12-14.)

23. Plaintiff has not been barred from moving to minimum security, although it would require a recommendation from the KPRB. (Exhibit C at 25 (non-point-based item 10.14); Exhibit K at ¶ 30; *see also* Exhibit H at 18:18-23, 39:8-40:3.)

24. Accordingly, those serving life sentences have not been categorically barred from eligibility for work release or "community corrections." (Exhibit I at 47:3-17, 50:3-9; *see also* Exhibit J at ¶ 19.) Plaintiff has no admissible evidence to the contrary.

25. Maturity and rehabilitation can be demonstrated for purposes of parole regardless of an inmate's security classification or participation in work release or "community corrections." (Exhibit I at 48:22-50:12; Exhibit J at ¶¶ 18-20.)

### *Disciplinary Reports*

26. Disciplinary reports penalize an inmate for breaking a rule in a correctional facility.

(Exhibit K at ¶ 20.)

27. They come in three classes of offenses:

    a.   Class 1 offenses are designated as "very serious in nature." (Exhibit K at ¶ 21.)

    b.   Class 2 offenses are designated as "of moderate seriousness." (Exhibit K at ¶ 21.)

    c.   Class 3 offenses are designated as "of a less serious nature." (Exhibit K at ¶ 21.)

28. Inmates are not allowed unmonitored contact with persons outside the correctional facility. (Exhibit K at ¶ 22.)

29. Contraband cell phones and other contraband communication devices pose a major risk to the safety and security of correctional facilities and even to the safety of persons outside of correctional facilities. (Exhibit K at ¶ 23.)

30. Inmates frequently use cell phones to threaten and intimidate witnesses, organize criminal gang activity, coordinate smuggling into a correctional facility, or coordinate escape attempts. (Exhibit K at ¶ 24.)

31. In addition, inmates may fight over the coveted devices. (Exhibit K at ¶ 25.)

32. All of these dangers have led to possession of these devices being classified as a Class 1 aggressive disciplinary violation. (Exhibit C at 19-20, 40; Exhibit K at ¶ 26.)

33. Plaintiff has been found guilty on disciplinary reports for being caught with unauthorized communication devices or related paraphernalia in July 2014, September 2015, February 2016, March 2017, May 2019, October 2021, August 2023, and July 2024. (Exhibit A at 4; Exhibit K at ¶¶ 35, 42, 46, 51-52, 54, 63-64, 75-76, 83-84, 87-88, pgs. 168-72, 182-93, 216-38.)

34. The October 2021 incident involved cell phones hidden in a TV. After that incident, Makthepharak wrote an outgoing letter in October 3, 2021, that was screened and

scanned in by security as part of regular screening practices for inmates' incoming and

outgoing mail. That letter said the following:

> We lost our T.V.'s, so I'll have order another one. On top of that, we can
> never use that spot again. . . . I was already well aware of the
> consequences of having the phone. I have spoken to you bout how soo
> [sic] many other people was using the same spot. . . . Don't worry that I
> got caught with a phone and it'll look bad in front of parole. I got plenty of
> time to work on myself. And more so that we have a lawyer willing to file
> paperwork for us. . . . Me and Steve sitting here wondering why we got
> hit. And we're working on to never get hit again. Someone ratted me out,
> but we not sure who and why. . . . I'm taking this as a lesson and turning it
> into a blessing because it allows me to find a new spot and not deal with
> MFers that might snitch me out.

(Exhibit K at ¶¶ 75-77, pgs. 216-27.)

### *Kansas Prisoner Review Board*

35. Current KPRB members Mark Keating and Jeannie Wark and past member Jonathan

Ogletree each have over two decades of experience serving in corrections and the

criminal justice system. (Exhibit G at ¶ 8; Exhibit I at 9:17-10:1, 11:5-14, 66; Exhibit J at

¶¶ 1-3.)

36. Each month, the KPRB conducts parole eligibility hearings for inmates incarcerated at

each of ten KDOC correctional facilities. (Exhibit J at ¶ 9.)

37. Each year, the KPRB conducts about 248 parole eligibility hearings, also referred to as

parole hearings. (Exhibit J at ¶ 10.)

38. Each year, the KPRB conducts and/or reviews about 1200 parole revocation hearings and

revocation hearing waivers. (Exhibit J at ¶ 11.)

39. The members of the KPRB that decided on whether Plaintiff should be paroled regularly

attend (or regularly attended) the Association of Paroling Authorities International's

(APAI) annual training conference to both receive and provide training on all aspects of

the parole process. (Exhibit G at ¶ 8; *see also* Exhibit I at 13:6-19.)

40. Defendant Ogletree has retired from the KPRB. (Exhibit I at 7:18-8:2.)

### *Youthful Offenders*

41. KDOC and the KPRB use the term "youthful offender" to refer to a person sentenced to prison for offenses committed as a juvenile, defined as under the age of 18. (Exhibit J at ¶ 23.)

42. From 1979 to 2023, 73% of parole hearings in Kansas for youthful offenders have resulted in a grant of parole. (Exhibit J at ¶ 24.)

43. From 2018 to 2023, 62% of parole hearings in Kansas for youthful offenders have resulted in a grant of parole. (Exhibit J at ¶ 25.)

44. Since 2012, at least 49 youthful offenders sentenced to life have been granted parole. (Exhibit J at ¶ 26.)

45. Since 2020, at least 15 youthful offenders sentenced to life have been granted parole. (Exhibit J at ¶ 27.)

46. It is not uncommon for an inmate who committed homicide while a juvenile to be granted parole. (Exhibit J at ¶ 28.) Plaintiff has no admissible evidence to the contrary. (*See* Exhibit F at ¶ 10(a); Exhibit H at 34:7-35:4 (Plaintiff admitting he does not know whether other inmates he interacts with are even eligible for parole).)

### *2021 Parole Hearing*

47. On March 31, 2021, Plaintiff had a parole hearing before the Kansas Prisoner Review Board (KPRB) that lasted approximately 55 minutes. (Doc. 44 at 2 (stipulation v); Exhibit E at ¶ 1; Exhibit I at 30:4-14; Exhibit J at ¶¶ 38-39.)

48. For parole hearings, a denial of parole is also referred to as "passing" parole eligibility or passing parole to a later date. (Exhibit J at ¶ 12.)

49. Plaintiff's parole was passed in 2021 primarily because of Plaintiff's disciplinary reports, which included disciplinary reports that were both severe and recent. (Exhibit J at ¶¶ 44-46, 48; Doc. 12-1; Exhibit E at ¶ 41; Exhibit G at ¶ 9; Exhibit H at 27:17-22, 28:2-5, 29:16-19; Exhibit I at 56:25-58:22, 66.)

50. The KPRB allows inmates to have an attorney participate in the inmate's parole hearing, and this sometimes occurs, although counsel is not appointed. (Doc. 44 at 3 (stipulation vi); Exhibit G at ¶ 4; Exhibit I at 31:9-13, 46:18-24.)

51. Plaintiff did not request to have an attorney participate in the 2021 hearing. (Exhibit E at ¶ 19; Exhibit H at 19:18-20:10.)

52. An audio recording was made of the parole hearing. (Doc. 44 at 3 (stipulation vii); Exhibit E at ¶¶ 8-9; Exhibit J at ¶¶ 40-41, pgs. 13-69.)

53. Plaintiff participated in the parole hearing. (Doc. 44 at 3 (stipulation viii); Exhibit J at 15-60.)

54. All three members of the KPRB (Jonathan Ogletree, Jeannie Wark, and Mark Keating) participated in the parole hearing. (Doc. 44 at 3 (stipulation ix); Exhibit H at 21:4-7.)

55. Plaintiff was interviewed during his parole hearing. (Doc. 44 at 3 (stipulation x); Exhibit J at 15-60.)

56. Secretary Zmuda did not personally appear at or participate in the parole hearing. (Doc. 44 at 3 (stipulation xi); Exhibit E at ¶ 21.)

57. Governor Kelly did not personally appear at or participate in the parole hearing. (Doc. 44 at 3 (stipulation xii); Exhibit E at ¶¶ 22, 68-70.)

58. Informal in-house guidance was provided to the KPRB years ago by Attorney General counsel when certain court decisions were released related to individuals who committed

offenses while still juveniles. This information included brief descriptions of those decisions and recommended modifications to the KPRB hearing processes that were adopted and are in use today. (Exhibit G at ¶ 8.)

59. Plaintiff's 2021 hearing was handled differently than typical parole hearings because Plaintiff was a youthful offender. (Exhibit J at 15:5-25.) For inmates who committed their offense while a juvenile, the following procedural differences apply in the parole process that do not apply to adult offenders:

    a. The full board participates in the parole hearings (at least two members, but usually all three). (Exhibit G at ¶ 5; Exhibit J at 15:1-4, 16:10-20).)

    b. The hearings are recorded. (Exhibit G at ¶ 5; Exhibit J at ¶¶ 40-41, 75, 78, pgs. 15:5-15, 15:25).)

    c. The inmate is provided a packet of information to be considered at the parole hearing 30 days prior to the hearing. (Exhibit G at ¶ 5; Exhibit I at 39:22-40:10, 66; Exhibit J at 15:5-23.)

60. The following grounds for denying parole are not used by the KPRB for youthful offenders: criminal history, objections by members of the public, and the serious or violent nature of the offense. (Exhibit G at ¶ 5; Exhibit J at ¶¶ 13, 29.)

61. For youthful offenders, the inmate's youth at the time of the offense *is* considered when making the discretionary parole decision. (Exhibit F at ¶ 12; Exhibit G at ¶ 5; Exhibit H at 28:6-18, 37:16-24; Exhibit I at 38:22-39:6; Exhibit J at ¶¶ 49, 68.) Plaintiff has no admissible evidence to the contrary. (*See* Exhibit F at ¶ 2.)

62. Plaintiff received a packet of information related to the 2021 parole hearing more than 30 days before the hearing. (Exhibit B at 1; Exhibit E at ¶¶ 2-4; Exhibit H at 18:24-19:5;

Exhibit I at 29:6-16; Exhibit J at 15:5-23.)

63. This packet provided notice of what might be considered at the hearing and contained evidence regarding what might be considered. (Exhibit E at ¶¶ 5-6.)

64. Plaintiff reviewed the materials in the packet prior to the hearing. (Exhibit E at ¶ 7; Exhibit H at 19:6-17; Exhibit J at ¶ 54, pg. 70.)

65. A member of the KPRB is assigned as a lead for each parole hearing. (Exhibit G at ¶ 4.)

66. The lead puts a packet of relevant information together related to the hearing. (Exhibit G at ¶ 4.)

67. The KPRB does not deliberate regarding the information prior to the hearing. (Exhibit G at ¶ 4.)

68. At least two KPRB members participate in the hearing, either in person or by video conference. (Exhibit G at ¶ 4.)

69. The hearing is treated as a conversation with the inmate. (Exhibit G at ¶ 4; Exhibit J at 18:1-19.)

70. The lead directs the conversation to relevant topics. (Exhibit G at ¶ 4; *see also* Exhibit J at 15:1-4.)

71. Generally, a KDOC staff member familiar with the resident will also comment during a part of the hearing based on the staff member's experiences with the resident. (Exhibit G at ¶ 4.)

72. An inmate's accomplishments and institutional record are reviewed and are discussed with the inmate at a hearing, which allows the inmate an opportunity to comment. (Exhibit G at ¶ 9; *see also* Exhibit J at 37:10-50:3.)

73. Plaintiff had an opportunity during the 2021 hearing to comment on the evidence being

considered, and Plaintiff did in fact comment on the evidence being considered. (Exhibit E at ¶¶ 10-11; Exhibit G at ¶ 4; Exhibit H at 22:2-12; *see also* Exhibit J at 15-58.)

74. The written evidence discussed during the hearing was contained in the packet Plaintiff had received. (Exhibit E at ¶¶ 3-6, 12. *Compare* Exhibit J at 15-61 *with* Exhibit B.)

75. During the hearing, Plaintiff's institutional history, including his disciplinary history, was discussed. (Exhibit G at ¶ 9; Exhibit J at 46:6-50:3); *see also* Exhibit B at 3, 17.)

76. Plaintiff commented on his institutional history, including his disciplinary history. (Exhibit G at ¶ 9; Exhibit J at 46:6-50:3.)

77. During the 2021 hearing, the offenses for which Plaintiff was imprisoned were discussed. (Exhibit J at ¶ 16, pgs. 19:15-36:14); *see also* Exhibit B at 2, 5, 7.)

78. Plaintiff commented on those offenses. (Exhibit J at 19:15-36:14, 56:10-24.)

79. Plaintiff was given opportunities during the parole hearing, near the beginning and end of the hearing, to bring up anything that Plaintiff wanted to be considered during the parole process. (Exhibit G at ¶¶ 4, 9; Exhibit H at 21:19-22:1, 22:15-25; Exhibit J at 18:23-19:14, 56:10-24).)

80. Ms. Wilson-Raw, a KDOC employee, participated in the parole hearing. (Exhibit E at ¶¶ 13-14; Exhibit H at 23:1-9; Exhibit J at 17:2-6, 57:21-59:19.)

81. She made comments during the parole hearing in the Plaintiff's presence that were favorable toward Plaintiff. (Exhibit E at ¶ 15; Exhibit H at 23:1-9; Exhibit J at 57:21-59:19.)

82. Plaintiff responded to some of Ms. Wilson-Raw's comments during the parole hearing. (Exhibit J at 57:21-58:20)

83. Inmates can submit written evidence to the KPRB for consideration during the parole

process. (Exhibit I at 32:3-10; Exhibit J at ¶ 30.)

84. The KPRB takes into consideration any such written evidence from the inmate. (Exhibit I at 32:3-10; Exhibit J at ¶ 31.)

85. Plaintiff did not have any other evidence that he wanted to present. (Exhibit H at 23:14-16.)

86. Inmates are free to reach out to an expert and ask the expert to submit a written report to the KPRB. (Exhibit I at 32:3-10; Exhibit J at ¶ 32.)

87. The KPRB takes into consideration any such written comments by an expert. (Exhibit J at ¶ 33.) Plaintiff has no admissible evidence to the contrary. (*See* Exhibit F at ¶ 11(b).)

88. Plaintiff did not request any expert assistance or testimony for the 2021 hearing. (Exhibit H at 20:11-19.)

89. Further, Plaintiff did not request to introduce any other evidence during the 2021 hearing. (Exhibit H at 20:11-14; 20:20-22; 23:14-16.) Plaintiff has no admissible evidence to the contrary.

90. The KPRB has the authority to subpoena witnesses and documents "necessary for the investigation of the issues before it." K.S.A. 22-3720; (Exhibit J at ¶ 34.)

91. Parole eligibility hearings involve factors (such as institutional history and the offenses for which the inmate has been imprisoned) that do not require investigation, so subpoenas have not historically been used in that context. (Exhibit J at ¶¶ 35-36; *see also id.* at ¶ 37.)

92. Plaintiff did not believe any evidence was considered by the board that seemed inappropriate for them to be considering. (Exhibit H at 23:10-13.)

93. After a parole hearing, the KPRB reviews its notes and has a full-board deliberation within a week of the hearing. (Exhibit G at ¶ 4; Exhibit I at 36:12-37:2.)

94.   Two members of the KPRB have to agree on the parole decision, and usually the decision is reached by consensus. (Exhibit G at ¶ 4; Exhibit I at 30:15-23, 53:25-54:5.)

95.   The KPRB aims to decide the matter within 30 days of the parole hearing. (Exhibit G at ¶ 4.)

96.   Once a decision is reached, a written Final Action Notice is prepared reflecting the decision, any reasons parole was passed, and any recommendations for the resident to improve the chances of parole in the future. (Exhibit G at ¶ 4.)

97.   The Final Action Notice is delivered to the inmate. (Exhibit G at ¶ 4; Exhibit J at ¶ 62.)

98.   The KPRB looks at both static and dynamic factors that change over time and include current behaviors and attitudes. Other factors, such as custody classification, disciplinary records, programming participation records, employment, and others are all based on both historical and current, up-to-date information to allow for the KPRB to gauge and measure an individual's degree of maturation and change over time. (Exhibit G at ¶ 9.)

99.   A decision on Plaintiff's parole was made days after the hearing. (Exhibit E at ¶ 16; Exhibit H at 25:2-24; Exhibit J at ¶ 43, pg. 57:4-20; Doc. 12-1.)

100.   The KPRB provided a written explanation of its decision to Plaintiff, clearly stating the pass reasons and providing recommendations to him.

   a.   Plaintiff received and signed a written action notice on April 16, 2021, regarding his denial of parole. The action notice included a "decision of the Prisoner Review Board" regarding Plaintiff's parole. (Doc. 44 at 3 (stipulation xiii); Doc. 12-1; Exhibit E at ¶¶ 23-25; *see also* Exhibit I at 34:4-10, 34:14-18); K.S.A. 22-3717(j)(1) (saying written notification with reasons shall be provided).

   b.   The action notice Plaintiff received stated the reasons why Plaintiff's parole was

passed. The reasons stated were "Denies responsibility" and "Disciplinary

reports." (Doc. 12-1; Exhibit I at 51:24-52:20, 56:25-58:22, 66; Exhibit J at ¶¶ 44,

47; *see also* Exhibit J at ¶ 13 (listing these as common reasons).)[1]

    c.    The action notice stated that parole would be passed to May 1, 2024. (Doc. 44 at 3

(stipulation xiii); Doc. 12-1; Exhibit H at 25:25-26:3; *see also* Exhibit J at ¶¶ 14-

15 (a three-year pass length does not require additional justification by the

KPRB)); K.S.A. 22-3717(j)(1).

    d.    The action notice included "Recommendations," which included "DR Free."

(Exhibit E at ¶ 26; Doc. 12-1.)

    e.    "DR Free" means to not receive disciplinary reports in the future. (Exhibit E at

¶ 27; Exhibit H at 26:11-23, 27:14-16.)

101. Plaintiff's parole was not passed for other reasons. (*See* Exhibit H at 27:17-28:1, 28:6-18,

37:16-24; Exhibit J at ¶¶ 19, 48, 50-53; Doc. 12-1.)

102. Prior to his March 31, 2021 hearing, Plaintiff received disciplinary reports for the

following conduct:

    a.    Class 1 disciplinary report on November 2, 2020, for Dangerous Contraband.

(Exhibit A at 4; Exhibit E at ¶ 29; Exhibit H at 10:2-14; Exhibit K at ¶¶ 72-73,

pgs. 209-15.)

    b.    Class 1 disciplinary report on March 7, 2020, for Interference with Cell Operation

and Visibility. (Exhibit A at 4; Exhibit E at ¶ 31; Exhibit H at 10:15-23; Exhibit K

at ¶¶ 69-70, pgs. 201-08.)

---

[1] *See Schuemann v. Colo. State Bd. of Adult Parole*, 624 F.2d 172, 174 (10th Cir. 1980) (holding
that detailed explanations are not required for parole-related decisions).

     c.   Class 2 disciplinary report on December 24, 2019, for Violating a Restricted Area. (Exhibit A at 4; Exhibit E at ¶ 33; Exhibit K at ¶¶ 67-68, pgs. 194-200.)

     d.   Class 1 disciplinary report on May 25, 2019, for Interference with Cell Operation and Visibility. (Exhibit A at 4; Exhibit E at ¶ 35; Exhibit H at 10:15-20, 10:24-11:2; Exhibit K at ¶¶ 62, 64, pgs. 182-193.)

     e.   Class 1 disciplinary report on May 25, 2019, for Dangerous Contraband. (Exhibit A at 4; Exhibit E at ¶ 37; Exhibit H at 10:2-14; Exhibit K at ¶¶ 63-64, pgs. 182-193.)

     f.   Class 1 disciplinary report on February 25, 2019, for Dangerous Contraband. (Exhibit A at 4; Exhibit E at ¶ 39; Exhibit H at 10:2-14; Exhibit K at ¶¶ 58-59, pgs. 173-181.)

103.   The packet of information Plaintiff received before the hearing included information on each of these disciplinary reports. (Exhibit B at 3, 17; Exhibit E at ¶¶ 30, 32, 34, 36, 38, 40.)

104.   Plaintiff's youth at the time of the offense *was* considered when making the discretionary parole decision. (Exhibit J at ¶ 49.)

105.   An inmate can request reconsideration of a parole decision by the KPRB on the basis of new evidence. K.A.R. 45-200-2(b); (Exhibit I at 33:2-8).

106.   Plaintiff did not request reconsideration of the 2021 parole decision by the KPRB. (Exhibit J at ¶ 56.)

107.   Parole decisions are also reviewable by the judiciary through a habeas corpus action, with the standard of review being whether the decision is "arbitrary and capricious." *Peltier v. Booker*, 348 F.3d 888, 892 (10th Cir. 2003); *Dimmick v. Bourdon*, 769 F. App'x 616, 619

(10th Cir. 2019); (Exhibit I at 33:2-18).

108. Plaintiff did not contest the parole decision through a habeas corpus action. (Doc. 44 at 3 (stipulation xiv); Exhibit E at ¶ 28.)

### *Pardons and Commutations*

109. The process for pardons and commutations is separate from the parole process. (Doc. 44 at 3 (stipulation xv); Exhibit E at ¶ 66); *see also* K.S.A. 22-3717(g).

110. Plaintiff applied for a pardon from Governor Kelly, but received notice that he was denied a pardon in a letter from the Governor's office dated June 22, 2022. (Doc. 44 at 3 (stipulation xvi); Exhibit D; Exhibit E at ¶¶ 64-65.)

### *2024 Parole Hearing*

111. Plaintiff had another parole hearing on April 4, 2024. (Doc. 44 at 3 (stipulation xvii); Exhibit J at ¶ 57.)

112. Plaintiff's parole was again passed in 2024 because of Plaintiff's disciplinary reports, which again included disciplinary reports that were both severe and recent. (Exhibit J at ¶¶ 60-61, 63, 65, 69, pgs. 71-73; Exhibit G at ¶ 9; Exhibit H at 29:20-22, 30:4-19, 32:5-11; Exhibit I at 56:25-57:5, 57:15-58:7.)

113. The 2024 hearing followed the same procedures as the 2021 hearing. (Exhibit J at ¶ 58.)

114. Plaintiff did not request to have an attorney participate in the 2024 hearing. (*See* Exhibit H at 29:20-30:3.) Plaintiff has no admissible evidence to the contrary.

115. An audio recording was made of the parole hearing. (Exhibit J at ¶¶ 75-77.)

116. When asked at his 2024 parole hearing if he would be willing to give up his cell phone knowing that it would have a favorable impact on the parole decision, Plaintiff said "No." (Exhibit J at ¶¶ 66-67.)

117. Plaintiff has no admissible evidence that he had any evidence that he wanted to present in

the 2024 hearing that was not considered.

118. Plaintiff has no admissible evidence that the KPRB considered any evidence related to

the 2024 parole hearing that seemed inappropriate for them to be considering.

119. Plaintiff received a written action notice in late April 2024 regarding his denial of parole.

(Doc. 44 at 3 (stipulation xviii); Exhibit J at ¶¶ 63-64, pgs. 71-73.)

120. The action notice stated that parole would be passed to May 2025. (Doc. 44 at 3

(stipulation xix); Exhibit J at 71.)

121. The 2024 decision on Plaintiff's parole was also made days after the hearing. (Exhibit J at

¶ 59.)

122. The action notice Plaintiff received stated "Pass Reasons" why Plaintiff's parole was

passed. The sole reason stated was "Disciplinary reports." (Exhibit H at 29:20-22, 30:4-7,

32:5-7; Exhibit J at ¶¶ 60-61, pg. 71; *see also* Exhibit J at ¶ 13 (listing this as a common

reason).)

123. Parole was not passed for other reasons. (Exhibit J at ¶¶ 19, 69-73, pg. 71.)

124. Prior to his April 4, 2024 hearing, Plaintiff received disciplinary reports for the following

conduct:

   a. Class 1 disciplinary report on August 26, 2023, for possession of an unauthorized

   communications device. (Exhibit E at ¶ 44; Exhibit H at 30:8-16; Exhibit K at

   ¶¶ 83-84, pgs. 228-33.)

   b. Class 1 disciplinary report on September 27, 2021, for possession of an

   unauthorized communications device. (Exhibit E at ¶ 43, Exhibit H at 30:8-16;

   Exhibit K at ¶¶ 75-76, pgs. 216-27.)

125. The action notice included "Pass Recommendations," which stated "Remain Free of

Disciplinary Reports." (Exhibit H at 30:17-19; Exhibit J at 71.)

126. Plaintiff was caught with a cell phone again on July 1, 2024 – just twelve weeks after his

hearing when he told the KPRB he would not be willing to give up a cell phone. (Exhibit

E at ¶ 45; Exhibit H at 31:17-20, 37:7-15; Exhibit K at ¶¶ 87-88, pgs. 234-38; *see also*

Exhibit J at ¶¶ 66-67.)

127. Plaintiff's youth at the time of the offense *was* considered when making the discretionary

parole decision. (Exhibit J at ¶ 68.)

128. Plaintiff did not request reconsideration of the 2024 parole decision by the KPRB.

(Exhibit J at ¶ 74.)

129. Plaintiff has no admissible evidence that he has contested the parole decision through a

habeas corpus action.

### *Secretary Zmuda and Governor Kelly*

130. Secretary Zmuda has not had any involvement with any grant or denial of parole for

Plaintiff or any other inmate. (Exhibit I at 11:19-12:13, 30:24-31:8, 66; Exhibit L at ¶¶ 3,

14-18; *see also* Exhibit L, *generally*.) Plaintiff has no admissible evidence to the contrary.

(*See* Exhibit F at ¶¶ 9, 10(d).)

131. The KPRB is the sole decision-making authority for parole decisions. (Exhibit J at ¶ 8;

Exhibit L at ¶ 4.)

132. Secretary Zmuda has not appointed or terminated any member of the KPRB. (Exhibit I at

8:5-14, 10:12-11:18; Exhibit L at ¶¶ 5-6.)

133. Secretary Zmuda's authority over the KPRB is only administrative in nature. He does not

have authority over the KPRB's parole decisions. (Exhibit I at 11:19-12:13, 30:24-31:8,

66; Exhibit L at ¶ 4); *see also* K.S.A. 75-52,152 ("The prisoner review board shall be

*administered* under the supervision of the secretary of corrections." (emphasis added));

K.S.A. 22-3717(g)-(h), (j), (l) (vesting authority over parole directly in the KPRB).

134. Secretary Zmuda has never entered into or revised an agreement or plan with any inmate regarding conditions for parole, such as under K.S.A. 75-5210a(a). (Exhibit L at ¶¶ 7-8; *see also id.* at ¶¶ 9-10.) Plaintiff has no admissible evidence to the contrary. (*See* Exhibit F at ¶ 7.)

135. Secretary Zmuda has never sent a report to the KPRB regarding the appropriateness of parole for any inmate. (Exhibit I at 29:2-22, 51:21-23; Exhibit J at ¶¶ 4-7; Exhibit L at ¶ 13; *see also* Exhibit L at ¶¶ 11-12.) Plaintiff has no admissible evidence to the contrary. (*See* Exhibit F at ¶ 8.)

136. Governor Kelly took no actions related to the matters in this case other than to appoint the Secretary of Corrections. (Exhibit H at 35:5-36:8, 43:10-13.) Plaintiff has no admissible evidence to the contrary.

137. Secretary Zmuda took no actions related to the matters in this case other than accept the Governor's appointment as the Secretary of Corrections. (Exhibit L.) Plaintiff has no admissible evidence to the contrary.

138. Neither Governor Kelly nor Secretary Zmuda participated in the parole process with regard to Plaintiff's denial of parole in either 2021 or 2024. (Exhibit H at 21:13-18, 25:5-10; Exhibit L.) Plaintiff has no admissible evidence to the contrary.

139. Neither Governor Kelly nor Secretary Zmuda personally enforced any parole laws or appear likely to personally enforce any parole laws in the future with regard to Plaintiff or anyone else. (Exhibit L.) Plaintiff has no admissible evidence to the contrary.

**ARGUMENTS AND AUTHORITIES**

***Summary Judgment Standard***

Summary judgment is appropriate when there is no genuine issue as to any material fact

22

and the movant is entitled to judgment as a matter of law. *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *Id.* The nonmoving party cannot create a genuine issue of fact by making allegations clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Facts must be shown through affidavits, deposition transcripts, or incorporated exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. [citation omitted] To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021).

I. **As a matter of state law, the Governor of Kansas and the Secretary of Corrections each lack the legal authority to provide the relief requested by the Plaintiff even if ordered to do so.**

Plaintiff requests that the Court grant relief affecting the parole process in the state of Kansas. (Doc. 44 at 24-26.) Under Kansas law, the parole process is overseen by the KPRB with clerical involvement by the Kansas Department of Corrections (KDOC). (Defendants' Statement of Facts ¶ 133.) As a matter of Kansas law, Governor Kelly's limited legal authority over KDOC includes the power to appoint and terminate the Secretary of Corrections. K.S.A. 75-5203(a). In turn, the Secretary of Corrections' limited legal authority over the KPRB includes the power to appoint and terminate the three members of the KPRB. K.S.A. 75-52,152. The Governor has no direct authority over the KPRB and cannot even appoint or terminate members of the KPRB. The Secretary, as the "chief executive officer" of KDOC under K.S.A. 75-5203(a) has authority over administrative matters involving the KPRB, which is "within the Kansas department of corrections" under K.S.A. 75-52,152. (Defendants' Statement of Facts ¶ 133.) But the Secretary does not have authority over substantive matters entrusted by the legislature directly to the

KPRB. (Defendants' Statement of Facts ¶ 133.)

The powers and duties of a state-government officer are determined by state law. *See Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 914 (E.D. Wis. 2002) (citing *Sherman v. Cmty. Sch. Dist. 21*, 980 F.2d 437, 441 (7th Cir. 1992)). When a statute delegates authority to a particular officer, sub-delegation to a subordinate officer is generally permitted absent some affirmative indication of a contrary legislative intent. *See G.H. Daniels III & Assocs., Inc. v. Perez*, 626 F. App'x 205, 212 (10th Cir. 2015); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1190 (10th Cir. 2014) (citing *Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 121 (1947)). To this end, the Governor of Kansas has the ability to hire various employees to serve as agents to assist in fulfilling the Governor's statutory duties. K.S.A. 75-3102, -108. The Governor can issue direct orders to those employees because the statutory duties are the Governor's. Similarly, the Secretary of Corrections has the ability to hire various employees to serve as agents to assist in fulfilling the Secretary's statutory duties. K.S.A. 75-5205(c). The Secretary can issue direct orders to them because the statutory duties are the Secretary's.

But the members of the KPRB do *not* serve as such agents and do not derive their legal authority in that manner. The members of the KPRB have their own statutory directives that provide them with authority separate from that of the Governor and the Secretary. *See, e.g.,* K.S.A. 22-3717(g)-(j), 75-52,152 *et seq.* Plaintiff has not established that the Governor or Secretary have any substantive authority over the parole process, which has been entrusted by the legislature specifically to the KPRB. It falls outside the Governor's and Secretary's purview.

Like all Kansas officials, the Governor has limited authority. She does not have absolute power over the state government or even absolute power over the state executive branch. The executive branch in Kansas even includes multiple different elected officials, including the

Governor, the Lieutenant Governor, the Attorney General, the Secretary of State, the Treasurer, and the Insurance Commissioner. Kan. Const. art. 1, § 1; K.S.A. 25-101b; K.S.A. 40-106. "The Kansas Constitution merely gives the Governor generalized responsibility for 'enforcement of the laws of this state.'" *Day v. Sebelius*, 376 F. Supp. 2d 1022, 1031 (D. Kan. 2005) (quoting Kan. Const. art. 1, § 3) (cited approvingly by *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 966 (10th Cir. 2021).); *see, e.g.,* Kan. Const. art. 1, §§ 4 (officers submit reports to the governor), 6 (governor can reorganize agencies), 11 (governor can fill vacancies by appointment for certain officers). For nonelected executive officials outside the Governor's office, the Governor generally has indirect influence through appointment and removal. *See, e.g.,* K.S.A. 75-5203(a) (appointment and removal of the secretary of corrections); *see also Myers v. United States*, 272 U.S. 52, 132 (1926) ("Made responsible under the Constitution for the effective enforcement of the law, the President needs as an indispensable aid to meet it *the disciplinary influence* upon those who act under him *of a reserve power of removal*." (emphasis added)).

It would be inconsistent with the rest of Kansas law for the phrase "supreme executive power" to mean the Governor has *direct* authority over every state official and over every state law. But the unique role of the Governor does prevent other branches of government from encroaching on her authority. For example, it has prevented statutes from impermissibly interfering with executive authority by delegating direct and indirect executive power to a council made up mostly of legislators. *State ex rel. Schneider v. Bennett*, 219 Kan. 285, Syl. ¶¶ 1-5, 7, pgs. 297-98. Here, the Governor appropriately has indirect influence on the KPRB through a chain of appointment and removal powers, and no other branch has displaced the Governor's unique role. The Governor's lack of direct control does not impermissibly intrude on the Governor's constitutional authority.

If Governor Kelly exercised authority beyond what is granted to her by state law, that would open her up to *quo warranto* actions under Kansas law for exceeding her authority. Under Kansas law, both the Governor and the Attorney General can bring *quo warranto* actions against other government entities for allegedly exceeding lawful authority. Kan. Const., art. 3, § 3 (the Kansas Supreme Court can exercise original jurisdiction over *quo warranto* actions); K.S.A. 60-1201 *et seq.* (*quo warranto* actions); K.S.A. 75-108 (actions by the Governor); *see also, e.g., Kelly v. Legis. Coordinating Council*, 311 Kan. 339, 344-45 (2020) (the Governor can bring a *quo warranto* action against an agency of the legislative branch); *State ex rel. Schmidt v. Kelly*, 309 Kan. 887, 892 (2019) (the Attorney General can bring a *quo warranto* action against the Governor). Because the Attorney General has the legal authority to bring a *quo warranto* action against the Governor, *State ex rel. Schmidt*, 309 Kan. at 892, if the Court orders Governor Kelly to exceed her authority with regard to the parole process, the Attorney General could potentially bring a *quo warranto* action to stop the Governor from unlawfully intruding into or exercising authority vested with the KPRB. *See* K.S.A. 60-1202(1).

## II. Eleventh Amendment immunity bars claims for injunctive and declaratory relief when a plaintiff lacks constitutional standing to raise the *Ex Parte Young* exception.

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). State officials share the state's immunity from suits against them in their official capacities. *See id.; White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212. A narrow exception, the *Ex Parte Young* exception, allows a plaintiff to seek prospective relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v.*

*Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)); *see also Ex Parte Young*, 209 U.S. 123 (1908). But a plaintiff must have constitutional standing to invoke the *Ex Parte Young* exception. *Johnston v. Prairie View, Inc.*, No. 19-2041-HLT, 2020 WL 1984287, at *3 (D. Kan. Apr. 27, 2020); *see also James v. Hegar*, 86 F.4th 1076, 1078 (5th Cir. 2023).

For the reasons argued in the following section, Plaintiff lacks constitutional standing for his claims and therefore Plaintiff cannot invoke the *Ex Parte Young* exception. Accordingly, Plaintiff's claims are barred by Eleventh Amendment immunity.

**III.    Eleventh Amendment immunity bars Plaintiff's claims because Plaintiff cannot establish constitutional standing due to lack of an actual injury, lack of causation, and lack of redressability.**

To establish federal subject-matter jurisdiction, plaintiffs must show that they have standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The "irreducible constitutional minimum of standing" contains a triad of requirements: injury in fact, causation, and redressability. *Id*. at 102-03. This triad "constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Id.* at 103-04. And "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

**A.  Plaintiff lacks standing with regard to any Defendants to assert claims for declaratory or injunctive relief on behalf of other persons.**

Outside of a class action, an inmate plaintiff must assert injuries to his own constitutional rights and lacks standing to raise claims on behalf of other inmates. *Abdulhaseeb v. Saffle*, 65 F. App'x 667, 670 & n.3 (10th Cir. 2003); *Cotner v. Hopkins*, 795 F.2d 900, 902 (10th Cir. 1986). Here, Plaintiff did not seek to have this case certified as a class action, and it has not been. (*See*

Docket; Doc. 44; Doc. 9.) Yet in Plaintiff's factual allegations in the pretrial order, Plaintiff

alleges harm to other inmates "similarly situated" to him. (Doc. 44 at 10-12, 14.) And in his

relief requested, he requests remedies on behalf of other inmates "similarly situated" to him.

(Doc. 44 at 25.) But Plaintiff lacks standing to raise claims on behalf of other inmates.

**B. Plaintiff lacks standing with regard to any Defendants to request declaratory or injunctive relief unrelated to any established, ongoing injuries.**

The first element of the standing analysis requires that a plaintiff allege and ultimately

prove "an 'injury in fact'—a harm suffered by the plaintiff that is concrete and actual or

imminent, not conjectural or hypothetical." *Steel Co.*, 523 U.S. at 103. "The 'injury in fact'

requirement differs depending on whether the plaintiff seeks prospective or retrospective relief."

*Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014).

To recover damages, a form of retroactive relief, it suffices to demonstrate a past harm that is

concrete and particularized. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1284, 1290 n.16 (10th

Cir. 2004). But "[w]hen prospective relief—such as an injunction—is sought, the plaintiff must

be suffering a continuing injury or be under a real and immediate threat of being injured in the

future." *Colorado Cross*, 765 F.3d at 1211. Similarly, standing to request declaratory relief

requires an ongoing injury. *See Barney v. Pulsipher*, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998)

("A plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate

a good chance of being likewise injured in the future.").

At the summary judgment stage, "mere allegations of injury are insufficient," and courts

"look instead to whether the summary judgment record supports a conclusion that the plaintiffs

have standing." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir.

2010) (citing *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999)).

"Therefore, Defendants should prevail on standing grounds if the record is devoid of evidence

raising a genuine issue of material fact that would support the plaintiff's ultimate burden of proving standing." *Id.*

The injury here cannot simply be a denial of parole because contesting a denial of parole must be done through a habeas corpus action, not a § 1983 action. *Dimmick v. Bourdon*, 769 F. App'x 616, 618-19 (10th Cir. 2019). Rather, in this § 1983 action, Plaintiff must show that he was harmed by parole *procedures*. *See id.* So any request for prospective injunctive or declaratory relief must be supported by establishing an ongoing injury caused by parole procedures related to the requested relief. *See Colorado Cross*, 765 F.3d at 1211.

Here, Plaintiff fails to establish an injury in fact for any of his claims for injunctive and declaratory relief. Plaintiff has failed to establish as an initial matter that he is suffering any ongoing harm. Plaintiff requests the following declaratory relief:

> that Defendants have operated, and continue to operate, a parole scheme that denies individuals, such as Mr. Makthepharak, who are serving parole-eligible life sentences for offenses committed as a juvenile, a meaningful and realistic opportunity for release, in violation of the prohibition against cruel and unusual punishment in the Eighth Amendment.

But the uncontested evidence shows that his parole was denied due to his own bad behavior. He was provided notice that his disciplinary reports may be considered, he had the opportunity to comment on them, and his parole was ultimately denied due to them. Plaintiff has failed to establish anything about the parole procedures that harmed him. He also requests declaratory relief holding:

> that Mr. Makthepharak is serving a *de facto* LWOP sentence under which he has not been afforded any meaningful or realistic opportunity for release, in violation of the prohibitions against cruel and unusual punishment in the Eighth Amendment.

But, as argued above, Plaintiff has failed to establish anything about the parole procedures that harmed him. And Plaintiff has failed to establish that parole is rarely granted such that it might

constitute a *de facto* life-without-parole sentence. He also requests declaratory relief holding:

> that K.S.A. § 75-5210a, which grants the Secretary of Corrections the exclusive authority to fashion the conditions of parole-ability for an inmate serving a parole-eligible life sentence, is unconstitutional as applied to individuals, including Mr. Makthepharak, who were juveniles at the time of their offenses.

But Plaintiff has not established that the Secretary of Corrections had any adverse influence over

Plaintiff's parole process at all. Plaintiff also requests declaratory relief holding:

> that K.S.A. § 22-3717(g)-(h), precluding the Parole Review Board from granting parole to an inmate serving a parole-eligible life sentence without the approval of the Secretary of Corrections, and setting the further factors the Parole Review Board should consider, is unconstitutional as applied to individuals, including Mr. Makthepharak, who were juveniles at the time of their offenses.

But lack of approval by the Secretary of Corrections was not a factor in Plaintiff's parole

decision, so it did not harm him. And the KPRB considered his status as a youthful offender in

the parole decisions. Plaintiff also requests declaratory relief holding:

> that Defendants' reliance on risk assessment tools that discriminate against those who were juveniles at the time of their offense to assess opportunities for release has denied Mr. Makthepharak a meaningful and realistic opportunity for release upon a showing of rehabilitation, in violation of the Eighth Amendment.

But Plaintiff has not shown that anything other than disciplinary reports contributed to his latest

denial of parole. Plaintiff also requests declaratory relief holding:

> that Defendants have denied Mr. Makthepharak and those similarly situated, a meaningful and realistic opportunity for release by denying him access to critical rehabilitative opportunities through policies and practices automatically barring him from minimum security classification regardless of individual merit, in violation of the prohibitions against cruel and unusual punishment in the Eighth Amendment.

But Plaintiff has not shown that he is barred from minimum custody or that his security

classification adversely affected his parole decisions.

Plaintiff also requests injunctive relief. Plaintiff requests an injunction:

> Ending the Secretary of Corrections' unilateral determination of the conditions of parole-ability for an inmate sentenced as a juvenile to a parole-eligible life sentence.

But Plaintiff has not shown that the Secretary of Corrections had any adverse influence over Plaintiff's parole process at all. Plaintiff also requests an injunction:

> Requiring the Parole Review Board to disclose to the inmate all evidence to be considered before a parole hearing.

But Plaintiff has not shown that his denials of parole were based on any evidence not disclosed to him before his parole hearings. (His disciplinary report record was disclosed to him before his parole hearings.) Plaintiff also requests an injunction:

> Requiring the Parole Review Board to provide the inmate an opportunity to be heard and present evidence in support of release.

But Plaintiff plainly had an opportunity to be heard and to present evidence in support of release. Plaintiff also requests an injunction:

> Requiring the Parole Review Board to provide the inmate a right to hear and confront adverse witnesses as necessary.

But Plaintiff has not established that any adverse witnesses testified against him at all. The only witness who testified in 2021, Ms. Wilson-Raw, gave testimony favorable to Plaintiff in Plaintiff's presence. Plaintiff even responded to some of Ms. Wilson-Raw's comments. Plaintiff also requests an injunction:

> Requiring the Parole Review Board to make a recording of every parole interview for the purposes of administrative and judicial review.

But recordings are already made. Plaintiff also requests an injunction:

> Requiring the Parole Review Board to prepare a written decision that is comprehensible and sufficiently detailed for a reviewing court to evaluate.

But the parole board did prepare written decisions that are comprehensible and sufficiently detailed to make clear why his parole was denied. Parole was denied due to Plaintiff's own bad

behavior. Plaintiff also requests an injunction:

> Requiring the Secretary of Corrections and the Parole Review Board to focus their parole inquiry as to these inmates on rehabilitation rather than the crime severity or older institutional disciplinary history, make the mitigation of youth central to the parole interview and decision, and create a presumption of relief for inmates sentenced as juveniles to parole-eligible life sentences.

But Plaintiff has not established that the Secretary had any involvement in the parole process at all or that the KPRB focused their inquiry on crime severity or older institutional disciplinary history. The KPRB considered Plaintiff's youthful-offender status. The parole interview discussed Plaintiff's youth and his growth since then. Plaintiff's parole was denied due to his own bad behavior, not due to any adverse presumption. Plaintiff also requests an injunction:

> Requiring the Governor, the Secretary of Corrections and the Parole Review Board to institute a meaningful administrative and judicial process to review decisions of the Parole Review Board.

But Plaintiff did not attempt to use the existing administrative and judicial review processes, so he cannot establish that he was injured by any infirmities in these existing processes.

Plaintiff has failed to establish an ongoing injury caused by parole procedures that would support any of his requested declaratory or injunctive relief.

### C. Plaintiff lacks standing for claims against Governor Kelly and Secretary Zmuda because they lack legal authority over parole decisions.

*1. Governor Kelly and Secretary Zmuda lack the legal authority to establish a credible threat of enforcement as would be necessary to establish causation.*

For the second prong, causation, "there must be . . . a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co.*, 523 U.S. at 103. For this reason, under binding Supreme Court precedent, a plaintiff lacks standing to bring a claim against a state official (such as a claim under *Ex Parte Young*) in the absence of a "credible threat of enforcement" by that official. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159

(2014). Indeed, *Ex Parte Young* itself specified that the official enjoined must have "some connection with the enforcement of the act, or else [the requested injunction would be] merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex Parte Young*, 209 U.S. at 157. "To determine whether a state official has 'some connection' to the law's enforcement, courts look at the official's duties and powers under state law." *Deida v. City of Milwaukee*, 192 F. Supp. 2d 899, 914 (E.D. Wis. 2002) (citing *Sherman v. Cmty. Sch. Dist. 21*, 980 F.2d 437, 441 (7th Cir. 1992)).

Plaintiff has cited *Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012), arguing that it permits suit to be brought against a governor because a governor bears generalized responsibility for enforcing state law. (Doc. 23 at 10-11, 13 (citing *Petrella*).) But the Tenth Circuit already addressed this argument in *Hendrickson*. As the Court explained in *Hendrickson* in distinguishing *Petrella*, generalized responsibility for enforcement of the laws is not enough where there is a separate statutory scheme vesting enforcement authority with another body, such as is the case here. *Hendrickson*, 992 F.3d at 967-68. Further, to the extent *Petrella* does not require a credible threat of enforcement, it would have been abrogated by *Susan B. Anthony List* and it would also have been inconsistent with the original holding of *Ex Parte Young* that required "some connection with the enforcement of the act."

Here, Plaintiff has not established any conduct by Governor Kelly or Secretary Zmuda that could be fairly traced and connected to Plaintiff's injuries or that could support a credible threat of enforcement. In fact, Governor Kelly and Secretary Zmuda *cannot* legally enforce the applicable parole statutes. No credible threat of enforcement by them has been established under *Susan B. Anthony List,* 573 U.S. 149, 159 (2014). Further, Plaintiff has not otherwise established causation by them. Therefore, Plaintiff lacks constitutional standing against Governor Kelly and

Secretary Zmuda because he has not established causation by them.

2. *Governor Kelly and Secretary Zmuda lack the ability to provide redress due to lack of legal authority.*

For the third prong of the standing inquiry, redressability, the relief sought must serve to either reimburse the plaintiff for losses or to eliminate lingering effects of losses. *See id.* at 105-06. "Relief that does not remedy the injury suffered" does not count. *Id.* at 107. Accordingly, under binding Tenth Circuit precedent, *Ex Parte Young* does not allow claims brought against a state governor or attorney general who lacks the legal authority to provide the requested injunctive relief. *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 966-68 (10th Cir. 2021); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010); *Day v. Sebelius*, 376 F. Supp. 2d 1022, 1031 (D. Kan. 2005) (cited approvingly by *Hendrickson*, 992 F.3d at 966) (holding that the "general enforcement power" of the Kansas Governor "is not sufficient to establish the connection to the [specific] statute required to meet the *Ex parte Young* exception to Eleventh Amendment immunity").

Here, Governor Kelly and Secretary Zmuda do not control or oversee parole decisions. Even if they were ordered to do so, they would have no legal authority to provide redress by making changes to the parole process. *See United States v. Rylander*, 460 U.S. 752, 757 (1983) ("the court . . . will not be blind to evidence that compliance [with a court order] is . . . factually impossible"). Therefore, under *Hendrickson*, Plaintiff lacks standing to raise the *Ex Parte Young* exception for claims against Governor Kelly and Secretary Zmuda due to lack of redressability.

**D. Plaintiff lacks standing to request some requested injunctive relief due to lack of redressability because it would exceed the Court's authority to grant.**

Plaintiff requests the following injunctive relief:

Requiring the Governor, the Secretary of Corrections and the Parole Review Board to institute a meaningful administrative and judicial process to review

decisions of the Parole Review Board.

As an initial matter, it is axiomatic that executive officials in Kansas do not have authority to legislate a new "judicial process," as plaintiff has requested. Defendants are executive officials, not members of the legislative or judicial branches.

Additionally, under the federal structure of the United States Constitution, the federal government cannot command the states how to use their legislative or quasi-legislative authority. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474-77 (2018); *Fed. Energy Regul. Comm'n v. Mississippi*, 456 U.S. 742, 761 (1982). So the remedy Plaintiffs seek, a command from the federal government to state officials to promulgate a policy under their alleged quasi-legislative or legislative authority, is not legally available.

Further, to the extent that Plaintiff requests that Governor Kelly and Secretary Zmuda be ordered to exercise substantive authority over the KPRB with regard to the parole process, that would also exceed the Court's authority to grant. The federal government cannot rewrite state laws to expand the state-law powers of a state official.[2] Accordingly, it would exceed the Court's authority to order Governor Kelly or Secretary Zmuda to direct the KPRB in ways they do not have authority under state law to do. The Court cannot grant Governor Kelly or Secretary Zmuda authority to do anything with regard to the parole process beyond appointing or terminating the Secretary of Corrections or the KPRB members, respectively. And this federal Court lacks the authority to order the termination of a state official. *Page v. Schnurr*, No. 20-3289-SAC, 2021 WL 3634687, at *6 (D. Kan. Aug. 17, 2021); *see also White v. Mass. Council of Constr. Emps., Inc.*, 460 U.S. 204, 221 (1983) (Blackmun, J., concurring) (discussing "the State's special

---

[2] *See, e.g., Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 24 (1st Cir. 2018); *Eubanks v. Wilkinson*, 937 F.2d 1118, 1126 (6th Cir. 1991); *Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1333 (11th Cir. 2021).

sovereign interest in determining whom it will hire, and in setting the terms and conditions of public employment"). Governor Kelly and Secretary Zmuda have no other legal authority over the parole process regarding which the Court could issue orders. So any injunctive relief ordered by this Court against Governor Kelly or Secretary Zmuda in this case would require them to exceed their lawful authority under Kansas law.

Accordingly, all of the above-mentioned relief would fail to provide legal redress, so Plaintiff lacks constitutional standing to seek such relief.

### E. The unpublished opinion in *Thomas v. Stitt* regarding a screening order involving Oklahoma officials fails to command a different result in this case.

In the unpublished opinion in *Thomas v. Stitt*, No. 21-6011, 2022 WL 289661 (10th Cir. Feb. 1, 2022), previously relied on by Plaintiff, none of the above arguments were raised because that case had been dismissed on screening before any arguments were made by any defendants. *Thomas*, 2022 WL 289661, at *1. Immunity and standing arguments were not considered. The case did not involve Kansas officials or Kansas law. No arguments were considered regarding which officials in the state of Kansas have authority over the parole process. *Thomas* did not find that the sovereign immunity of the state of Kansas has been abrogated. The unpublished order in *Thomas* regarding a screening order involving Oklahoma officials is of limited persuasive value in this case involving a summary-judgment motion by Kansas officials raising arguments involving the peculiarities of Kansas law. Instead, the Court should base its decision on the uncontested evidence in this case and the binding and persuasive decisions cited in this motion.

### F. Conclusion Regarding Immunity and Standing

For all of the above reasons, Plaintiff lacks standing to raise the *Ex Parte Young* exception for his claims, so Plaintiff's claims should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity and lack of constitutional standing.

IV.    **Alternatively, Plaintiff's claims are not ripe because any procedural problems with the parole process have not resulted in a denial of parole.**

Plaintiff's claims are not ripe because they rely on "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1097 (10th Cir. 2006). Plaintiff's parole has been denied due to disciplinary reports. Even if some aspects of the parole process might hypothetically in the future result in a constitutional violation, those aspects have not affected any parole decisions related to Plaintiff so far, so his claims would not be ripe.

V.    **Some of Plaintiff's claims are also moot due to a superseding parole decision and Defendant Ogletree's retirement.**

Some of Plaintiff's requested injunctive and declaratory relief is moot due to lack of an ongoing injury or redressability. *See Arizonans for Off. Eng. v. Arizona,* 520 U.S. 43, 67 (1997) ("an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed"); *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1224 (10th Cir. 2009) (saying that "a declaratory or injunctive action" becomes moot when the plaintiff can no longer "demonstrate a good chance of being likewise injured by the defendant in the future").

In the pretrial order, Plaintiff alleges that his 2021 denial of parole was based "principally" on him denying responsibility for his offenses. (Doc. 44 at 10, 12.) But a superseding parole decision in 2024 was based solely on disciplinary reports. So Plaintiff is not suffering any ongoing injury due to parole decisions being based on him denying responsibility. So, to the extent any claim alleges that parole decisions are based on him denying responsibility, it is moot, depriving the Court of subject-matter jurisdiction over those allegations.[3]

---

[3] Further, Plaintiff has not made allegations of wrongdoing specific to his latest parole hearing in April 2024 and has waived the ability to do so. (*See* Doc. 44 at 5-14, 22-23; *see also* Doc. 9); *Henry v. Bd. of Leavenworth Cnty Comm'rs*, 64 F. Supp. 2d 1042, 1050 n.21 (D. Kan. 1999).

Additionally, Defendant Ogletree has retired from the KPRB. (Exhibit I at 7:18-8:2.) So Ogletree now lacks legal authority over parole decisions, which means he does not present a credible threat of enforcement as would be necessary to establish causation for any ongoing injuries nor does he have the ability to provide redress. Therefore, an "actual controversy" with Ogletree no longer exists, *see Arizonans,* 520 U.S. at 67, and Plaintiff's claims against Defendant Ogletree are moot, depriving the Court of subject-matter jurisdiction over those claims.

## VI.  **Alternatively, Plaintiff has failed to meet his burden to establish an Eighth Amendment violation.**

### A.  **The Eighth Amendment does not apply to the facts of this case because parole decisions and procedures are not punitive under the Eighth Amendment.**

To preserve the argument, *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016) – cases about criminal sentencing – do not apply to the parole process. *Bowling v. Director*, 920 F.3d 192, 197 (4th Cir. 2019); *United States v. Sparks*, 941 F.3d 748, 754 (5th Cir. 2019); *Brown v. Precythe*, 46 F.4th 879, 886 (8th Cir. 2022). Parole decisions and procedures are not punitive under the Eighth Amendment. *Diaz v. Lampela*, 601 F. App'x 670, 676 (10th Cir. 2015) (citing *Mahn v. Gunter*, 978 F.2d 599, 602 n.7 (10th Cir. 1992)).

### B.  **Plaintiff has not demonstrated that the parole process was a sham such that he did not enjoy a meaningful and realistic opportunity for release.**

In both *Graham* and *Miller*, the Court said, in the context of prohibiting certain sentences of life without parole, that "some meaningful opportunity for release" must be provided. *Graham*, 560 U.S. at 75 (2010); *Miller*, 567 U.S. at 479 (2012). The Tenth Circuit has specifically found that "[a] discretionary parole system can . . . comply with Graham." *Rainer v. Hansen*, 952 F.3d 1203, 1210 (10th Cir. 2020). If the *Graham* standard affects parole decisions, it only affects them as far as this: "The parole process cannot be a sham." *Heredia v. Blythe*, 638

F. Supp. 3d 984, 999 (W.D. Wis. 2022). The Tenth Circuit has rejected a request to impose "procedural safeguards" on the parole process under *Graham*. *Rainer*, 952 F.3d at 1210; *see also Brown v. Precythe*, 46 F.4th 879, 890 (8th Cir. 2022). While the Supreme Court has imposed *sentencing* requirements, "the Court has never suggested that juvenile offenders are different from adult offenders *in the context of a parole decision*." *Heredia*, 638 F. Supp. 3d at 997 (emphasis added). And the *Graham* case also stated that "[a] State is not required to guarantee eventual freedom." *Graham*, 560 U.S. at 75.

Here, Plaintiff has failed to establish that the parole process in Kansas is a sham such that he did not enjoy a meaningful and realistic opportunity for release. Further, Plaintiff cites no legal authority for the Eighth Amendment to be interpreted as a mandate for specific procedural rules in a parole process when constitutional amendments that *have* been interpreted to require specific procedural rules do not require the rules Plaintiff requests. *See Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7 (1979) (holding that federal due process rights do not attach to parole hearings); *Jones v. Rivers*, 338 F.2d 862, 871 (4th Cir. 1964) ("The right of counsel under the Sixth Amendment does not apply to parole hearings; it applies only to trials in court."). Therefore, summary judgment should be granted to Defendants because Plaintiff has failed to establish an Eight Amendment violation.

**C. Alternatively, Plaintiff did enjoy a meaningful and realistic opportunity for release.**

The uncontested evidence shows that Plaintiff enjoyed a meaningful and realistic opportunity for release. The KPRB considered his youth at the time of the offense when making the discretionary parole decision. The KPRB provided notice of the evidence to be considered, including Plaintiff's disciplinary history, and provided an opportunity to comment on that evidence, including an opportunity to comment on Plaintiff's disciplinary history. Plaintiff did comment on his disciplinary history. The most recent decision to pass parole was based entirely

on Plaintiff's own bad behavior as documented by his disciplinary reports. Plaintiff even

admitted that he did not think the KPRB considered any evidence that was inappropriate for

them to consider. (Exhibit H at 23:10-13.) So Plaintiff has admitted that it is appropriate for the

KPRB to consider his disciplinary reports. Therefore, summary judgment should be granted to

Defendants because Plaintiff has failed to establish an Eight Amendment violation.

## VII.    Alternatively, Governor Kelly and Secretary Zmuda are entitled to summary judgment on Plaintiff's claims because Plaintiff fails to state the requisite personal participation by them.

"Liability under § 1983 requires personal participation in the unlawful acts." *Beedle v.

Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005); *see also Schneider v. City of Grand Junction

Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). Legally, "liability" does not refer merely to

monetary damages, but more broadly to legal responsibility to provide redress in general.

Liability(1), Black's Law Dictionary (12th ed. 2024) ("The quality, state, or condition of being

legally obligated or accountable; legal responsibility to another or to society, enforceable by civil

remedy or criminal punishment"). Here, Governor Kelly and Secretary Zmuda did not act at all,

so they should be granted summary judgment due to lack of personal participation in any injury.

## VIII.    Alternatively, strong considerations of comity require giving the state of Kansas the first opportunity to correct its errors.

"[T]he strong considerations of comity that require giving a state court system that has

convicted a defendant the first opportunity to correct its own errors also require giving the States

the first opportunity to correct the errors made in the internal administration of their prisons."

*Lewis v. Casey*, 518 U.S. 343, 362 (1996). Accordingly, federal courts should not "dictat[e]

precisely what course the State should follow" in this area. *Id.* Here, the state of Kansas should

be given the first opportunity to correct any errors the Court identifies.

For these reasons, Defendants request that the Court grant them summary judgment.

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
785-296-2215
Fax: (785) 291-3767
*Attorney for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of November, 2024, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

Jonathan Sternberg and Brody Sabor
Jonathan Sternberg, Attorney, PC
2323 Grand Blvd., Suite 1100
Kansas City, MO 64108-2607
jonathan@sternberg-law.com
*Attorneys for Plaintiff*

*/s/ Matthew L. Shoger*
Matthew L. Shoger
Assistant Attorney General