Exhibit I

### In the Matter Of:

## MAKTHEPHARAK V. KELLY

2:23-cv-02121-DDC-RES

## JONATHAN OGLETREE

*August 29, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF KANSAS

 3

 4   SASHADA MAKTHEPHARAK,

 5                    Plaintiff,

 6   vs.                            Case No.
                                    2:23-cv-02121-DDC-RES
 7   LAURA KELLY, et alia,

 8                    Defendants.

 9

10

11              REMOTE DEPOSITION OF JONATHAN OGLETREE,

12   taken on behalf of the Plaintiff before Carrie Easton

13   Logback, RPR, CRR, CBC, CCR No. 1430, CCR No. 899,

14   (appeared via Zoom video conference) pursuant to Notice

15   on the 29th day of August, 2024, at Lansing Community

16   Library, 730 1st Terrace, Lansing, Kansas 66043.

17

18

19

20

21

22

23

24

25
```



```
 1                         INDEX

 2   WITNESS:                                      PAGE

 3     JONATHAN OGLETREE

 4       Examination by Mr. Sternberg              4

 5       Certificate of Certified Shorthand Reporter    63

 6

 7

 8                       EXHIBITS

 9   EXHIBIT                                       PAGE
     NUMBER                 DESCRIPTION            IDENTIFIED
10

11   Exhibit 1   Statutes Re: Prisoner Review Board    13

12   Exhibit 3   Executive Order                  14

13   Exhibit 4   Kansas DOC website printout      41

14   Exhibit 5   Youthful Offender Information     28

15   Exhibit 6   Notice of Decision               35

16

17   NOTE:   Exhibits were attached to the transcript.

18

19

20

21

22

23

24

25
```



```
 1                          APPEARANCES

 2

 3   APPEARING  FOR  THE  PLAINTIFF:

 4        JONATHAN  STERNBERG,  ATTORNEY,  P.C.
          2323  Grand  Boulevard  #1100
 5        Kansas  City,  Missouri  64108
          (816)292-7020
 6        jonathan@sternberg-law.com
          By:   Jonathan  Sternberg
 7

 8   APPEARING  FOR  THE  DEFENDANT:

 9        OFFICE  OF  THE  KANSAS  ATTORNEY  GENERAL
          120  SW  10th  Avenue
10        2nd  Floor
          Topeka,  Kansas  66612
11        (785)296-2215
          shon.qualseth@ag.ks.gov
12        matt.shoger@ag.ks.gov
          By:   Shon  D.  Qualseth
13              Matthew  L.  Shoger

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              (Deposition commenced at 9:57 a.m.)
 2                      JONATHAN OGLETREE,
 3   being first duly sworn, via Zoom videoconference,
 4   testified under oath as follows:
 5                      EXAMINATION
 6   BY MR. STERNBERG:
 7        Q.   Mr. Ogletree, we have not had the opportunity
 8   to meet.  My name is Jonathan Sternberg, and I
 9   represent the plaintiff, Sashada Makthepharak, in this
10   case.  Can you state your name and address for the
11   record, please?
12        A.   Jonathan Ogletree.  29 -- it's 2124 Birch
13   Street, Leavenworth, Kansas, 66048.
14        Q.   And these are preliminary questions I would
15   always ask, but are you on any medications today that
16   would prevent you from answering any questions or
17   giving truthful testimony?
18        A.   No.
19        Q.   Have you ever had your deposition taken
20   before?
21        A.   No.
22        Q.   Okay.  So let's just go over a couple of
23   ground rules to start this off.  One thing is, we can't
24   talk over each other, and this has been made very
25   clear, or the reporter can't get an accurate record.
```

1   It can be a tough rule to follow, but I'll ask that you

2   wait for me to give a full question, and then I'll wait

3   for you to give a full answer; is that fair?

4          A.   Yes.

5          Q.   Now, I will need a verbal response as well.

6   No head nods, head shakes.  Try to avoid using yeah or

7   nah.  And if I ask you whether your answer was a yes or

8   a no, I'm not trying to be confrontational or anything,

9   I'm just trying to make sure we have an accurate

10  record; do you understand that?

11         A.   Yes.

12         Q.   And your counsel, Mr. Qualseth, may lodge

13  some objections during the deposition, but unless they

14  instruct you not to answer, you are to go forward and

15  give your answer subject to that objection; you

16  understand that?

17         A.   Yes.

18         Q.   And if you don't understand a question or if

19  you need it to be repeated, just go ahead and ask me to

20  do that, and I will, okay?

21         A.   Okay.

22         Q.   Finally, you are free to ask for a break

23  anytime you want, with the one exception you can't ask

24  for one if I've just asked you a question; is that

25  fair?



1       A.   Yes.

2       Q.   Can you describe your education, college,

3  grad school, post-grad, whatever it might be?

4       A.   I have a bachelor's degree in management and

5  I have a master's degree in management and leadership.

6       Q.   Now, you are -- were recently the chair or

7  president of the Kansas Prisoner Review Board; is that

8  correct?

9       A.   Correct.

10      Q.   Are you still in that position?

11      A.   No.

12      Q.   Is there a new president or chair that has

13 been appointed, to your knowledge?

14      A.   Not to my knowledge.

15      Q.   Just to be clear, before we go forward, are

16 you a lawyer?

17      A.   No.

18      Q.   Okay.  How long -- when did you stop being

19 the president or chair, and what is it called, of the

20 Kansas Prisoner Review Board?

21      A.   It's the chair of the Kansas Prisoner Review

22 Board, and I actually resigned 1 August 2024.

23      Q.   How long had you been in that position?

24      A.   Eight years.  I was appointed January 3rd

25 of 2016.



1      Q.   Why did you resign?

2      A.   I retired.

3      Q.   Ah, fair enough.

4      A.   Yes.

5      Q.   How did you obtain this position as the chair

6  of the Prisoner Review Board?

7      A.   I was previously a member of the board since

8  July 1st, 2011.

9      Q.   Who -- were you appointed then?

10      A.   I was appointed by the current secretary at

11  the time, which was Ray Roberts.

12      Q.   When you say the secretary, what do you mean

13  by that?

14      A.   Secretary of Corrections.

15      Q.   Okay.  Now, who is the current Secretary of

16  Corrections?

17      A.   Jeff Zmuda.

18      Q.   And you know Mr. Zmuda?

19      A.   Yes.

20      Q.   And if Mr. Zmuda wished, could he have while

21  you were the chair appointed a new chair at any time?

22      A.   Yes.

23      Q.   So he elected of course to keep you on?

24      A.   Yes.

25      Q.   Did you have any specific term?



1          A.   No.

2          Q.   Did you apply for that position?

3          A.   No.

4          Q.   So how does it work when there's a -- when

5   someone resigns, the secretary simply appoints a new

6   person?

7          A.   It did for me.

8          Q.   Is that normal?

9          A.   Well, I was the second chair, so the second

10  appointment.  July 1st, 2011, it changed from the

11  Parole Board to the Prisoner Review Board, giving the

12  Secretary of Corrections jurisdiction over

13  appointments.

14         Q.   And so previously the Secretary of

15  Corrections didn't have jurisdiction over appointments?

16         A.   No.

17         Q.   Prior to being involved with the Prisoner

18  Review Board, did you have a background in Corrections?

19         A.   Yes.

20         Q.   Can you describe that background?

21         A.   I started in Corrections in 1989 at Lansing

22  Correctional Facility as an officer.  I worked several

23  positions, such as counselor, unit team manager.  I was

24  the director of a geographical re-entry program in

25  Shawnee County.  I was the statewide cognitive



1    coordinator prior to being on the board.

2         Q.  Can you give a brief description of duties

3    that you had as the chair of the Prisoner Review Board?

4         A.  The duties of the chair were just oversight

5    of the daily function of the Prisoner Review Board,

6    position on the Sentencing Commission, as well as just

7    the normal processes of a Parole Board.

8         Q.  And how many members besides yourself were on

9    the board?

10        A.  There was two other members for a total of

11   three.

12        Q.  And who are the other -- you said there's

13   currently a chair, so who are the other two current

14   members?

15        A.  Mark Keating and Jeannie Wark.

16        Q.  And you're aware that they are also

17   defendants in this same lawsuit?

18        A.  Yes.

19        Q.  Were they selected in the same manner that

20   you were, to your knowledge?

21        A.  Yes.

22        Q.  And were either of them chosen by the

23   secretary, Mr. Zmuda?

24        A.  No.

25        Q.  Was it the previous secretary as well?



1      A.  Yes.

2      Q.  So did they become members while you were the

3  chair?

4      A.  Mark became a member the day I became chair.

5      Q.  Do you know whether the other -- whether

6  Mr. Keating and Ms. Wark also had previous experience

7  in Corrections?

8      A.  Yes.

9      Q.  Can you describe that, if you know?

10      A.  Partially know.  Mark Keating had -- and

11  Jeannie, both, had numerous experience as a parole

12  officer and promoted up through that system.  Mark was

13  the director of the board and parole region.  Jeannie

14  was the parole manager for DOC.

15      Q.  So then it was natural that when it switched

16  from the Parole Board to the Prisoner Review Board they

17  would be made members of that?

18      A.  Yes.

19      Q.  Who supervises the Prisoner Review Board?

20      A.  Administratively, the secretary.

21      Q.  And how does he do that?

22      A.  Well, he has no dealing with the day-to-day

23  functions or any -- any voice in the decisions that are

24  made, so it's mostly administrative, like when I leave,

25  the chairs leave, any requests that he receives from



1  the governor of the office as far as a question about a

2  previous decision, that.

3       Q.  Did he meet with the board ever?

4       A.  No.

5       Q.  So you said before he supervised you, when

6  you say that's just administrative, it's just in terms

7  of your job duties, like leave, and that's about it?

8       A.  Yes.

9       Q.  So if you -- if -- I'm not saying you did,

10  but if you -- if the board had made some arbitrary or

11  capricious or irrational decision, the secretary

12  wouldn't actually have any oversight of that?

13       A.  No.

14       Q.  How would you typically communicate with the

15  secretary?

16       A.  When issues came up, we would have

17  conversations, whether that be personnel issues within

18  the board.  I was part of the management team for DOC,

19  so the weekly and biweekly meetings.

20       Q.  So he would meet with you weekly or biweekly?

21       A.  Meet with the management team.

22       Q.  Who was the management team?

23       A.  That was the head of each of the departments.

24       Q.  In the Department of Corrections?

25       A.  In the Department of Corrections.



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024
12

1          Q.   And so the Prisoner Review Board is
2    considered a department of --
3          A.   A division.
4          Q.   A division of the Department of Corrections?
5          A.   Yes.
6          Q.   Were you or Mr. Keating or Ms. Wark or any of
7    the other members of the board during your time
8    required to complete any trainings to obtain their
9    position?
10         A.   Previous?
11         Q.   Trainings for the Prisoner Review Board.
12         A.   We attend trainings as they come available.
13         Q.   Who puts on those trainings?
14         A.   One of the trainings is from the Association
15    of Paroling Authorities International, APAI.  We attend
16    an annual conference.
17         Q.   So at these conferences they put on seminars
18    and you attend them?
19         A.   Yes.
20         Q.   Is there any requirement for the number of
21    hours you have to have or anything like that?
22         A.   No.
23         Q.   Is there any requirement for what the subject
24    matter of the trainings?
25         A.   The subject matter is surrounding issues of



```
 1   paroling authorities.
 2          Q.   That's pretty broad, though, isn't it?
 3          A.   It can be.
 4          Q.   But in order to keep your job or something
 5   like that, there's no, you know, number of hours or
 6   subject matter, you know, kind of like lawyers and
 7   doctors have continuing educational requirements, you
 8   didn't have a requirement like that?
 9          A.   No.
10          Q.   To your knowledge, did you or did the other
11   members of the board receive any training or background
12   in the legal requirements for parole in Kansas?
13          A.   No formalized training, no.
14          Q.   Do you have any familiarity with the statutes
15   and regulations that govern parole in Kansas?
16          A.   Yes.
17          Q.   I'm going to show you what's been -- and,
18   Carrie, I submitted the exhibits.  I did them first
19   incorrectly in the wrong format, but then I did them in
20   the format you guys wanted.  I submitted them to the
21   box online, all the exhibits that I'm going to refer
22   to, or I might refer to.
23              So I'm going to show you what has been marked
24   as Exhibit 1.  These are the -- a series of statutes of
25   Kansas governing parole and the Prisoner Review Board.
```



1    Have you seen these sorts of statutes before?

2        A.  Yes.

3        Q.  And in what context have you seen them?

4        A.  I reviewed them since being on the board.

5        Q.  Was it in con -- in the context of being

6    involved in this lawsuit?

7        A.  No.

8        Q.  And then I'm also going to show you one page,

9    because this is really the only regulation, but it's a

10   Kansas regulation involving hearings in the Parole

11   Board; have you seen this before?

12       A.  Yes.

13       Q.  Okay.  Now, you mentioned before that in 2011

14   the Parole Board became the Prisoner Review Board, and

15   this states Kansas Parole Board; does this still apply

16   to the Prisoner Review Board?

17       A.  Yes.

18       Q.  And is that because -- I'm going to show you

19   what's been marked as Exhibit 3.  Have you seen this

20   Executive Order from Governor Brownback from 2011

21   before?

22       A.  Yes.

23       Q.  And is this because that Executive Order made

24   any regulation or statute that applies to the Parole

25   Board apply automatically to the Prisoner Review Board?



1          A.   Yes.

2          Q.   Keep those handy because we might refer to

3    them in a little bit.  What about constitutional

4    requirements, do you and other members of the board

5    receive any training or have familiarity with the

6    constitutional requirements for considering parole?

7          A.   No.

8          Q.   So are you familiar with at all -- you're

9    free to say no, of course -- with a line of cases from

10   the U.S. Supreme Court over the past decade or so known

11   as Graham or Miller or Montgomery about the requirement

12   to parole people convicted of offenses as juveniles?

13              MR. QUALSETH:   Object to the form.

14   BY MR. STERNBERG:

15         Q.   You can answer.

16         A.   Familiar with those -- that case in

17   particular.

18         Q.   With those lines of cases?

19         A.   Yes.

20         Q.   You are?

21              What is your understanding of the

22   constitutional requirements outlined in those cases?

23         A.   That youthful offenders -- youthful offenders

24   are given an opportunity to be released and that they

25   cannot be on life without parole status.



1                  (Court reporter interrupted for

2    clarification.)

3    BY MR. STERNBERG:

4        Q.   What is -- to your understanding, under those

5    lines of decisions, what is life without parole status?

6        A.   When a Court imposed life without parole.

7        Q.   So what if the Court imposes parole, does

8    that automatically -- sorry, the Court -- sorry.  I'll

9    withdraw that question.

10              So when a Court, as courts do in Kansas,

11   which doesn't -- well, I'll withdraw that, too.

12              From your experience, does Kansas have life

13   without parole from the courts?

14       A.   Yes.

15       Q.   It does?  In what circumstance?

16       A.   It depends.  I think it has to be a capital

17   murder case.  They have currently 23 on life without

18   parole in Kansas.

19       Q.   Aren't those on death row?

20       A.   Yes.

21       Q.   Okay, so that's death row.  But for a

22   non-death sentence, does Kansas have life without

23   parole?

24       A.   Not to my knowledge.

25       Q.   Okay.  So every person who is sentenced to



1  life in Kansas for, say, first-degree murder,

2  second-degree murder has a possibility under the

3  statute of parole, correct?

4              MR. QUALSETH:  Object to the form.

5       A.  Correct.

6  BY MR. STERNBERG:

7       Q.  The answer you just gave about these Supreme

8  Court cases was that youthful offenders are given an

9  opportunity to be released and no life without parole,

10 and then I asked you what is life without parole, and

11 you said when a Court imposes life without parole.  In

12 Kansas, where courts impose life but have a potential

13 parole date, does that, to your understanding,

14 automatically fit those line of Supreme Court cases?

15      A.  Which cases?

16      Q.  The ones I'm talking about, Graham, Miller,

17 Montgomery, the ones you said you're familiar with.

18      A.  How so?

19      Q.  So if a judge gives someone let's say 20 to

20 life, does that mean they're eligible for parole at

21 20 years?

22              MR. QUALSETH:  Object to the form.

23      A.  It would depend on the year of the actual

24 crime.  20 to life in certain years mean that they will

25 be seen after ten years.

```
 1              (Court reporter interrupted for
 2   clarification.)
 3   BY MR. STERNBERG:
 4       Q.   Then I asked, so at that point, they would be
 5   eligible for parole?
 6                MR. QUALSETH:   I objected to the form.
 7       A.   Correct.
 8   BY MR. STERNBERG:
 9       Q.   Does the fact that they become eligible for
10   parole in your understanding automatically fits the --
11   that line of Supreme Court cases?
12       A.   How so?
13       Q.   Well, to go back, your answer to your
14   understanding of those Supreme Court cases was that
15   youthful offenders must be given an opportunity to be
16   released and no life without parole status.  I then
17   asked you what is life without parole status, and you
18   said when a Court imposes life without parole.  My
19   question is, when someone is eligible for parole, then,
20   in your view, does that automatically fit that line of
21   Supreme Court cases?
22       A.   Yes.  That they're eligible, yes.
23       Q.   So the mere fact that someone is eligible for
24   parole in Kansas you believe is all that those Supreme
25   Court cases require?
```



1            MR. QUALSETH:   Object to the form.

2        A.   Yes.

3    BY MR. STERNBERG:

4        Q.   Did you and any other members of the Prisoner

5    Review Board receive any training pertaining to

6    adolescent psychological development?

7        A.   No.

8        Q.   Have you or any other members of the board

9    received any training to assist you in evaluating

10   offenses that were committed by juveniles rather than

11   by adults?

12       A.   No.

13       Q.   In Exhibit 1, the series of statutes, if you

14   turn through to the third one, 22 -- actually, I'll

15   withdraw that.

16           In that series of statutes, if you turn to

17   the very next-to-last page, the next-to-last page,

18   KSA 75-5210a, next-to-last page, there you go, it

19   describes the Secretary of Corrections entering into a

20   written agreement with inmates when inmates are

21   convicted of off grid crimes.  Are you familiar with

22   this statute?

23       A.   Yes.

24       Q.   Does the Secretary of Corrections create

25   agreements outlining requirements with inmates that

1  they must complete to show they're ready for parole
2  when they're convicted of an off grid crime?
3       A.  The Department of Corrections does.  Not the
4  secretary directly.
5       Q.  Have you seen these agreements before?
6       A.  Yes.
7       Q.  In your position when you were the chair of
8  the Prisoner Review Board, did you ever review those
9  agreements?
10      A.  Yes.
11      Q.  What are some of the conditions in those
12  agreements that you've seen?
13      A.  They identify certain programs an individual
14  must -- should attend while incarcerated.
15      Q.  Just to go back, we said for an off grid
16  crime because that's what it says in the statute; what
17  is an off grid crime?
18      A.  Anything that is considered a discretionary
19  release.
20      Q.  What does that mean?
21      A.  Meaning that they have the possibility of
22  release after a certain period of time.
23      Q.  But aren't required to be?
24      A.  Correct.
25      Q.  So by way of example, is first-degree murder



1  in Kansas an off grid crime?

2       A.  Yes.

3       Q.  Is second-degree murder an off grid crime?

4       A.  It can be.

5       Q.  So this would be any offense -- when they say

6  grid -- withdrawn.

7            When they say grid, they're referring to the

8  sentencing grid, correct?

9       A.  Correct.

10      Q.  Can you describe what that is?

11           MR. QUALSETH:  Object to the form.

12      A.  In 1993, they developed a sentencing grid,

13  which is a determinate sentencing grid that gives a

14  certain range for certain offenses.

15  BY MR. STERNBERG:

16      Q.  And so sometimes, though, an offense is

17  outside that grid, and that makes it an off grid

18  offense, correct?

19           MR. QUALSETH:  Object to the form.

20      A.  Correct.

21  BY MR. STERNBERG:

22      Q.  Going back to the agreements, you said before

23  it's not the Secretary of Corrections, but it's the

24  Department of Corrections.  Who in the Department of

25  Corrections makes these agreements?



1    A.  Those agreements are done when -- at the

2 diagnostic unit when someone is entered into the

3 system.

4    Q.  Is there any oversight of what goes in those

5 agreements?

6    A.  I'm not sure.

7    Q.  Do you know if the -- when you say agreement,

8 does the inmate have to agree to the agreement?

9    A.  No.

10    Q.  Are the inmates given access to the

11 agreements?

12    A.  Yes.

13    Q.  Are they given any say in what goes in the

14 agreements?

15    A.  I don't do them personally, so I don't know.

16    Q.  That's fair.

17        And to your knowledge, and I promise I'll

18 stop asking about these, can the agreements be revised?

19    A.  Yes.

20    Q.  Who revises them?

21    A.  It would be the classification system.

22    Q.  What is the classification system?

23    A.  A system of individuals like the

24 classification administrator that handles the records

25 at the facility, the offenders' records, and unit team

1  count.

2      Q.  So when you say classification, what is being

3  classified?

4      A.  Anywhere from custody to programs to

5  placement at certain facilities.

6      Q.  So it's a custody; you mean like in terms of

7  the security level?

8      A.  Yes.

9      Q.  And what are those security levels?

10     A.  They have special management, max, medium,

11 and minimum custody.

12     Q.  And are inmates reclassified from time to

13 time?

14     A.  Yes.

15     Q.  How does that work?

16     A.  They have a periodic review.

17     Q.  And are the agreements revised during that

18 same periodic review?

19     A.  They are reviewed, yes.

20     Q.  As the chair of the Prisoner Review Board,

21 were you made aware when revisions were made to these

22 agreements?

23     A.  No.

24     Q.  Does an inmate need to have successfully

25 completed all of the conditions of the agreement to go



1  before the board and be considered for parole?

2      A.  No.

3      Q.  I want you to turn to another statute in

4  here, in Exhibit 1.  It's three pages in.  22-3717.

5  And then turn down, keep going until you get to --

6  apologize, this is quite long -- until you get to G.

7  Keep going.  Next one.  Next one.  Right there.  That

8  says, Subject to the provisions of this section,

9  meaning this whole statute, the Prisoner Review Board

10  may release on parole those persons confined in

11  institutions who are eligible for parole when, No. 1,

12  either the board believes they should be released for

13  hospitalization or deportation or to answer a warrant,

14  or No. 2, the Secretary of Corrections has reported to

15  the board in writing that the inmate has satisfactorily

16  completed the programs required by the agreement

17  entered into that we just talked about, and any

18  revision of such agreement, and the board believes that

19  the inmate is able to fulfill, et cetera, okay.

20          You just -- I just asked you does an inmate

21  need to have completed all the conditions of the

22  agreement to go before the board and be considered for

23  parole, and you said no.  Doesn't this statute require

24  that an inmate has to have done so in order to be

25  paroled?



1          MR. QUALSETH:  Object to the form.

2      A.  No.

3  BY MR. STERNBERG:

4      Q.  Why does it not require that?

5      A.  Parole eligibility is determined by date and

6  time, not by completions of a program.

7      Q.  But this statute says otherwise, doesn't it?

8          MR. QUALSETH:  Object to form.

9      A.  No.

10  BY MR. STERNBERG:

11      Q.  What statute or regulation states what you

12  just said, that the board has control to determine

13  based on time when someone gets out?

14          MR. QUALSETH:  Same objection.

15      A.  It would be in this same statute saying that

16  the board should consider all factors, and the ten

17  factors that are laid out for the board to consider.

18  BY MR. STERNBERG:

19      Q.  Well, that's a different part of this same

20  statute, it says subject to the provisions of this

21  section up at the top.  Are you telling me that you

22  just ignore that agreement portion?

23      A.  No.

24      Q.  So how does that agreement portion where it

25  requires that the Secretary of Corrections has reported



1    to the board in writing that the inmate has

2    satisfactorily completed the programs required by the

3    agreement as a pre-condition for parole, how do you

4    have the ability to ignore that?

5                  MR. QUALSETH:  Object to the form.

6        A.   The second portion of that said the board

7    believes that the inmate is able and willing to fulfill

8    the obligation of a law abiding citizen.

9    BY MR. STERNBERG:

10        Q.   So, but it says, And the board believes that.

11    The first part is that the Secretary of Corrections has

12    reported that to the board.  It requires both?

13                  MR. QUALSETH:  Object to the form.

14    BY MR. STERNBERG:

15        Q.   How does it not?

16        A.   It does not.  They give us a report whether

17    an individual completed programs or not.

18        Q.   They give you a report, and if they haven't

19    completed it, the board can still parole them anyway?

20        A.   Correct.

21        Q.   Where -- what instrument -- where in here

22    does it say that?

23                  MR. QUALSETH:  Object to the form.

24        A.   In the other portions, as you noted in the

25    same statute, that the board has that levity to parole.



```
 1   BY MR. STERNBERG:
 2        Q.  You said before that you are familiar with
 3   these statutes and you'd seen them.  Please direct me
 4   to the exact language in this statute where it says
 5   what you're saying.
 6              MR. QUALSETH:  Same objection.
 7        A.  I can't direct you to the exact portion of
 8   that, but I can review.  In Section H --
 9        Q.  Uh-huh.
10        A.  -- where it gives -- outlines the -- when the
11   hearing shall happen and whether or not the board can
12   grant, and it can grant when a person can be released.
13        Q.  Where in there does it say you get to ignore
14   whether the Secretary of Corrections has reported the
15   agreement has been satisfied?
16              MR. QUALSETH:  Object to the form.
17        A.  It doesn't.
18   BY MR. STERNBERG:
19        Q.  Okay.  It simply tells the other factors that
20   are to be used, correct?
21        A.  Correct.
22        Q.  Does the Secretary of Corrections provide the
23   Prisoner Review Board with a report for each inmate
24   that is being evaluated for parole?
25        A.  Other than programs?
```



```
 1        Q.  Well, this says secretary -- the Secretary of

 2   Corrections has reported to the board in writing.  Does

 3   the Secretary of Corrections provide the review board

 4   with a report for each inmate in writing?

 5        A.  No.

 6        Q.  I'm going to show you what has been marked

 7   Exhibit 5.  This is something that your counsel

 8   provided us in discovery.  Do you recognize this

 9   document?

10        A.  Yes.

11        Q.  What is that?

12        A.  It's a packet that we send to youthful

13   offenders.

14        Q.  And this specifically is for

15   Mr. Makthepharak, the plaintiff in this case?

16        A.  Correct.

17        Q.  In here, I'll just represent to you, we don't

18   have to review the whole thing, there is no report from

19   the Secretary of Corrections about whether

20   Mr. Makthepharak has satisfied any agreement; would

21   that be normal?

22        A.  Correct.

23        Q.  When does an inmate serving a life sentence

24   with the possibility of parole first become eligible to

25   be considered for parole?
```



1          A.   It depends.

2          Q.   On what?

3          A.   It depends on their sentence structure.

4          Q.   So Mr. Maktthepharak, for example, was

5     convicted of first-degree murder in 2001, that had been

6     committed I think the year before, and was sentenced to

7     20 to life.  When would he have become first eligible

8     for parole?

9          A.   In 2021.

10         Q.   Because he served 20 years?

11         A.   Correct.

12         Q.   And that's when, according to this, he first

13    saw the Parole Board, correct?

14         A.   Correct.

15         Q.   How many affirmative votes are necessary for

16    an inmate to be granted parole?

17         A.   A majority.

18         Q.   So that would be two out of three?

19         A.   Two out of three.

20         Q.   Can you describe the voting process?

21         A.   The voting process is after deliberation, and

22    the board members vote to grant or not to grant

23    release.

24         Q.   If you vote not to grant release or to grant

25    release, is a report made to the Secretary of



1  Corrections?

2      A.  No.

3      Q.  In theory, could the Secretary of Corrections

4  either way override the board's decision?

5      A.  No.

6      Q.  So when you said before that he supervises

7  the board, it wouldn't include any of that at all?

8      A.  No.

9      Q.  At a parole hearing before the board, who

10 appears?

11     A.  If the offender has counselor -- the offender

12 appears, the offender's counsel, the offender's unit

13 counsel from the facility, and board members.

14     Q.  Does a prisoner have the ability to bring

15 witnesses?

16     A.  No.

17     Q.  So if he wanted to hire an expert, he

18 couldn't do that?

19     A.  No.

20     Q.  Is he of the ability to subpoena evidence,

21 even internally, from the Department of Corrections?

22     A.  No.

23     Q.  Does he have the ability -- let's say there

24 is a witness in the form of his unit counsel; does he

25 have the ability to cross-examine or ask questions of



1  that witness?

2      A.  No.

3      Q.  Does he have the ability to present evidence

4  of his own?

5      A.  Yes.

6      Q.  Describe that.

7      A.  If the individual has letters of support, has

8  letters that talk about like employment history prior

9  to incarceration, completion of programs, summaries of

10 participation in programs, they can submit that.

11     Q.  Is there a burden on either the defendant or

12 the department or his unit team counsel to show that he

13 is or isn't a good candidate for parole?

14     A.  Yes.

15     Q.  What is that burden?

16     A.  In line with the statutory factors that the

17 board have to consider.

18     Q.  So who has the burden, is it the defendant or

19 is it -- is it the prisoner or is it the board or is it

20 the department?

21     A.  The offender.

22     Q.  But to prove that, to meet that burden, he

23 doesn't have the ability to bring in any witnesses?

24              MR. QUALSETH:  Object to the form.

25     A.  No.



```
 1   BY MR. STERNBERG:
 2        Q.  If an inmate is denied parole, can they have
 3   that decision reviewed?
 4        A.  Yes.
 5        Q.  By who?
 6        A.  The board.
 7        Q.  The same board who just made the decision?
 8        A.  Yes.
 9        Q.  Is there a possibility of review by any
10   higher authority, the secretary, the governor?
11        A.  The courts.
12        Q.  So how does one go about asking a court for a
13   review of a parole decision?
14        A.  Following the legal process.
15        Q.  Do you have any understanding of what that
16   legal process is?
17        A.  It's filing a complaint with the courts and
18   going through the whole process, the court process.
19        Q.  Is that an appeal of the parole decision?
20             MR. QUALSETH:  Object to the form.
21        A.  No.
22   BY MR. STERNBERG:
23        Q.  Do you have any idea what that court process
24   is even called?
25        A.  No.
```



1    Q.  Do you have any idea of what the court

2  process involves?

3    A.  No.

4    Q.  Are you required to provide inmates who have

5  been denied parole -- I'm sorry, you, the board; when I

6  say you, I mean the board -- a written explanation as

7  to why they were denied?

8    A.  We give reasons.

9    Q.  Are you required to?

10    A.  Yes.

11    Q.  Is there some statute or regulation that

12  requires you to do that?

13    A.  No.

14    Q.  You just do it as a matter of course?

15    A.  Yes.

16    Q.  Is this done in writing or is it done

17  verbally or both?

18    A.  In writing.

19    Q.  Do you believe that an inmate deserves to

20  know why they were denied parole?

21    A.  Yes.

22    Q.  Why?

23    A.  If it's areas they can work on to improve the

24  possibility of release, they should know.

25    Q.  So going back to my question about people

1  convicted of off grid crimes with a discretionary

2  parole date, are most inmates in that position, in your

3  experience, granted parole on their first time

4  appearing before the board?

5       A.  Not most.

6       Q.  Are they ever?

7       A.  Yes.

8       Q.  On average, what would you say?  I'm not

9  going to hold you to it as an expert, but on average,

10 in your experience, how many times would you say

11 experts -- I'm sorry, inmates appear before the board

12 before they're granted parole?

13      A.  That's too broad.

14      Q.  Fair enough.

15          Are many inmates who are in that position

16 never granted parole?

17              MR. QUALSETH:   Object to the form.

18      A.  No.

19 BY MR. STERNBERG:

20      Q.  Are they ever never granted parole?

21      A.  Rarely.

22      Q.  If someone like Mr. Makthepharak, he had his

23 parole hearing in 2021 and was denied, when would be

24 the next time he would come up for parole?

25      A.  Can you repeat that?



1       Q.   Sure.  Bad question.   When someone like

2  Mr. Makthepharak comes up for parole for the first

3  time, in his case, it was in 2021, he's a 20 to life

4  sentence, when would be the next time he'd see the

5  Parole Board?

6       A.   It depends.

7       Q.   Can you say on average how long you think

8  that would take?

9       A.   No average.

10      Q.   Who makes that decision?

11      A.   The board.

12      Q.   I'm going to show you Exhibit 6.   Do you

13  recognize that document?

14      A.   Yes.

15      Q.   What is that?

16      A.   That's the action notice giving the offender

17  notice of the decision.

18      Q.   And this was the notice actually given to

19  Mr. Makthepharak?

20      A.   Correct.

21      Q.   And so this states that it was passed to

22  May 1st, 2024.   How was that decision made?

23      A.   Through deliberations.

24      Q.   So you three board members talk about this

25  afterward and decide what to put in here?

```
 1        A.   We decide on the length of pass that we think
 2   is appropriate.
 3        Q.   What factors go into making that decision?
 4        A.   The overall view of the case.
 5        Q.   Meaning what?
 6        A.   When you apply the factors, when you look at
 7   the factors, you decide what would be an appropriate
 8   length of pass.
 9        Q.   When you say the factors, you mean the ones
10   in this statute that you pointed to before?
11        A.   Correct.
12        Q.   Outside of the parole hearing, does the board
13   review any other materials about the inmate when making
14   its decision and deliberating?
15        A.   How so?
16        Q.   So you have this parole hearing where you
17   have the witnesses you mentioned before and the
18   materials that you mentioned before, and then you go
19   back and deliberate.  During that deliberation, are
20   there any other things that the board reviews about the
21   offender that weren't present at the hearing?
22        A.   Present at the hearing for the board, or for
23   the offender?
24        Q.   Present at the parole hearing.
25        A.   For the board or for the offender?
```



1    Q.   Either way.

2    A.   Okay.  No.

3    Q.   Okay.  Are the only factors you considered as

4  the board in granting parole the ones you pointed to in

5  Section H of the statute?

6    A.   Yes.

7    Q.   What are the risks that the board is most

8  concerned about when it decides whether or not to

9  parole a prisoner?

10    A.   Overall, public safety.

11    Q.   Are there any other risks that the board

12  takes into account?

13    A.   That's the main risk.

14    Q.   Does the board take into account how much of

15  a sentence an inmate has served regardless of whether

16  it's his first time at parole?

17    A.   Correct.

18    Q.   Does it take into consideration his good

19  behavior while serving his sentence or his bad behavior

20  while serving his sentence?

21    A.   Correct.

22    Q.   Does it consider the age of the inmate when

23  he committed the offense versus the age he is at the

24  time?

25    A.   Correct.



1    Q.  Even though that's not one of the factors in
2  the statute?
3    A.  Correct.
4    Q.  So you do consider factors outside of those
5  in the statute?
6    A.  Yes.
7    Q.  What other factors do you consider besides
8  those in the statute and besides age?
9    A.  Just age and there could be other factors.
10  Whether or not an individual has employment already and
11  those kind of things, but we say they tie back to the
12  factors we consider.
13    Q.  Isn't employment already one of the factors
14  in 22-3717H?
15    A.  Employment while incarcerated.  I'm talking
16  about employment post-incarceration.
17    Q.  Are there any assessments the board has
18  regarding the evaluation of an inmate's eligibility for
19  parole that distinguishes between inmates who committed
20  their crimes as an adult or as a juvenile?
21    A.  No.
22    Q.  So back to Exhibit 5, it says at the top
23  youthful offender information; what does that mean?
24    A.  That means, and I'm not correct on the date,
25  but the board made an adjustment based on Miller and



1   Montgomery that with youthful offender they would get

2   this packet prior to the hearing.

3        Q.  How does that differ than an ordinary

4   prisoner's packet?

5        A.  They don't get a copy of the packet.

6        Q.  So ordinarily a prisoner doesn't get to see

7   what the information about them is at all?

8        A.  Correct.

9        Q.  Only because he was a youth, he gets that?

10       A.  Correct.

11       Q.  But there's no different assessments have --

12   that the board uses distinguishing between him

13   ultimately and any other prisoner?

14       A.  No.

15       Q.  So there's no special accounting for whether

16   he shows maturity or not?

17              MR. QUALSETH:  Object to the form.

18       A.  No.

19   BY MR. STERNBERG:

20       Q.  Certainly no different than any other

21   offender?

22       A.  No.

23       Q.  If an inmate has an educational background

24   such as a bachelor's degree or trade certification,

25   does that affect your evaluation of their eligibility

1   for parole?

2        A.  Yes.

3        Q.  So if someone had already completed high

4   school or college before they went to prison, and they

5   would be considered differently than someone who didn't

6   have that opportunity before they went to prison?

7        A.  I don't understand that question.

8        Q.  Okay.  So you have someone like

9   Mr. Makthepharak who was I think 16 years old at the

10  time, he hadn't completed high school at the time he

11  went to prison, and you have someone who commits a

12  crime as an adult who has a bachelor's degree.

13  Obviously, the person with the bachelor's degree has

14  more employability when they'll get out of prison.

15  Mr. Makthepharak does not.  Does the board then view

16  that -- you said you look at future employment.  Does

17  the board then look at the offender who has that

18  employability better than someone like

19  Mr. Makthepharak?

20       A.  It depends.

21       Q.  Depends on what?

22       A.  Other factors.

23       Q.  Like what?

24       A.  Skills learned.

25       Q.  So what if someone has a bachelor's in



1  engineering and has, you know, that's quite a skill,

2  Mr. Makthepharak has no such thing, he just has maybe a

3  GED; does the board look better at someone that might

4  have that skill that they had before they went to

5  prison?

6      A.  Look better at what skill?

7      Q.  At -- again, we're taking someone who has an

8  engineering degree who went to prison and is up for

9  parole for the first time for discretionary review

10  versus someone like Mr. Makthepharak, who was 17, or

11  less than 17, had no high school education at the time

12  he went to prison and is now up for review.  Do you

13  look better at the person who has the skill versus

14  Mr. Makthepharak?

15          MR. QUALSETH:  Object to the form.

16      A.  No.

17  BY MR. STERNBERG:

18      Q.  Even though you just said that having an

19  educational background does affect your evaluation of

20  their eligibility?

21      A.  It's only one item.

22      Q.  Are you aware that the Kansas Department of

23  Corrections has its own government website?

24      A.  Yes.

25      Q.  I'm going to show you Exhibit 4.  Have you



1  ever seen this before?

2          A.  I don't think so.

3          Q.  Okay.  Well, I'm going to represent to you,

4  because there's the website address at the bottom, that

5  this is from the Kansas Department of Corrections' own

6  website.  Do you recognize that man who is pictured

7  there?

8          A.  Yes.

9          Q.  Who is that?

10         A.  Secretary Jeff Zmuda.

11         Q.  And you see it contains a biography for

12  Mr. Zmuda?

13         A.  Yes.

14         Q.  Do you see in the bio where it says that the

15  secretary is a firm believer that while offenders are

16  serving their time in prison, the department and staff

17  should be working hard to equip offenders with

18  resources and skills they need to be successful on

19  their re-entry and has made improving services in

20  workforce readiness among inmates one of his top

21  priorities?

22                  MR. QUALSETH:  Object to the form.

23         A.  Correct.

24  BY MR. STERNBERG:

25         Q.  As a member of the review board, do you view



1   yourself as helping to determine if an inmate has

2   garnered the skills necessary for a successful re-entry

3   into the community?

4        A.   Yes.

5        Q.   What skills are necessary for an inmate to be

6   successful?

7        A.   Too broad.

8        Q.   What sort of skills?

9        A.   Could be a plethora of skills.   Employment

10  skills, relationship skills, it could be cognitive

11  skills.

12       Q.   When you're evaluating an inmate, what do you

13  view as constituting workforce readiness?

14       A.   Employability.

15       Q.   Even if it's not introduced into the record

16  let's say at the parole hearing, is the board able to

17  see an inmate's work experience from his time in

18  prison?

19       A.   Correct.

20       Q.   How would you see that?

21       A.   It's part of the information pulled by the

22  board.

23       Q.   So you said before that a youthful offender

24  is given that information, so Mr. Makthepharak's work

25  history would be in here?

1      A.   Yes.

2      Q.   I'm going to represent to you that it's not

3   in here at all.

4      A.   Okay.

5      Q.   Why would that be?

6           MR. QUALSETH:   Object to the form.

7      A.   I have no idea.

8   BY MR. STERNBERG:

9      Q.   Or his educational history, would that

10  ordinarily be there?  Feel free to look through it if

11  you'd like.  There's no information about his --

12     A.   Educational, GED, right there.

13     Q.   Right.  But how about his training in prison?

14     A.   That would be from -- that would be these,

15  risk reduction program, it would be listed there.

16     Q.   Except here Mr. Makthepharak I'll represent

17  to you completed an electrical certification vocational

18  training program in 2019, and it's not listed there at

19  all.

20          MR. QUALSETH:   Object to the form.

21  BY MR. STERNBERG:

22     Q.   Would that be normal?

23     A.   Would it be normal for it not to be there?

24     Q.   Correct.

25     A.   No.

1       Q.   But it isn't here, correct?

2       A.   I don't see it.

3       Q.   Okay.

4       A.   But it's listed in his job history,

5  electrical fundamentals, right here.

6       Q.   Well, it says he took a class.  He actually

7  had a certification to do electrical work; that's not

8  listed there?

9       A.   No.  And that's part of the process with the

10  hearing.  The offender can let us know that they have

11  certification.

12       Q.   But they're not told what information they

13  have to bring to the board beforehand, are they?

14       A.   They review with their counselor at the

15  facility.

16       Q.   Is their counselor a lawyer?

17       A.   No.

18       Q.   Are they given a free lawyer if they want

19  one?

20       A.   They can hire an attorney.

21       Q.   What if they can't afford a lawyer?

22       A.   (Witness gestures.)

23       Q.   Okay.

24       A.   No attorney.  Sorry.

25       Q.   Are inmates who have been out on work release



1  more likely to get parole than those who haven't?

2       A.  Yes.

3       Q.  And you mentioned before the custody levels

4  of the prison, special, maximum, medium, minimum.  At

5  which one of those or ones of those is a prisoner

6  allowed work release?

7       A.  Minimum custody.

8       Q.  Just minimum?

9       A.  Yes.

10      Q.  You may not know this, but I'll ask.  Do you

11  know whether any inmates who are serving life sentences

12  convicted as juveniles are ever eligible for work

13  release?

14      A.  I don't know, but they should be.

15      Q.  They would have to be eligible for minimum

16  custody in order to be so, correct?

17      A.  Correct.

18      Q.  Just as a roundabout number, how many inmates

19  would you say the Prisoner Review Board evaluates every

20  year?

21      A.  For parole eligibility?

22      Q.  Correct.

23      A.  250 to 300.

24      Q.  Do you know how many prisoners there are in

25  the state of Kansas?



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024
47

```
 1        A.   Over 9,000.
 2        Q.   Do you know how many juvenile offenders
 3   sentenced to life there are in Kansas?
 4        A.   No.
 5        Q.   That's one thing no one seems to be able to
 6   tell me.
 7             Do you know how many inmates in the state of
 8   Kansas currently are serving a life sentence, period?
 9        A.   No.
10        Q.   Do you believe, personally, as someone who
11   has a long history in Corrections, that most inmates
12   can be rehabilitated?
13                  MR. QUALSETH:   Object to the form.
14        A.   Define rehabilitated.
15   BY MR. STERNBERG:
16        Q.   Rehabilitated by the system sufficient that
17   you would parole them for re-entry into the population.
18        A.   Yes.
19        Q.   And part of your position is to evaluate
20   whether that's actually been done, correct?
21        A.   Correct.
22        Q.   Are you aware of resources that the
23   Department of Corrections offers to inmates to
24   evaluate -- that you evaluate to aid in their
25   rehabilitation?
```



1        A.   Yes.

2        Q.   What sort of programs?

3        A.   The programs through re-entry.  I can't list

4    them all.

5        Q.   Just what sorts of programs, generally?

6        A.   Job training, different substance abuse

7    treatment programs, mental health treatment, education.

8        Q.   Are these resources offered to all inmates?

9        A.   They're available.

10       Q.   Are there limitations on who they're

11   available to?

12       A.   They have criteria.

13       Q.   Is one of those criteria the security

14   classification level of the inmate?

15       A.   Not in all instances.

16       Q.   Is it often a limitation?

17       A.   No.

18       Q.   So if someone is in special management, I

19   think that's what you called it before, the highest

20   security level, are they eligible for job training?

21       A.   No.

22       Q.   If someone is in maximum, are they eligible

23   for job training and education?

24       A.   Yes.

25       Q.   For the same ones that someone in medium or

1    minimum would be eligible?

2        A.  Different classes, yes.

3        Q.  So what, if you know any examples, because

4    you just said that this is the case, what sort of

5    programs would someone in minimum be eligible for that

6    someone in maximum would not?

7        A.  Actual work release.

8        Q.  That's it?

9        A.  That I know of.

10       Q.  Can someone in maximum security attend

11   college level classes?

12       A.  Yes.

13       Q.  We've been talking about Sashada

14   Makthepharak.  Do you personally recall Sashada

15   Makthepharak and his case?

16       A.  Vaguely remember the hearing.

17       Q.  Because he has a long name?

18       A.  Yes.

19       Q.  So has Mr. Makthepharak been eligible for

20   parole before?

21       A.  Before 2021?

22       Q.  No.  Sorry.  Bad question.  Has he been

23   eligible for parole?

24       A.  In 2021, yes.

25       Q.  Okay.  And the next time you said he can be

1  considered is May 2024 because that was the board's

2  decision?

3       A.  Correct.

4       Q.  Do you recall whether -- it's now past May

5  2024; was he considered another time?

6       A.  Yes.

7       Q.  And has he still not been paroled?

8       A.  Correct.

9       Q.  Do you know how old Mr. Makthepharak was when

10  he was first taken into custody?

11       A.  Sixteen, I think.

12       Q.  So I'll tell you he entered prison, you can

13  see it in here, in 2001; it's now the year 2024.  So

14  he's been in prison for 23 years, correct?

15       A.  Correct.

16       Q.  And we talked about this a little bit before,

17  but this is all the information that you would have

18  received about Mr. Makthepharak, correct, is in this

19  packet?

20       A.  Correct.

21       Q.  So were you ever given a report from the

22  Secretary of Corrections regarding him?

23       A.  No.

24       Q.  Now, going back to Exhibit 6, does this give

25  the reasons why Mr. Makthepharak was denied parole?



1        A.   Correct.

2        Q.   What were those reasons?

3        A.   Denies responsibility and disciplinary

4    reports.

5        Q.   Okay.  So we'll start with denies

6    responsibility.  Is a person required in your review to

7    admit responsibility to be granted parole?

8        A.   No.

9        Q.   So why would that be a reason to deny

10   Mr. Makthepharak parole?

11             MR. QUALSETH:   Object to the form.

12       A.   It could be a reason to deny parole.

13   BY MR. STERNBERG:

14       Q.   Well, it clearly was here, but why would that

15   be?

16       A.   Could be a broad thing.

17       Q.   Explain what you mean by that.

18       A.   Someone's participation in a crime or if they

19   are denying participation or a number of things

20   associated with the crime.

21       Q.   So the fact -- so even though this happened

22   23 years ago, the fact that now he denies

23   responsibility in some way for what happened is enough

24   as a youthful offender to deny him parole?

25       A.   Not in itself.



1    Q.  So is it also -- is it just because he also
2  had disciplinary reports?

3    A.  Those are the reasons, yes.

4    Q.  Okay.  So when someone denies responsibility
5  for their offense in your view as a juvenile and also
6  has disciplinary reports, they have to be denied
7  parole?

8    A.  It depends.

9    Q.  Well, those are the two reasons you gave, so
10  what does it depend on?

11    A.  The degree of the disciplinary reports and
12  the degree of the denial of responsibility.

13    Q.  So despite the fact that someone may be more
14  mature now than they were at the time of their juvenile
15  offense, those factors in your view are enough to deny
16  them parole?

17    A.  Correct.

18    Q.  Okay.

19        MR. QUALSETH:  Are you at a good
20  stopping point, Jonathan, take a little break?

21        MR. STERNBERG:  Oh, yeah, that's
22  perfectly fine.

23        (Recess.)

24  BY MR. STERNBERG:

25    Q.  Back to Mr. Makthepharak's own proceedings,

1  do you recall, and you may not, how each of the members

2  of the board voted?

3      A.  Yes.

4      Q.  And how was that?

5      A.  We all voted to deny.

6      Q.  Do you -- is there ever a dissenting vote?

7      A.  Yes.

8      Q.  When that happens, is that put in the final

9  report to the inmate?

10     A.  No.

11     Q.  So when one of the members of the board

12 believes an inmate should be paroled, but the other two

13 don't, the reasons why that person believes that are

14 never given to the inmate?

15     A.  No.

16     Q.  Do you actually recall Mr. Makthepharak's

17 parole hearing itself?

18     A.  Somewhat.

19     Q.  Was it done by Zoom like this?

20     A.  Yes.

21     Q.  Is that common?

22     A.  After the pandemic, yes.

23     Q.  I mean, this was 2021, so it was still kind

24 of pandemic time --

25     A.  Yes.



1      Q.   -- right?

2           Do they still do that to this day?

3      A.   Yes.

4      Q.   Now, I'll represent to you that it lasted a

5  little less than an hour; is that normal?

6      A.   Yes.

7      Q.   Do you recall whether there was any

8  discussion by any party there whether he had

9  demonstrated maturity as opposed to when he committed

10  his offense at age 15 or 16?

11      A.   Yes.

12      Q.   What do you recall that discussion being?

13      A.   Not in detail.

14      Q.   What do you recall of it at all?

15      A.   We always discuss those factors.

16      Q.   If I represented to you that the word

17  maturity was never used, would that be a surprise?

18           MR. QUALSETH:   Object to the form.

19      A.   That would be impossible, because our

20  deliberation is not recorded.   Deliberation.

21  BY MR. STERNBERG:

22      Q.   Oh, I'm sorry, I don't mean the deliberation.

23  I mean the hearing itself.

24      A.   In the hearing?

25      Q.   Yes.



1      A.   Oh, I'm not sure if it was brought up or not.

2      Q.   Okay.  If I represented to you that it wasn't

3  brought up at all, would that surprise you?

4      A.   No.

5      Q.   Do you recall that practically the entire

6  hearing was devoted to whether he recalls the facts of

7  his offense all the way back in 2001?

8      A.   No.

9      Q.   Would that surprise you?

10      A.   No.

11      Q.   So sometimes practically an entire hearing is

12  devoted to the facts of the person's offense from all

13  those years ago?

14              MR. QUALSETH:   Object to the form.

15      A.   Depending on discrepancy, yes.

16  BY MR. STERNBERG:

17      Q.   What if there are no discrepancies, what if

18  it's they -- I'll withdraw that.  Bad question.

19           Do hearings like his sometimes for youthful

20  offenders concentrate solely on the offense he

21  committed back when?

22              MR. QUALSETH:   Object to the form.

23      A.   No.

24  BY MR. STERNBERG:

25      Q.   How does whether Mr. Makthepharak takes



1  responsibility and has disciplinary reports have

2  anything to do with his maturity today versus when he

3  committed an offense while a teenager?

4      A.  Disciplinary reports reflects in a sense

5  maturity and ability to follow the rules.

6      Q.  So disciplinary reports vary, correct?

7      A.  Correct.

8      Q.  Sometimes things are quite small, having, you

9  know, food you're not supposed to have, right?

10     A.  Correct.

11     Q.  Sometimes it's committing a crime?

12     A.  Yes.

13     Q.  And there's a big gulf between those, right?

14     A.  Yes.

15     Q.  Show you in Exhibit 5 Mr. Makthepharak's list

16 of disciplinary reports.  These are all, for the most

17 part, fairly minor offenses, right?

18     A.  No.

19     Q.  What's not minor in there?

20     A.  Dangerous contraband, interfering with cell

21 operation, dangerous contraband, possession of

22 unauthorized communication device --

23     Q.  Why is possession of an unauthorized

24 communication device a serious offense?

25     A.  As determined by the Department of



 1  Corrections.

 2       Q.  So because Department of Corrections deems it

 3  a serious offense, it's a serious offense?

 4       A.  They consider it escape material.

 5       Q.  How does that bear on someone's maturity

 6  today versus when they were 16?

 7       A.  I would say the ability to follow rules.

 8       Q.  Now, I'll note that at the time he saw the

 9  board in February of -- or April 2021, he hadn't had a

10  disciplinary offense for eight months or so; is that

11  right?

12       A.  No.

13       Q.  And so did the board take that into account?

14       A.  I said no.  It's five months.

15       Q.  When was his parole hearing?

16       A.  April.  And his last DR was in November.

17  Five months.

18       Q.  You're correct, it's five months.  So it's

19  five months, and did the board take that into account?

20       A.  Yes.

21       Q.  How?

22       A.  The link since his last disciplinary report.

23       Q.  So when someone who committed an offense as a

24  youth has these kinds of disciplinary reports, they're

25  always denied parole?



 1          A.  Cannot always say always.

 2          Q.  So sometimes they would be granted parole?

 3          A.  Possibly.

 4          Q.  Why?  Why is this different?

 5          A.  Depending on other factors.

 6          Q.  What factors?

 7          A.  Broad.

 8          Q.  So list some of them if there are other

 9   factors.

10          A.  Employment, education, progress through the

11   system, release plans.

12          Q.  So the only reasons given to Mr. Makthepharak

13   again were denies responsibility and disciplinary

14   reports?

15          A.  Correct.

16          Q.  At the same time as this shows, he received

17   a -- or the GED in prison, he had earned an electrical

18   certification, he had a stable work history, but you

19   still for those two reasons denied him parole, right?

20          A.  Correct.

21          Q.  Even though someone with exactly the same

22   characteristics might also be granted parole, right?

23          A.  Not exactly.  Not the exact same.

24          Q.  So someone with these characteristics is

25   always going to be denied parole?



JONATHAN OGLETREE                                  August 29, 2024
MAKTHEPHARAK V. KELLY                                          59

1        A.  I cannot always say always.

2        Q.  Okay.  So isn't in fact the Parole Board's

3   decision just entirely up to them with no oversight?

4        A.  Is it up to the board?

5        Q.  Isn't your decision whether to parole someone

6   just up to how you guys feel that day, with no

7   oversight?

8                 MR. QUALSETH:  Object to the form.

9        A.  No.

10  BY MR. STERNBERG:

11       Q.  Okay.  If an inmate who was given a life

12  sentence and is continuously denied parole, what

13  eventually happens to them?

14       A.  Continuously denied?  I don't know what --

15  anyone in that.

16       Q.  So in your experience, everyone is always

17  granted parole who has a life sentence?

18       A.  Eventually.

19       Q.  Everyone?

20       A.  That's eligible.

21       Q.  I didn't say that.  So I said if you have a

22  life sentence --

23       A.  Uh-huh.

24       Q.  -- in Kansas we've already established, we're

25  not talking about a death penalty case, that they come



1  up for parole, are you saying that everyone who has the

2  ability to come up for parole always eventually gets

3  parole?

4       A.  Not everyone.

5       Q.  Okay.  And if they don't, what happens to

6  them?

7       A.  It depends.

8       Q.  Don't they die in prison?

9       A.  It depends.

10      Q.  How would someone who doesn't ever get parole

11  who has a life sentence not die in prison?

12      A.  They'd be like to the state hospital, they're

13  not in prison, but they're still --

14      Q.  Okay.  They die in Department of Corrections'

15  custody, right?

16      A.  The state hospital is not Department of

17  Corrections.

18      Q.  Okay.  Let's say someone doesn't go to the

19  state hospital --

20      A.  Uh-huh.

21      Q.  -- and someone has a life sentence and

22  doesn't get parole, don't they die in prison?

23      A.  Possible.

24      Q.  Okay.  How old are you, Mr. Ogletree?

25      A.  58.



1    Q.  So you -- how long ago -- I don't mean to

2    make you do math, but how long ago were you 16 years

3    old?

4                    MR. QUALSETH:  Object to the form.

5    A.  Oh, it was 42 years ago.

6    BY MR. STERNBERG:

7    Q.  Do you think you've changed as a person since

8    then?

9                    MR. QUALSETH:  Object to the form.

10   A.  I have.

11   BY MR. STERNBERG:

12   Q.  Do you think you've matured since then?

13                   MR. QUALSETH:  Object to the form.

14   A.  I have.

15   BY MR. STERNBERG:

16   Q.  Do you think it's normal for a person to

17   change in their maturity levels between when they're 16

18   and 39?

19                   MR. QUALSETH:  Same objection.

20   A.  Not always.

21   BY MR. STERNBERG:

22   Q.  It's not normal always?

23   A.  Not always.

24   Q.  I didn't say that.  I said is it normal that

25   someone between 16 and 39 matures?



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024
62

```
1              MR. QUALSETH:  Object to the form.
2       A.  I don't know what normal would be.
3  BY MR. STERNBERG:
4       Q.  In the line of work you had for the last
5  while as the chair of the Prisoner Review Board, is it
6  safe to say you believe in second chances?
7       A.  Yes.
8       Q.  What makes a person deserve a second chance?
9       A.  Displaying the characteristics of being a law
10 abiding citizen.
11              MR. STERNBERG:  I don't think I have any
12 more questions.  Thank you.
13              MR. QUALSETH:  We'll read and sign.
14              COURT REPORTER:  For the record,
15 Mr. Qualseth, do you need a copy of the transcript?
16              MR. QUALSETH:  Yes, I do.
17          (Deposition concluded at 11:16 a.m.)
18
19
20
21
22
23
24
25
```



JONATHAN OGLETREE                                    August 29, 2024
MAKTHEPHARAK V. KELLY                                          63

```
 1              C E R T I F I C A T E

 2         I, Carrie Easton Logback, a Certified Court

 3    Reporter, do hereby certify:

 4         That prior to being examined the witness was

 5    by me duly sworn, via remote videoconference;

 6         That said deposition was taken down by me in

 7    shorthand at the time and place hereinbefore stated

 8    and was thereafter reduced to writing under my

 9    direction;

10         That I am not a relative or employee or

11    attorney or counsel of any of the parties, or a

12    relative or employee of such attorney or counsel, or

13    financially interested in the action.

14

15         WITNESS my hand and seal this 11th day of

16    September, 2024.

17
```



```
                    Carrie Easton Logback
                    CCR No. 1430, CCR No. 899, RPR


21    MAKTHEPHARAK v. KELLY, et al.

22

23

24

25
```

JONATHAN OGLETREE                                    August 29, 2024
MAKTHEPHARAK V. KELLY                                             64

JONATHAN OGLETREE                              August 29, 2024
MAKTHEPHARAK V. KELLY 640569

 1

 2

 3    Case:   MAKTHEPHARAK V. KELLY

 4
          DECLARATION UNDER PENALTY OF PERJURY
 5
          I declare under penalty of perjury that
 6    I have read the entire transcript of my Depo-
      sition taken in the captioned matter or the
 7    same has been read to me, and the same is
      true and accurate, save and except for
 8    changes and/or corrections, if any, as indi-
      cated by me on the DEPOSITION ERRATA SHEET
 9    hereof, with the understanding that I offer
      these changes as if still under oath.

10

11    _____
          Jonathan Ogletree
12

13

14            NOTARIZATION OF CHANGES

15               (If Required)

16

17    Subscribed and sworn to on the _10^th_ day of

18

19    _October_____, 20_24_ before me,

20

21    (Notary Sign) _____

22

23    (Print Name) _Carolyn J. Perez___  Notary Public,

24

25    in and for the State of _Kansas_____



Carolyn J Perez
NOTARY PUBLIC—STATE OF KANSAS
MY APPT EXP: 8/23/25

JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024

1   HMKT640569
    Case:  MAKTHEPHARAK V. KELLY

2

3   Page No. 10   Line No. 13   Change to: the director of

4   the northern parole region. Jeannie

5   Reason for change: Inaccurate transcription

6   Page No. 10   Line No. 25   Change to: the chair's

7   leave, any requests the he receives from

8   Reason for change: Inaccurate transcription

9   Page No. 11   Line No. 1   Change to: the governor's

10  office as far as a question about a

11  Reason for change: Inaccurate transcription

12  Page No. 26   Line No. 25   Change to: same statute,

13  that the board has the ability to parole.

14  Reason for change: Inaccurate transcription

15  Page No. 39   Line No. 1   Change to: Montgomery that

16  with youthful offenders they would get

17  Reason for change: Inaccurate transcription

18  Page No. 57   Line No. 22   Change to: A. The length

19  since his last disciplinary report.

20  Reason for change: Inaccurate transcription

21  Page No._____ Line No._____ Change to:_____

22  _____

23  Reason for change:_____

24  SIGNATURE: _Jonathan Ogletree_ DATE: 10-10-24

25  Jonathan Ogletree



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024

```
1    EMORA PHARAK V. KELLY 640569
     Case:  MAKTHEPHARAK V. KELLY
2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Jonathan Ogletree
```



———————
    1
———————

**1**
    6:22
    13:24
    19:13
    24:4,11
**15**
    54:10
**16**
    40:9
    54:10
    57:6
    61:2,17,
    25
**17**
    41:10,11
**1989**
    8:21
**1993**
    21:12
**1st**
    7:8 8:10
    35:22

———————
    2
———————

**2**
    24:14
**20**
    17:19,21,
    24 29:7,
    10 35:3
**2001**
    29:5
    50:13
    55:7
**2011**
    7:8 8:10
    14:13,20

**2016**
    6:25
**2019**
    44:18
**2021**
    29:9
    34:23
    35:3
    49:21,24
    53:23
    57:9
**2024**
    6:22
    35:22
    50:1,5,13
**2124**
    4:12
**22**
    19:14
**22-3717**
    24:4
**22-3717H**
    38:14
**23**
    16:17
    50:14
    51:22
**250**
    46:23
**29**
    4:12

———————
    3
———————

**3**
    14:19
**300**
    46:23
**39**
    61:18,25

**3rd**
    6:24

———————
    4
———————

**4**
    41:25
**42**
    61:5

———————
    5
———————

**5**
    28:7
    38:22
    56:15
**58**
    60:25

———————
    6
———————

**6**
    35:12
    50:24
**66048**
    4:13

———————
    7
———————

**75-5210a**
    19:18

———————
    9
———————

**9,000**
    47:1

———————
    A
———————

**abiding**

**26:8**
    62:10
**ability**
    26:4
    30:14,20,
    23,25
    31:3,23
    56:5 57:7
    60:2
**abuse**
    48:6
**access**
    22:10
**account**
    37:12,14
    57:13,19
**accounting**
    39:15
**accurate**
    4:25 5:9
**action**
    35:16
**actual**
    17:23
    49:7
**address**
    4:10 42:4
**adjustment**
    38:25
**administrat
ive**
    10:24
    11:6
**Administrat
ively**
    10:20
**administrat
or**
    22:24
**admit**

**51:7**
**adolescent**
    19:6
**adult**
    38:20
    40:12
**adults**
    19:11
**affect**
    39:25
    41:19
**affirmative**
    29:15
**afford**
    45:21
**afterward**
    35:25
**age**
    37:22,23
    38:8,9
    54:10
**agree**
    22:8
**agreement**
    19:20
    22:7,8
    23:25
    24:16,18,
    22 25:22,
    24 26:3
    27:15
    28:20
**agreements**
    19:25
    20:5,9,12
    21:22,25
    22:1,5,
    11,14,18
    23:17,22
**ahead**
    5:19



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

aid
    47:24

allowed
    46:6

annual
    12:16

answering
    4:16

anytime
    5:23

APAI
    12:15

apologize
    24:6

appeal
    32:19

appearing
    34:4

appears
    30:10,12

applies
    14:24

apply
    8:2
    14:15,25
    36:6

appointed
    6:13,24
    7:9,10,21

appointment
    8:10

appointments
    8:13,15

appoints
    8:5

April
    57:9,16

arbitrary

11:10

areas
    33:23

assessments
    38:17
    39:11

assist
    19:9

Association
    12:14

attend
    12:12,15,
    18 20:14
    49:10

attorney
    45:20,24

August
    6:22

authorities
    12:15
    13:1

authority
    32:10

automatical
ly
    14:25
    16:8
    17:14
    18:10,20

average
    34:8,9
    35:7,9

avoid
    5:6

aware
    9:16
    23:21
    41:22
    47:22

———————————

B

———————————

bachelor's
    6:4 39:24
    40:12,13,
    25

back
    18:13
    20:15
    21:22
    33:25
    36:19
    38:11,22
    50:24
    52:25
    55:7,21

background
    8:18,20
    13:11
    39:23
    41:19

bad
    35:1
    37:19
    49:22
    55:18

based
    25:13
    38:25

bear
    57:5

behavior
    37:19

believer
    42:15

believes
    24:12,18
    26:7,10
    53:12,13

big
    56:13

bio
    42:14

biography
    42:11

Birch
    4:12

bit
    15:3
    50:16

biweekly
    11:19,20

board
    6:7,20,22
    7:6,7
    8:11,18
    9:1,3,5,
    7,9
    10:13,16,
    19 11:3,
    10,18
    12:1,7,11
    13:11,25
    14:4,11,
    14,15,16,
    25 15:4
    19:5,8
    20:8
    23:20
    24:1,9,
    12,15,18,
    22 25:12,
    16,17
    26:1,6,
    10,12,19,
    25 27:11,
    23 28:2,3
    29:13,22
    30:7,9,13
    31:17,19
    32:6,7
    33:5,6
    34:4,11
    35:5,11,
    24 36:12,

20,22,25
    37:4,7,
    11,14
    38:17,25
    39:12
    40:15,17
    41:3
    42:25
    43:16,22
    45:13
    46:19
    53:2,11
    57:9,13,
    19 59:4
    62:5

board's
    30:4 50:1
    59:2

bottom
    42:4

box
    13:21

break
    5:22
    52:20

bring
    30:14
    31:23
    45:13

broad
    13:2
    34:13
    43:7
    51:16
    58:7

brought
    55:1,3

Brownback
    14:20

burden
    31:11,15,
    18,22



JONATHAN OGLETREE                                    August 29, 2024
MAKTHEPHARAK V. KELLY                            Index: called..correct

---

**C**

---

called
  6:19
  32:24
  48:19

candidate
  31:13

capital
  16:16

capricious
  11:11

Carrie
  13:18

case
  4:10
  15:16
  16:17
  28:15
  35:3 36:4
  49:4,15
  59:25

cases
  15:9,18,
  22 17:8,
  14,15
  18:11,14,
  21,25

cell
  56:20

certificati
on
  39:24
  44:17
  45:7,11
  58:18

cetera
  24:19

chair
  6:6,12,
  19,21

  7:5,21
  8:9 9:3,
  4,13
  10:3,4
  20:7
  23:20
  62:5

chairs
  10:25

chance
  62:8

chances
  62:6

change
  61:17

changed
  8:10 61:7

characteris
tics
  58:22,24
  62:9

chosen
  9:22

circumstanc
e
  16:15

citizen
  26:8
  62:10

clarificati
on
  16:2 18:2

class
  45:6

classes
  49:2,11

classificat
ion
  22:21,22,
  24 23:2
  48:14

classified
  23:3

clear
  4:25 6:15

cognitive
  8:25
  43:10

college
  6:2 40:4
  49:11

Commission
  9:6

commits
  40:11

committed
  19:10
  29:6
  37:23
  38:19
  54:9
  55:21
  56:3
  57:23

committing
  56:11

common
  53:21

communicate
  11:14

communicati
on
  56:22,24

community
  43:3

complaint
  32:17

complete
  12:8 20:1

completed
  23:25

  24:16,21
  26:2,17,
  19 40:3,
  10 44:17

completion
  31:9

completions
  25:6

con
  14:5

concentrate
  55:20

concerned
  37:8

conditions
  20:11
  23:25
  24:21

conference
  12:16

conferences
  12:17

confined
  24:10

confrontati
onal
  5:8

considerati
on
  37:18

considered
  12:2
  20:18
  24:1,22
  28:25
  37:3 40:5
  50:1,5

constitutin
g
  43:13

constitutio
nal
  15:3,6,22

context
  14:3,5

continuing
  13:7

continuousl
y
  59:12,14

contraband
  56:20,21

control
  25:12

conversatio
ns
  11:17

convicted
  15:12
  19:21
  20:2 29:5
  34:1
  46:12

coordinator
  9:1

copy
  39:5
  62:15

correct
  6:8,9
  17:3,5
  18:7
  20:24
  21:8,9,
  18,20
  26:20
  27:20,21
  28:16,22
  29:11,13,
  14 35:20
  36:11
  37:17,21,



25 38:3,
24 39:8,
10 42:23
43:19
44:24
45:1
46:16,17,
22 47:20,
21 50:3,
8,14,15,
18,20
51:1
52:17
56:6,7,10
57:18
58:15,20

**Correctional**
8:22

**Corrections**
7:14,16
8:12,15,
18,21
10:7
11:24,25
12:4
19:19,24
20:3
21:23,24,
25 24:14
25:25
26:11
27:14,22
28:2,3,19
30:1,3,21
41:23
47:11,23
50:22
57:1,2
60:17

**Corrections'**
42:5
60:14

counsel
5:12 28:7
30:12,13,
24 31:12

counselor
8:23
30:11
45:14,16

count
23:1

County
8:25

couple
4:22

court
15:10
16:1,6,7,
8,10
17:8,11,
14 18:1,
11,14,18,
21,25
32:12,18,
23 33:1
62:14

courts
16:10,13
17:12
32:11,17

create
19:24

crime
17:24
20:2,16,
17 21:1,3
40:12
51:18,20
56:11

crimes
19:21
34:1
38:20

criteria
48:12,13

cross-
examine
30:25

current
7:10,15
9:13

custody
23:4,6,11
46:3,7,16
50:10
60:15

———————————
            D
———————————

daily
9:5

dangerous
56:20,21

date
17:13
25:5 34:2
38:24

day
10:4 54:2
59:6

day-to-day
10:22

dealing
10:22

death
16:19,21
59:25

decade
15:10

decide
35:25
36:1,7

decides

37:8

decision
11:2,11
30:4
32:3,7,
13,19
35:10,17,
22 36:3,
14 50:2
59:3,5

decisions
10:23
16:5

deems
57:2

defendant
31:11,18

defendants
9:17

Define
47:14

degree
6:4,5
39:24
40:12,13
41:8
52:11,12

deliberate
36:19

deliberatin
g
36:14

deliberatio
n
29:21
36:19
54:20,22

deliberatio
ns
35:23

demonstrate
d
54:9

denial
52:12

denied
32:2
33:5,7,20
34:23
50:25
52:6
57:25
58:19,25
59:12,14

denies
51:3,5,22
52:4
58:13

deny
51:9,12,
24 52:15
53:5

denying
51:19

department
11:24,25
12:2,4
20:3
21:24
30:21
31:12,20
41:22
42:5,16
47:23
56:25
57:2
60:14,16

departments
11:23

depend
17:23
52:10



**Depending**
55:15
58:5

**depends**
16:16
29:1,3
35:6
40:20,21
52:8
60:7,9

**deportation**
24:13

**deposition**
4:19 5:13

**describe**
6:2 8:20
10:9
21:10
29:20
31:6

**describes**
19:19

**description**
9:2

**deserve**
62:8

**deserves**
33:19

**detail**
54:13

**determinate**
21:13

**determine**
25:12
43:1

**determined**
25:5
56:25

**developed**
21:12

**development**
19:6

**device**
56:22,24

**devoted**
55:6,12

**diagnostic**
22:2

**die**
60:8,11,
14,22

**differ**
39:3

**differently**
40:5

**direct**
27:3,7

**directly**
20:4

**director**
8:24
10:13

**disciplinary**
51:3
52:2,6,11
56:1,4,6,
16 57:10,
22,24
58:13

**discovery**
28:8

**discrepancies**
55:17

**discrepancy**
55:15

**discretionary**
20:18

**discuss**
54:15

**discussion**
54:8,12

**Displaying**
62:9

**dissenting**
53:6

**distinguishes**
38:19

**distinguishing**
39:12

**division**
12:3,4

**DOC**
10:14
11:18

**doctors**
13:7

**document**
28:9
35:13

**duties**
9:2,4
11:7

—————
**E**
—————

**earned**
58:17

**education**
6:2 41:11
48:7,23
58:10

**educational**
13:7
39:23

34:1 41:9

**elected**
7:23

**electrical**
44:17
45:5,7
58:17

**eligibility**
25:5
38:18
39:25
41:20
46:21

**eligible**
17:20
18:5,9,
19,22,23
24:11
28:24
29:7
46:12,15
48:20,22
49:1,5,
19,23
59:20

**employability**
40:14,18
43:14

**employment**
31:8
38:10,13,
15,16
40:16
43:9
58:10

**engineering**
41:1,8

**entered**
22:2
24:17
50:12

41:19
44:9,12

**entering**
19:19

**entire**
55:5,11

**equip**
42:17

**escape**
57:4

**established**
59:24

**evaluate**
47:19,24

**evaluated**
27:24

**evaluates**
46:19

**evaluating**
19:9
43:12

**evaluation**
38:18
39:25
41:19

**eventually**
59:13,18
60:2

**evidence**
30:20
31:3

**exact**
27:4,7
58:23

**examples**
49:3

**exception**
5:23

**Executive**
14:20,23

**Exhibit**
13:24



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024
Index: exhibits..grid

14:19
19:13
24:4 28:7
35:12
38:22
41:25
50:24
56:15

**exhibits**
13:18,21

**experience**
10:6,11
16:12
34:3,10
43:17
59:16

**expert**
30:17
34:9

**experts**
34:11

**Explain**
51:17

**explanation**
33:6

——————————

**F**

**facilities**
23:5

**facility**
8:22
22:25
30:13
45:15

**fact**
18:9,23
51:21,22
52:13
59:2

**factors**
25:16,17

27:19
31:16
36:3,6,7,
9 37:3
38:1,4,7,
9,12,13
40:22
52:15
54:15
58:5,6,9

**facts**
55:6,12

**fair**
5:3,25
7:3 22:16
34:14

**fairly**
56:17

**familiar**
15:8,16
17:17
19:21
27:2

**familiarity**
13:14
15:5

**February**
57:9

**feel**
44:10
59:6

**filing**
32:17

**final**
53:8

**Finally**
5:22

**fine**
52:22

**firm**
42:15

**first-
degree**
17:1
20:25
29:5

**fit**
17:14
18:20

**fits**
18:10

**follow**
5:1 56:5
57:7

**food**
56:9

**form**
15:13
17:4,22
18:6 19:1
21:11,19
25:1,8
26:5,13,
23 27:16
30:24
31:24
32:20
34:17
39:17
41:15
42:22
44:6,20
47:13
51:11
54:18
55:14,22
59:8
61:4,9,13
62:1

**formalized**
13:13

**format**
13:19,20

**forward**

5:14 6:15

**free**
5:22 15:9
44:10
45:18

**fulfill**
24:19
26:7

**full**
5:2,3

**function**
9:5

**functions**
10:23

**fundamentals**
45:5

**future**
40:16

——————————

**G**

**garnered**
43:2

**gave**
17:7 52:9

**GED**
41:3
44:12
58:17

**generally**
48:5

**geographical**
8:24

**gestures**
45:22

**give**
5:2,3,15
9:2

26:16,18
33:8
50:24

**giving**
4:17 8:11
35:16

**good**
31:13
37:18
52:19

**govern**
13:15

**governing**
13:25

**government**
41:23

**governor**
11:1
14:20
32:10

**grad**
6:3

**Graham**
15:11
17:16

**grant**
27:12
29:22,24

**granted**
29:16
34:3,12,
16,20
51:7
58:2,22
59:17

**granting**
37:4

**grid**
19:21
20:2,15,
17 21:1,



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024
Index: ground..job

3,6,7,8,
12,13,17
34:1

ground
4:23

gulf
56:13

guys
13:20
59:6

───────────

**H**

───────────

handles
22:24

handy
15:2

happen
27:11

happened
51:21,23

hard
42:17

head
5:6 11:23

health
48:7

hearing
27:11
30:9
34:23
36:12,16,
21,22,24
39:2
43:16
45:10
49:16
53:17
54:23,24
55:6,11
57:15

hearings
14:10
55:19

helping
43:1

high
40:3,10
41:11

higher
32:10

highest
48:19

hire
30:17
45:20

history
31:8
43:25
44:9 45:4
47:11
58:18

hold
34:9

hospital
60:12,16,
19

hospitaliza
tion
24:13

hour
54:5

hours
12:21
13:5

───────────

**I**

───────────

idea
32:23
33:1 44:7

identify
20:13

ignore
25:22
26:4
27:13

impose
17:12

imposed
16:6

imposes
16:7
17:11
18:18

impossible
54:19

improve
33:23

improving
42:19

incarcerate
d
20:14
38:15

incarcerati
on
31:9

include
30:7

incorrectly
13:19

individual
20:13
26:17
31:7
38:10

individuals
22:23

information
38:23

39:7
43:21,24
44:11
45:12
50:17

inmate
22:8
23:24
24:15,19,
20,24
26:1,7
27:23
28:4,23
29:16
32:2
33:19
36:13
37:15,22
39:23
43:1,5,12
48:14
53:9,12,
14 59:11

inmate's
38:18
43:17

inmates
19:20,25
22:10
23:12
33:4
34:2,11,
15 38:19
42:20
45:25
46:11,18
47:7,11,
23 48:8

instances
48:15

institution
s
24:11

instruct

5:14

instrument
26:21

interfering
56:20

internally
30:21

Internation
al
12:15

interrupted
16:1 18:1

introduced
43:15

involved
8:17 14:6

involves
33:2

involving
14:10

irrational
11:11

issues
11:16,17
12:25

item
41:21

───────────

**J**

───────────

January
6:24

Jeannie
9:15
10:11,13

Jeff
7:17
42:10

job



11:7 13:4
45:4
48:6,20,
23

Jonathan
4:8,12
52:20

judge
17:19

July
7:8 8:10

jurisdiction
8:12,15

juvenile
38:20
47:2
52:5,14

juveniles
15:12
19:10
46:12

— K —

Kansas
4:13 6:7,
20,21
13:12,15,
25 14:10,
15 16:10,
12,18,22
17:1,12
18:24
21:1
41:22
42:5
46:25
47:3,8
59:24

Keating
9:15
10:6,10

12:6

kind
13:6
38:11
53:23

kinds
57:24

knowledge
6:13,14
9:20
13:10
16:24
22:17

KSA
19:18

— L —

laid
25:17

language
27:4

Lansing
8:21

lasted
54:4

law
26:8 62:9

lawsuit
9:17 14:6

lawyer
6:16
45:16,18,
21

lawyers
13:6

leadership
6:5

learned
40:24

leave
10:24,25
11:7

Leavenworth
4:13

legal
13:12
32:14,16

length
36:1,8

letters
31:7,8

level
23:7
48:14,20
49:11

levels
23:9 46:3
61:17

levity
26:25

life
15:25
16:5,6,
12,17,22
17:1,9,
10,11,12,
20,24
18:16,17,
18 28:23
29:7 35:3
46:11
47:3,8
59:11,17,
22 60:11,
21

limitation
48:16

limitations
48:10

lines
15:18

16:5

link
57:22

list
48:3
56:15
58:8

listed
44:15,18
45:4,8

lodge
5:12

long
6:18,23
24:6 35:7
47:11
49:17
61:1,2

— M —

made
4:24
10:17,24
11:10
14:23
23:21
29:25
32:7
35:22
38:25
42:19

main
37:13

majority
29:17

make
5:9 61:2

makes
21:17,25
35:10
62:8

making
36:3,13

Makthepharak
4:9
28:15,20
29:4
34:22
35:2,19
40:9,15,
19 41:2,
10,14
44:16
49:14,15,
19 50:9,
18,25
51:10
55:25
58:12

Makthepharak's
43:24
52:25
53:16
56:15

man
42:6

management
6:4,5
11:18,21,
22 23:10
48:18

manager
8:23
10:14

manner
9:19

Mark
9:15
10:4,10,
12

marked
13:23



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024
Index: master's..offered

14:19
28:6

master's
6:5

material
57:4

materials
36:13,18

math
61:2

matter
12:24,25
13:6
33:14

mature
52:14

matured
61:12

matures
61:25

maturity
39:16
54:9,17
56:2,5
57:5
61:17

max
23:10

maximum
46:4
48:22
49:6,10

meaning
20:21
24:9 36:5

means
38:24

medications
4:15

medium

23:10
46:4
48:25

meet
4:8 11:3,
20,21
31:22

meetings
11:19

member
7:7 10:4
42:25

members
9:8,10,14
10:2,17
12:7
13:11
15:4
19:4,8
29:22
30:13
35:24
53:1,11

mental
48:7

mentioned
14:13
36:17,18
46:3

mere
18:23

Miller
15:11
17:16
38:25

minimum
23:11
46:4,7,8,
15 49:1,5

minor
56:17,19

Montgomery
15:11
17:17
39:1

months
57:10,14,
17,18,19

murder
16:17
17:1,2
20:25
21:3 29:5

_____

N

_____

nah
5:7

natural
10:15

next-to-
last
19:17,18

nods
5:6

non-death
16:22

normal
8:8 9:7
28:21
44:22,23
54:5
61:16,22,
24 62:2

note
57:8

noted
26:24

notice
35:16,17,
18

November
57:16

number
12:20
13:5
46:18
51:19

numerous
10:11

_____

O

_____

Object
15:13
17:4,22
19:1
21:11,19
25:1,8
26:5,13,
23 27:16
31:24
32:20
34:17
39:17
41:15
42:22
44:6,20
47:13
51:11
54:18
55:14,22
59:8
61:4,9,13
62:1

objected
18:6

objection
5:15
25:14
27:6
61:19

objections
5:13

obligation
26:8

obtain
7:5 12:8

offender
30:11
31:21
35:16
36:21,23,
25 38:23
39:1,21
40:17
43:23
45:10
51:24

offender's
30:12

offenders
15:23
17:8
18:15
28:13
42:15,17
47:2
55:20

offenders'
22:25

offense
21:5,16,
18 37:23
52:5,15
54:10
55:7,12,
20 56:3,
24 57:3,
10,23

offenses
15:12
19:10
21:14
56:17

offered
48:8



JONATHAN OGLETREE
MAKTHEPHARAK V. KELLY

August 29, 2024
Index: offers..possibility

offers
  47:23

office
  11:1

officer
  8:22
  10:12

Ogletree
  4:7,12
  60:24

online
  13:21

operation
  56:21

opportunity
  4:7 15:24
  17:9
  18:15
  40:6

opposed
  54:9

order
  13:4
  14:20,23
  24:24
  46:16

ordinarily
  39:6
  44:10

ordinary
  39:3

outlined
  15:22

outlines
  27:10

outlining
  19:25

override
  30:4

oversight

9:4 11:12
22:4
59:3,7

—————————

P

—————————

packet
  28:12
  39:2,4,5
  50:19

pages
  24:4

pandemic
  53:22,24

parole
  8:11 9:7
  10:11,13,
  14,16
  13:12,15,
  25 14:10,
  14,15,24
  15:6,12,
  25 16:5,
  6,7,13,
  18,23
  17:3,9,
  10,11,13,
  20 18:5,
  10,16,17,
  18,19,24
  20:1
  24:1,10,
  11,23
  25:5
  26:3,19,
  25 27:24
  28:24,25
  29:8,13,
  16 30:9
  31:13
  32:2,13,
  19 33:5,
  20 34:2,
  3,12,16,

20,23,24
35:2,5
36:12,16,
24 37:4,
9,16
38:19
40:1 41:9
43:16
46:1,21
47:17
49:20,23
50:25
51:7,10,
12,24
52:7,16
53:17
57:15,25
58:2,19,
22,25
59:2,5,
12,17
60:1,2,3,
10,22

paroled
  24:25
  50:7
  53:12

paroling
  12:15
  13:1

part
  11:18
  25:19
  26:11
  43:21
  45:9
  47:19
  56:17

Partially
  10:10

participati
on
  31:10
  51:18,19

party
  54:8

pass
  36:1,8

passed
  35:21

past
  15:10
  50:4

penalty
  59:25

people
  15:12
  33:25

perfectly
  52:22

period
  20:22
  47:8

periodic
  23:16,18

person
  8:6 16:25
  27:12
  40:13
  41:13
  51:6
  53:13
  61:7,16
  62:8

person's
  55:12

personally
  22:15
  47:10
  49:14

personnel
  11:17

persons
  24:10

pertaining
  19:5

pictured
  42:6

placement
  23:5

plaintiff
  4:9 28:15

plans
  58:11

plethora
  43:9

point
  18:4
  52:20

pointed
  36:10
  37:4

population
  47:17

portion
  25:22,24
  26:6 27:7

portions
  26:24

position
  6:10,23
  7:5 8:2
  9:6 12:9
  20:7
  34:2,15
  47:19

positions
  8:23

possession
  56:21,23

possibility
  17:2
  20:21
  28:24



32:9
33:24

Possibly
58:3

post-grad
6:3

post-
incarcerati
on
38:16

potential
17:12

practically
55:5,11

pre-
condition
26:3

preliminary
4:14

present
31:3
36:21,22,
24

president
6:7,12,19

pretty
13:2

prevent
4:16

previous
9:25 10:6
11:2
12:10

previously
7:7 8:14

prior
8:17 9:1
31:8 39:2

priorities
42:21

prison
40:4,6,
11,14
41:5,8,12
42:16
43:18
44:13
46:4
50:12,14
58:17
60:8,11,
13,22

prisoner
6:7,20,21
7:6 8:11,
17 9:3,5
10:16,19
12:1,11
13:25
14:14,16,
25 19:4
20:8
23:20
24:9
27:23
30:14
31:19
37:9
39:6,13
46:5,19
62:5

prisoner's
39:4

prisoners
46:24

proceedings
52:25

process
29:20,21
32:14,16,
18,23
33:2 45:9

processes
9:7

program
8:24 25:6
44:15,18

programs
20:13
23:4
24:16
26:2,17
27:25
31:9,10
48:2,3,5,
7 49:5

progress
58:10

promise
22:17

promoted
10:12

prove
31:22

provide
27:22
28:3 33:4

provided
28:8

provisions
24:8
25:20

psychologic
al
19:6

public
37:10

pulled
43:21

put
12:17
35:25
53:8

puts
12:13

Q

Qualseth
5:12
15:13
17:4,22
18:6 19:1
21:11,19
25:1,8,14
26:5,13,
23 27:6,
16 31:24
32:20
34:17
39:17
41:15
42:22
44:6,20
47:13
51:11
52:19
54:18
55:14,22
59:8
61:4,9,
13,19
62:1,13,
15,16

question
5:2,18,24
11:1 16:9
18:19
33:25
35:1 40:7
49:22
55:18

questions
4:14,16
30:25
62:12

R

range

21:14

Rarely
34:21

Ray
7:11

re-entry
8:24
42:19
43:2
47:17
48:3

read
62:13

readiness
42:20
43:13

ready
20:1

reason
51:9,12

reasons
33:8
50:25
51:2
52:3,9
53:13
58:12,19

recall
49:14
50:4
53:1,16
54:7,12,
14 55:5

recalls
55:6

receive
13:11
15:5 19:5

received
19:9
50:18



58:16

**receives**
10:25

**recently**
6:6

**Recess**
52:23

**reclassifie**
**d**
23:12

**recognize**
28:8
35:13
42:6

**record**
4:11,25
5:10
43:15
62:14

**recorded**
54:20

**records**
22:24,25

**reduction**
44:15

**refer**
13:21,22
15:2

**referring**
21:7

**reflects**
56:4

**region**
10:13

**regulation**
14:9,10,
24 25:11
33:11

**regulations**
13:15

**rehabilitat**
**ed**
47:12,14,
16

**rehabilitat**
**ion**
47:25

**relationshi**
**p**
43:10

**release**
20:19,22
24:10
29:23,24,
25 33:24
45:25
46:6,13
49:7
58:11

**released**
15:24
17:9
18:16
24:12
27:12

**remember**
49:16

**repeat**
34:25

**repeated**
5:19

**report**
26:16,18
27:23
28:4,18
29:25
50:21
53:9
57:22

**reported**
24:14
25:25
26:12

27:14
28:2

**reporter**
4:25 16:1
18:1
62:14

**reports**
51:4
52:2,6,11
56:1,4,6,
16 57:24
58:14

**represent**
4:9 28:17
42:3
44:2,16
54:4

**represented**
54:16
55:2

**requests**
10:25

**require**
18:25
24:23
25:4

**required**
12:8
20:23
24:16
26:2
33:4,9
51:6

**requirement**
12:20,23
13:8
15:11

**requirement**
**s**
13:7,12
15:4,6,22
19:25

**requires**
25:25
26:12
33:12

**resign**
7:1

**resigned**
6:22

**resigns**
8:5

**resources**
42:18
47:22
48:8

**response**
5:5

**responsibil**
**ity**
51:3,6,7,
23 52:4,
12 56:1
58:13

**retired**
7:2

**review**
6:7,20,21
7:6 8:11,
18 9:3,5
10:16,19
12:1,11
13:25
14:14,16,
25 19:5
20:8
23:16,18,
20 24:9
27:8,23
28:3,18
32:9,13
36:13
41:9,12
42:25
45:14

46:19
51:6 62:5

**reviewed**
14:4
23:19
32:3

**reviews**
36:20

**revised**
22:18
23:17

**revises**
22:20

**revision**
24:18

**revisions**
23:21

**risk**
37:13
44:15

**risks**
37:7,11

**Roberts**
7:11

**roundabout**
46:18

**row**
16:19,21

**rule**
5:1

**rules**
4:23 56:5
57:7

---

**S**

**safe**
62:6

**safety**
37:10



Sashada
    4:9
    49:13,14

satisfactor
ily
    24:15
    26:2

satisfied
    27:15
    28:20

school
    6:3 40:4,
    10 41:11

second-
degree
    17:2 21:3

secretary
    7:10,12,
    14,15
    8:5,12,14
    9:23,25
    10:20
    11:11,15
    19:19,24
    20:4
    21:23
    24:14
    25:25
    26:11
    27:14,22
    28:1,3,19
    29:25
    30:3
    32:10
    42:10,15
    50:22

section
    24:8
    25:21
    27:8 37:5

security
    23:7,9
    48:13,20
    49:10

selected
    9:19

seminars
    12:17

send
    28:12

sense
    56:4

sentence
    16:22
    28:23
    29:3 35:4
    37:15,19,
    20 47:8
    59:12,17,
    22 60:11,
    21

sentenced
    16:25
    29:6 47:3

sentences
    46:11

sentencing
    9:6 21:8,
    12,13

series
    13:24
    19:13,16

served
    29:10
    37:15

services
    42:19

serving
    28:23
    37:19,20
    42:16
    46:11
    47:8

shakes
    5:6

Shawnee
    8:25

show
    13:17,23
    14:8,18
    20:1 28:6
    31:12
    35:12
    41:25
    56:15

shows
    39:16
    58:16

sign
    62:13

simply
    8:5 27:19

Sixteen
    50:11

skill
    41:1,4,6,
    13

skills
    40:24
    42:18
    43:2,5,8,
    9,10,11

small
    56:8

solely
    55:20

someone's
    51:18
    57:5

sort
    43:8 48:2
    49:4

sorts
    14:1 48:5

special
    23:10

39:15
    46:4
    48:18

specific
    7:25

specifically
    28:14

stable
    58:18

staff
    42:16

start
    4:23 51:5

started
    8:21

state
    4:10
    46:25
    47:7
    60:12,16,
    19

states
    14:15
    25:11
    35:21

statewide
    8:25

status
    15:25
    16:5
    18:16,17

statute
    14:24
    17:3
    19:22
    20:16
    24:3,9,23
    25:7,11,
    15,20
    26:25
    27:4

33:11
    36:10
    37:5
    38:2,5,8

statutes
    13:14,24
    14:1
    19:13,16
    27:3

statutory
    31:16

Sternberg
    4:8 15:14
    16:3 17:6
    18:3,8
    19:3
    21:15,21
    25:3,10,
    18 26:9,
    14 27:1,
    18 32:1,
    22 34:19
    39:19
    41:17
    42:24
    44:8,21
    47:15
    51:13
    52:21,24
    54:21
    55:16,24
    59:10
    61:6,11,
    15,21
    62:3,11

stop
    6:18
    22:18

stopping
    52:20

Street
    4:13

structure
    29:3



**subject**
5:15
12:23,25
13:6  24:8
25:20

**submit**
31:10

**submitted**
13:18,20

**subpoena**
30:20

**substance**
48:6

**successful**
42:18
43:2,6

**successfully**
23:24

**sufficient**
47:16

**summaries**
31:9

**supervised**
11:5

**supervises**
10:19
30:6

**support**
31:7

**supposed**
56:9

**Supreme**
15:10
17:7,14
18:11,14,
21,24

**surprise**
54:17
55:3,9

**surrounding**
12:25

**switched**
10:15

**system**
10:12
22:3,21,
22,23
47:16
58:11

---

**T**

**takes**
37:12
55:25

**taking**
41:7

**talk**
4:24  31:8
35:24

**talked**
24:17
50:16

**talking**
17:16
38:15
49:13
59:25

**team**
8:23
11:18,21,
22  22:25
31:12

**teenager**
56:3

**telling**
25:21

**tells**
27:19

**ten**
17:25
25:16

**term**
7:25

**terms**
11:6  23:6

**testimony**
4:17

**theory**
30:3

**thing**
4:23
28:18
41:2  47:5
51:16

**things**
36:20
38:11
51:19
56:8

**tie**
38:11

**time**
7:11,21
12:7
20:22
23:12,13
25:6,13
34:3,24
35:3,4
37:16,24
40:10
41:9,11
42:16
43:17
49:25
50:5
52:14
53:24
57:8
58:16

**times**
34:10

**today**
4:15  56:2
57:6

**told**
45:12

**top**
25:21
38:22
42:20

**total**
9:10

**tough**
5:1

**trade**
39:24

**training**
13:11,13
15:5
19:5,9
44:13,18
48:6,20,
23

**trainings**
12:8,11,
12,13,14,
24

**transcript**
62:15

**treatment**
48:7

**truthful**
4:17

**turn**
19:14,16
24:3,5

**typically**
11:14

---

**U**

**U.S.**
15:10

**Uh-huh**
27:9
59:23
60:20

**ultimately**
39:13

**unauthorized**
56:22,23

**understand**
5:10,16,
18  40:7

**understanding**
15:21
16:4
17:13
18:10,14
32:15

**unit**
8:23
22:2,25
30:12,24
31:12

---

**V**

**Vaguely**
49:16

**vary**
56:6

**verbal**
5:5

**verbally**
33:17



**versus**
37:23
41:10,13
56:2 57:6

**view**
18:20
36:4
40:15
42:25
43:13
52:5,15

**vocational**
44:17

**voice**
10:23

**vote**
29:22,24
53:6

**voted**
53:2,5

**votes**
29:15

**voting**
29:20,21

—————————

**W**

—————————

**wait**
5:2

**wanted**
13:20
30:17

**Wark**
9:15 10:6
12:6

**warrant**
24:13

**website**
41:23
42:4,6

**weekly**
11:19,20

**wished**
7:20

**withdraw**
16:9,11
19:15
55:18

**withdrawn**
21:6

**witnesses**
30:15
31:23
36:17

**word**
54:16

**work**
8:4 23:15
33:23
43:17,24
45:7,25
46:6,12
49:7
58:18
62:4

**worked**
8:22

**workforce**
42:20
43:13

**working**
42:17

**writing**
24:15
26:1
28:2,4
33:16,18

**written**
19:20
33:6

**wrong**

13:19

—————————

**Y**

—————————

**year**
17:23
29:6
46:20
50:13

**years**
6:24
17:21,24,
25 29:10
40:9
50:14
51:22
55:13
61:2,5

**youth**
39:9
57:24

**youthful**
15:23
17:8
18:15
28:12
38:23
39:1
43:23
51:24
55:19

—————————

**Z**

—————————

**Zmuda**
7:17,18,
20 9:23
42:10,12

**Zoom**
53:19

