## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SASHADA MAKTHEPHARAK,
    Plaintiff,

vs.                        Case No. 2:23-cv-02121-DDC-RES

LAURA KELLY, *et al.*,
    Defendants.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Sashada Makthepharak opposes the defendants' joint motion for summary judgment (Doc. 47). The Court should deny the defendants' motion and proceed with the case. Genuine disputes of material fact preclude summary judgment, and the defendants are not entitled to judgment as a matter of law.

### Introduction / Nature of the Case

Mr. Makthepharak was convicted of a felony murder in Kansas at the age of 16 for an offense he was accused of committing at age 15. He received a sentence of life in prison without possibility of parole for 20 years. Since then, for more than 23 years, he has been incarcerated in the Kansas Department of Corrections.

Because Mr. Makthepharak was convicted as a juvenile, as the U.S. Supreme Court confirmed in a series of decisions, the Eighth Amendment prohibition on cruel and unusual punishment prohibits his incarceration without a meaningful and realistic opportunity to obtain release based on demonstrating maturity and rehabilitation.

Mr. Makthepharak brought this action under 42 U.S.C. § 1983 against the Governor of Kansas, the Secretary of Corrections, and the members of the Kansas Prisoner Review Board ("the KPRB"), all in their official capacities. He explained that Kansas's parole scheme under K.S.A. § 75-5210a, K.S.A. § 22-3717(g), KAR 45-

1

200-1, KAR 44-5-104, which essentially is a system of *ad hoc* clemency at the behest of the Secretary of Corrections with no substantive, enforceable standards and without review, violates the Eighth Amendment because it denies the meaningful and realistic opportunity to demonstrate maturity and rehabilitation the Supreme Court requires, rendering his sentence a *de facto* sentence of life without parole ("LWOP") (Doc. 44 at 5-9).  He seeks declaratory relief that his continued incarceration without that meaningful opportunity violates the Eighth Amendment and an injunction requiring the defendants to provide that opportunity.

The defendants now have moved for summary judgment under Fed. R. Civ. P. 56, making a number of arguments including that Mr. Makthapharak lacks standing to challenge his *de facto* LWOP sentence, they are immune under the Eleventh Amendment, and Mr. Makthapharak actually does have a meaningful and realistic opportunity for release (Doc. 47).  Perhaps most curiously, the defendants assert that they *do not actually follow* Kansas's parole statutes in §§ 75-5210a and 22-3717(g) that Mr. Makthepharak challenges at all, but instead the KPRB's parole scheme is something the members create themselves and operates outside of the Secretary of Corrections' oversight as the statutes require.

The Court should deny Defendants' motion.  Mr. Makthapharak has standing.  The defendants are not immune, because they are responsible through their actions and inactions for his continued incarceration without a meaningful opportunity for release.  And rather than the defendants' not following the statutes Mr. Makthepharak challenges helping them, it only goes to show that the parole system is entirely *ad hoc*, with no actual standards whatsoever.  At the very least, there is a material dispute of fact over whether Mr. Makthepharak has a meaningful opportunity to demonstrate maturity and rehabilitation and for release, under which the defendants are not entitled to judgment as a matter of law. Therefore summary judgment under Fed. R. Civ. P. would be inappropriate.

2

## Exhibits

References to exhibits A through L in this response, including sub-exhibits such as J-1, J-2, etc. refer to those exhibits attached to the defendants' motion for summary judgment (Doc. 47). In providing pin citations to sub-exhibits, the defendants apparently cite to the PDF pagination of the overall exhibits, which matches the ECF pagination added to the documents after filing. Citations to sub-exhibits in this response are to the internal pagination of those sub-exhibits, where present.

Plaintiff provides three additional exhibits, designated by number:

Exhibit 1    IMPP 15-101A

Exhibit 2    Defendants' Request for Production Responses

Exhibit 3    Copies of inmate data sheets from the Kansas Department of
               Corrections Website

### D. Kan. Rule 56.1(b)(1) Statement

Mr. Makthepharak responds the following to the statements of material fact in the defendants' motion for summary judgment he disputes or for which he offers clarification by paragraph number, which this response cites as "DSMF":

8. Mr. Makthepharak admits that he signed Doc. 12-2.

9. Interpreting the "program plan" to refer to the "Inmate Program Plan," Doc. 12-2, discussed in the previous paragraph, Mr. Makthepharak admits the document states it conditions good time credits on participation in the program plan.

10-11. Objection. Mr. Makthepharak admits that Doc. 12-2 does not *itself* claim to condition the granting of parole on participation in the program plan and admits no agreement was made between him and the Secretary that had that effect. But he objects that this is irrelevant, as it does not supersede the legal requirements of Kansas statutes including K.S.A. § 22-3717(g).

3

12.  Controverted.  The defendants' statement that "[t]he existence of an agreement under K.S.A. 75-5210a is not required for parole to be granted by the KPRB" is not a fact but a legal conclusion.  Mr. Makthepharak's arguments in that regard are below at Section I.A.  Further, the defendants' citations fail to support this supposed "fact."  Exhibit G ¶¶1-3 and the list on page 8 do not in any way mention agreements under K.S.A. § 75-5210a ("5210a Agreements").  Mr. Ogletree's assertions in his deposition, and the declarations of the Secretary and Mark Keating, only establish that the defendants are not even following the Kansas statutes that govern parole.  The legislative testimony the defendants cite further contradicts their factual assertion.  There, then-Secretary of Corrections, Roger Endell, testified "*[w]hen an inmate signs* the letter of agreement, and *when he is ready*, we will take him to the parole board." Doc. 12-3 at 1 (emphasis added).  Secretary Endell further testified that such an agreement "is not a guarantee, this is not a contract, it addresses the right to parole issues …. For those who refuse to agree, are the people who will do a lot of time." *Id.* at 2.  Read in context, Secretary Endell was plainly testifying that parole decisions would depend on 5210a Agreements.

13.  Objection.  Mr. Makthepharak admits that failure to complete programs was not cited as a reason for his denying parole.  But he objects that this is irrelevant, as it does not supersede the legal requirements under Kansas statutes for how parole is to be considered.

15.  Clarification.  Mr. Makthepharak admits thatat least at some points in his 23 years in prison, he has been classified as medium-low custody.  But as the defendants recognize in DSMF ¶ 17, he has not always had this classification.

18.  Clarification.  Mr. Makthepharak admits that KDOC considers him to be "an active and validated security threat group member," but notes that this

consideration is triggered by his classification scoring combined with disciplinary reports (Ex. H at 11:19-12:14).

24.   Controverted.  Mr. Makthepharak disputes that "those serving life sentences have not been categorically barred from eligibility for work release or 'community corrections.'"  The portions of Exhibit I the defendants cite do not discuss or relate to eligibility for community corrections in any way.  Exhibit J ¶19 only defines community corrections, but does not discuss individuals serving life sentences at all.  To the contrary, Mr. Makthepharak is categorically barred from work release and community corrections because he would have to be continuously housed in a minimum security facility for at least 30 days (Ex. 1 at 4).  But minimum security is totally foreclosed to Mr. Makthepharak because his number of points will never be less than nine (Ex. C at 11-23, 38) ("greatest" level custody assessment = 6 points, plus "life" sentence = 3 points).

25.   Objection.  "Maturity and rehabilitation can be demonstrated for purposes of parole regardless of an inmate's security classification or participation in work release or "community corrections" is not a fact but a legal conclusion.

42-43.   Objection.  Mr. Makthepharak objects to admission of the defendants' supposed statistics that "From 1979 to 2023, 73% of parole hearings in Kansas for youthful offenders have resulted in a grant of parole. (Exhibit J at ¶ 24.)" and "From 2018 to 2023, 62% of parole hearings in Kansas for youthful offenders have resulted in a grant of parole. (Exhibit J at ¶ 25.)".  The defendants objected to providing documents or records of the KPRB that would support or disprove this claim by showing other parole hearings that have been conducted (Ex. 2 at 1).  The defendants should not be permitted to admit unsupported and self-serving assertions in declarations at the summary judgment stage when they have refused to produce evidence that would prove or disprove those assertions.

46. Objection. Mr. Makthepharak objects to the admissibility of the defendants' statement that "It is not uncommon for an inmate who committed homicide while a juvenile to be granted parole." Characterizing the release as "uncommon" is opinion testimony and not the proper subject of expert testimony. Further, the defendants refused to produce documentation that would prove or disprove their claims (see objections to ¶¶42-44, above) (Ex. 2 at 1). The defendants should not be permitted to rely on Mr. Makthepharak's lack of knowledge in the manner they attempt when they have refused to produce evidence that would provide him that basis of knowledge.

49. Disputed. The primary reason for the denial of Mr. Makthepharak's parole in 2021 can be inferred to be the reason listed first on the action notice, which is "[d]enies responsibility." (Doc. 12-1).

50. Clarification. Mr. Makthepharak does not dispute that KPRB permits counsel to be present, but there is no *right* to counsel. KAR 45-200-1.

60. Disputed. KPRB regularly considers in determining parole, and in fact did consider in determining Mr. Makthepharak's parole in 2021, his criminal history and the nature of his underlying conviction (Ex. B at 8-9 (full complaint from underlying case and report of unrelated juvenile criminal history included in pre-hearing packet)). In fact, discussion of his crime of conviction predominated at his 2021 hearing: of 47 pages of actual transcript (less cover pages, index, etc.), over a third of those – 16 pages – was spent discussing the underlying convictions (Ex. J-1 at 7-23).

83-90. Disputed. Inmates are not informed – and Mr. Makthepharak was in fact never informed – that he could submit written evidence to KPRB, obtain expert witnesses, or subpoena witnesses (Ex. H at 40:14-19). *See also* KAR 45-200-1. Mr. Ogletree testified that inmates cannot subpoena witnesses, hire an expert, or cross-examine the witnesses the authorities bring (Ex. I at 30).

91.  Disputed.  While Mr. Makthepharak does not dispute that subpoenas have not historically been used by KPRB, he disputes the assertion that parole eligibility hearings involve factors that do not require them.  Mr. Ogletree in his deposition testified that the KPRB only uses factors identified in § 22-3717(h) (Ex. I at 25, 27, 37), none of which involved subpoenaed information.

98.  Disputed.  Defendant Ogletree testified that the only factors the board considers in granting parole are those listed in K.S.A. § 22-3717(h) (Ex. I at 25, 27, 37).

104.  Objection.  Mr. Makthepharak objects to the admissibility of this evidence.  Declarations must be based on the declarant's personal knowledge.  Fed. R. Civ. P. 56(c)(4).  The defendants present no foundation for Mr. Keating's personal knowledge of the mental states of other members of KPRB.

**2024 Parole Hearing (¶¶111-129):** Objection.  Mr. Makthepharak does not dispute those facts contained in these paragraphs to which he has already stipulated.  But he objects to the consideration of any further evidence of the 2024 parole hearing because the defendants, despite this pending litigation, failed to preserve the record of that hearing (Ex. J. at ¶¶ 75-76).  Further disputes and objections to these paragraphs continue below.

113.  Disputed.  The procedures for making audio recordings were not the same, as the audio recording was not saved in this case (Ex. J at ¶¶ 75-76).

114.  Disputed.  Mr. Makthepharak was never informed that he had the right to have an attorney participate in the hearing (Ex. H at 40:11-13).

116.  Objection.  This fact is not supported by admissible evidence.  Fed. R. Civ. P. 56(c)(2).  The evidence supporting this fact (Ex. J ¶67) should be inadmissible because its probative value is substantially outweighed by the danger of unfair prejudice.  Its probative value is weak because, while at least partially falling outside the hearsay definition, the exchange is an alleged out-of-court

7

conversation between Mr. Makthepharak and an anonymous KPRB member at a parole hearing in 2024. The inability of the declarant, Mr. Keating, to even identify the KPRB member speaking (a person he works with on a regular basis) reduces the probative value of the statement. The unfair prejudice substantially outweighs this probative value due to surprise: despite pending litigation relating Mr. Makthepharak's parole rights, the defendants failed to preserve audio recording evidence of this statement (Ex. J at ¶¶ 75-76), and the defendants never supplemented their Rule 26 disclosures regarding this alleged statement.

117. Objection. Mr. Makthepharak objects to the defendants being allowed to rely on this because they lost the recording.

133. Disputed. In addition to administrative oversight, the Secretary can replace members of the KPRB (Ex. I at 7).

134-135. Disputed. Mr. Ogletree testified that KDOC staff do enter into K.S.A. § 75-5210a agreements and that KPRB has reviewed them (Ex. I at 19-20).

### D. Kan. Rule 56.1(b)(2) Statement

Mr. Makthepharak states the following material facts that remain in dispute, which are not contained in the defendants' suggestions, which this response cites as "PSMF":

### *Organizational Structure and Powers of Defendants and Related Agencies*

1. As Governor of the State of Kansas, Governor Laura Kelly has a duty to enforce the laws of the state. Kan. Const. Art. I § 3. Among these duties, Governor Kelly appoints – and may remove – the Secretary of Corrections. K.S.A. § 75-5205.

2. As the Secretary of the Kansas Department of Corrections, Secretary Zmuda manages the state-operated prison system. K.S.A. § 75-5205.

3. The Secretary appoints the members of the Kansas Prisoner Review Board ("the KPRB"), who serve at his pleasure (Ex. I at 7; K.S.A. § 75-52,152).

4.      The Secretary provides the KPRB with all necessary personnel and accounting services. K.S.A. § 22-3713(b).

5.      The KPRB is the only entity that may parole Mr. Makthepharak, and K.S.A. § 22-3717 is the only statute that empowers the KPRB to do so.

### *Custody Classification*

6.      The Custody Classification Manual's score-based system sets the default custody classification for prisoners (Ex. C at 23).

7.      The score-based system will not result in a prisoner being classified below Low-Medium unless his point-based score is less than 7 (Ex. C at 23).

8.      Youthful offenders serving life sentences for homicide will never have a score of less than 7 because Item 1 of the scoring, "Most Serious Current Conviction," will never be lower than a 6 for "Greatest" (Ex. C at 11 (defining item 1), 38 (Offense Severity Scale)), and Item 6, "Time Remaining to Serve," will never be lower than a 3 (Ex. C at 21).

9.      Rather than account for the special characteristics of youthful offenders, the Security Classification Manual actually *penalizes* youthful offenders based on their age, assigning between 1 and 3 additional points for prisoners until they are 43 years old (Ex. C at 18).

10.      At the same time, there are no provisions in the Security Classification Manual to account for any progress towards maturity and rehabilitation by youthful offenders (*see generally* Ex. C).

11.      As prisoners are not able to participate in work release without first being continuously housed in a minimum security facility for at least 30 days, no prisoner like Mr. Makthepharak sentenced to life in prison as a juvenile will ever be able to participate in work release (Ex. 1 at 4).

### *Parole Policies and Procedures*

12.      K.S.A. §§ 22-3717(g)(2) and 75-5210a require, in order for an inmate to be paroled by the KPRB, that the Secretary of Corrections enter into a "written agreement with the inmate specifying those educational, vocational, mental health or other programs which the secretary determines the inmate must satisfactorily complete in order to be prepared for release," and this must happen in order for an inmate to be paroled.

13.      Secretary Zmuda and his predecessors never enter into or revise K.S.A. § 75-5210a agreements with inmates in the custody of KDOC (Ex. L at ¶¶7-10).

14.      Neither Secretary Zmuda nor his predecessors have ever reported to the KPRB as required by K.S.A. § 22-3717(g)(2) and § 75-5210a (Ex. L. at ¶¶ 12-13).

15.      The KPRB was not provided a report from the Secretary of Corrections regarding Mr. Makthepharak before the parole considerations in 2021 or 2024, as required by K.S.A. § 22-5210a (Ex. I at 50:21-23; Ex. L at 13).

16.      The KPRB is not required by statute, nor has enacted any regulation or policy to require to consider whether an inmate who was a youthful offender has matured and been rehabilitated.  *See* K.S.A. § 22-3717(h).

17.      When it comes to youthful offenders, besides providing them a packet of their file, which is not provided to other offenders, there are no different assessments that the KPRB uses in assessing their parole than any other offender (Ex. I at 38-39).

18.      In determining whether a youthful offender should receive parole, there is no accounting for whether he shows maturity or not (Ex. I at 39).

19.      In determining whether a youthful offender should receive parole, the KPRB does not consider any factors outside of those listed in K.S.A. § 22-3717(h) (Ex. I at 27, 37).

20.     The members of the KPRB have not received any training to assist them in evaluating offenses that were committed by juveniles, as opposed to adults (Ex. I at 19).

21.     The KPRB does not substantively differentiate between inmates who committed underlying crimes as juveniles and those who committed underlying crimes as adults (Ex. I at 38).

22.     Members of the KPRB do not receive any formal training on the legal requirements for parole in Kansas (Ex. I at 13).

23.     Members of the KPRB do not receive any training with or have familiarity with the constitutional requirements for considering parole (Ex. I at 15).

24.     Members of the KPRB do not receive any training pertaining to adolescent psychological development (Ex. I at 19).

25.     Members of the KPRB do not receive any training to assist in evaluating offenses committed by juveniles as opposed to adults (Ex. I at 19).

26.     Inmates bear the burden to show they are eligible for parole (Ex. I at 31).

27.     Inmates are not able to present witnesses at parole hearings before KPRB, as the presence of witnesses is not permitted at parole hearings (Ex. I at 30; KAR 45-200-1).

28.     Inmates are not afforded subpoena power to gather or present evidence at parole hearings (Ex. I at 30).

29.     Of the juvenile offenders the defendants identified in discovery has having been paroled between 2012 and 2024 (Ex. 3 at 2), many of them had numerous corrections offenses in the time shortly before their release, including level one offenses within a year before their release (Ex. 3 at 3-21).  Mr. Makthepharak has included a summary of all of them (Ex. 3 at 3-21), followed by

copies of their publicly available records from

https://kdocrepository.doc.ks.gov/kasper (Ex. 3 at 22-248).

30.        Of the juvenile offenders the defendants identified in discovery as

having been paroled between 2012 and 2024 (Ex. 3 at 2), six in fact were not

actually paroled (Ex. 3 at 2-21).

## Arguments and Authorities

### Summary Judgment Standard

Summary judgment is only appropriate if the moving party demonstrates

that there is no genuine dispute as to any material fact and that it is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(a). In applying this standard, the

Court views the evidence and all reasonable inferences from it in the light most

favorable to the nonmoving party. *City of Herriman v. Bell*, 590 F.3d 1176, 1181

(10th Cir. 2010). A genuine issue of material fact exists when "the evidence,

construed in the light most favorable to the nonmoving party, is such that a

reasonable jury could return a verdict for the nonmoving party." *Bones v.

Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). A fact is "material" if,

under the applicable substantive law, it is "essential to the proper disposition of the

claim." *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32

(10th Cir. 2001) (citation omitted). An issue of fact is "genuine" if "the evidence is

such that a reasonable jury could return a verdict for the non-moving party."

*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party initially must show the absence of a genuine issue of

material fact and entitlement to judgment as a matter of law. *Spaulding v. United

Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citation omitted). Once the

movant has met this initial burden, the burden shifts to the nonmoving party to "set

forth specific facts showing that there is a genuine issue for trial" – from which a rational trier of fact could find for the nonmovant." *Anderson*, 477 U.S. at 256.

In deciding a motion for summary judgment, the Court may consider affidavits, depositions, documentary evidence, interrogatories, admissions and stipulations,  and facts that are subject to judicial notice. *Becker v. Safelite Glass Corp.*, 244 F. Supp. 625, 631 (D. Kan. 1965).  A court may take judicial notice of statutes. *United States v. Coffman*, 638 F.2d 192, 194 (10th Cir. 1980).

I.    **The defendants are not entitled to summary judgment on Mr. Makthepharak's claims because there is at least a genuine dispute over whether the defendants denied Mr. Makthepharak a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.**

   A. **Summary**

Mr. Makthepharak seeks declaratory relief under 42 U.S.C. § 1983 that Kansas's parole scheme, as applied to him, violates the Eighth Amendment's prohibition against cruel and unusual punishment (Doc. 44 at 22).  This is because is a *de facto* sentence of life without parole, as the defendants' actions and inactions prevent him from the meaningful and realistic opportunity for release by demonstrating maturity and rehabilitation that the U.S. Supreme Court requires (Doc. 44 at 22).

The Eighth Amendment's prohibition on cruel and unusual punishment contains a "narrow proportionality principle" that forbids "extreme sentences that are grossly disproportionate to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 997, 1000-01 (Kennedy, J. concurring); *accord Graham v. Florida*, 560 U.S. 48, 59-60 (2010).

Relying on this proportionality principle, in a series of decisions the Supreme Court has recognized that because children are constitutionally different than adults, the Eighth Amendment prohibition on cruel and unusual punishment places

substantive limits on their sentencing. The first, *Roper v. Simmons*, prohibited sentencing juveniles to death. 543 U.S. 551, 568 (2005). In *Graham*, the Court expanded on *Roper* by prohibiting sentencing juveniles to life without possibility of parole for non-homicide offenses. 560 U.S. at 74. In *Miller v. Alabama*, the Court extended the prohibition on life-without-parole sentences to juvenile offenders convicted of homicide. 567 U.S. 460, 479 (2012). Finally, in *Montgomery v. Louisiana*, the Court held these prohibitions to be new substantive rules of federal constitutional law and therefore retroactively applicable. 577 U.S. 190, 212 (2016).

The Court in *Graham* and *Miller* require that a juvenile sentenced to life must be given a "meaningful opportunity to obtain release *based on demonstrated maturity and rehabilitation*." *Graham*, 560 U.S. at 75 (emphasis added). This means the juvenile must have a "realistic opportunity to obtain release." *Id.* at 82. The "remote possibility" of executive clemency is insufficient to mitigate the harshness of a life sentence; in other words, executive clemency does not satisfy the requirement of a meaningful and realistic opportunity for release that the Court required in *Graham*. *Id.* at 69-70.

In contrast to prior decisions like *Harmelin*, the juvenile sentencing cases establish bright-line rules that prohibit certain sentences for juvenile offenders. *See, e.g., Graham*, 560 U.S. at 74 ("This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment."). If a juvenile is given a life sentence and does not have a meaningful opportunity for release, then the sentence is cruel and unusual punishment in violation of the Eighth Amendment's guarantee. *See Miller*, 567 U.S. at 479; *see also Graham*, 560 U.S. at 75.

A sentence for "life" is not strictly required to trigger these principles; applying these decisions, other courts have looked to the practical effect of a

sentence, holding that a *de facto* life sentence offends the Eighth Amendment just as much as a *de jure* life sentence. *See, e.g., Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017) (holding that three consecutive life sentences that required plaintiff to serve 131.75 years before any eligibility for parole meant plaintiff had no realistic opportunity for release).

To remedy a sentence that violates the Eighth Amendment under *Graham* or *Miller*, a state may either resentence the individual or may retroactively provide them a meaningful and realistic opportunity for release. *See Montgomery*, 577 U.S. at 212.

Here, the defendants argue that the only way Mr. Makthepharak can prevail on his claim is by showing the Kansas parole process is a "sham" (Doc. 47 at 38-39). The out-of-circuit authority on which they rely is not controlling, and in fact Defendants ignore on-point case law from this circuit. In *Thomas v. Stitt*, the Tenth Circuit reversed the dismissal of claims by a district court that had reasoned that neither *Montgomery* nor *Miller* "'expanded existing parole procedures for persons convicted as juveniles.'" *Thomas v. Stitt*, No. 21-6011, 2022 WL 289661, at *3 (10th Cir. 2022) (unpublished). The Tenth Circuit correctly held that the Supreme Court had not limited its holdings in that manner, and that "a fair reading of the cases does not foreclose [plaintiff's] claims." *Id.* The defendants fail to address *Thomas* as it relates to this critical legal rule, despite being fully aware of the decision, which they address in their arguments on standing and immunity. *See* Doc. 47 at 36.

To the extent that the defendants' law supporting their "not a sham" standard actually support that position, this Court should decline to follow them because their reasoning is flawed. In *Heredia*, plaintiffs representing a class of youthful offenders challenged Wisconsin's parole procedures on similar grounds to Mr. Makthepharak's challenge. *See Heredia v. Blythe*, 638 F. Supp.3d 984, 986-87

(W.D. Wis. 2022). The district court granted the defendants summary judgment, concluding the plaintiffs could only show "the role of courts in policing those decisions is modest, but not meaningless." *Id.* at 999. The court cited several arguments for this conclusion, but nowhere in its reasoning developing its "not a sham" standard did it address the one statement in *Graham* that provided any elaboration on what a "meaningful opportunity" means: that the "remote possibility" of executive clemency is *not* a meaningful opportunity to obtain release. *See id.* at 992-1000. Instead, it addressed that factor only extremely briefly when it turned toward its analysis based on the standard it had developed. *See id.* at 1001.

The appropriate rule of for this Court is simply that of *Graham*: the defendants must allow Mr. Makthepharak a realistic and meaningful opportunity to obtain release based on demonstrating maturity and rehabilitation. Whether they have done that is simply an ultimate fact question for this Court to determine after the parties have the opportunity to present their evidence. But as Mr. Makthepharak explains now, there is at least a genuine dispute of material fact on this, under which the defendants are not entitled to judgment as a matter of law. The Court should determine that dispute after trial, not summary judgment.

## B. Kansas's parole scheme does not afford Mr. Makthepharak a meaningful and realistic opportunity to obtain release, because that scheme functions as a system of ad hoc clemency, are governed by no substantive, enforceable standards, and are unreviewable.

Kansas's parole scheme is set out statutorily in K.S.A. § 22-3717. Under this scheme, a person serving a sentence becomes eligible for parole after a certain period of time determined by the rules in the statute as applied to their particular sentence. *See* K.S.A. § 22-3717(a)-(f). Once a person is eligible, the Kansas Prisoner Review Board ("the KPRB") is empowered – if certain conditions are met, and subject to all the provisions of the overall statute – to release individuals on parole. K.S.A. § 22-3717(g). The KPRB is required to follow certain procedures in

16

considering individuals for parole, some of which it may make for itself by promulgating regulations. K.S.A. § 22-3717(i)-(j), (l). Finally, the scheme requires various conditions of release and requirements for continued supervision of those released on parole. K.S.A. § 22-3717(m)-(x).

Importantly, the operative section of the statute, § 22-3717(g), only permits the KPRB to release a person in one of two circumstances. First, the KPRB may release a person when it "believes that the inmate should be released for hospitalization, deportation or to answer the warrant or other process of a court and is of the opinion that there is reasonable probability that the inmate can be released without detriment to the community or to the inmate." *Id.* Second, the KPRB may release a person when "the secretary of corrections has reported to the board in writing that the inmate has satisfactorily completed the programs required by any agreement entered under K.S.A. 75-5210a … and the board believes that the inmate is able and willing to fulfill the obligations of a law abiding citizen and is of the opinion that there is reasonable probability that the inmate can be released without detriment to the community or to the inmate." *Id.*

K.S.A. § 75-5210a, in turn, provides that within "a reasonable time after a defendant is committed to the custody of the secretary of corrections," solely at the discretion of the Secretary, "the [S]ecretary shall enter into a written agreement with the inmate specifying those educational, vocational, mental health or other programs which the secretary determines the inmate must satisfactorily complete in order to be prepared for release on parole supervision." K.S.A. § 75-5210a.

The determination whether the inmate has satisfied this is entirely at the Secretary of Corrections' discretion. *Id.* There are no substantive statutory or regulatory factors guiding, limiting, or in any way constraining the Secretary's decision-making regarding the content of the agreement with the inmate, whether the inmate has satisfied it, or whether it needs revision. The Secretary of

Corrections is under no obligation to announce the bases upon which he fashions the content of the agreement with the inmate or decides whether the inmate has satisfied it or whether it needs modification, and neither the Secretary of Corrections nor any other department has promulgated or issued any written, publicly available guidance about any such criteria. *See* KAR Chapters 44 and 45. Even if a Secretary of Corrections did announce any such criteria, he or she would not be bound by them and would be under no obligation to adhere to them, and could change them at any time without notice or explanation.

This means that under Kansas's statutes, the Secretary of Corrections possesses unfettered discretion to determine what an inmate's agreement is, whether it has been satisfied or not, and whether it needs further modification – for any reason whatsoever or for no reason at all. And there is no process for appeal or review of the Secretary's decision by anyone in either case.

K.S.A. § 22-3717(g) is the *only* grant of authority for a prisoner to be released on parole. So, if the Secretary fails to report to KPRB regarding agreements entered into according to K.S.A. § 75-5210a – or fails in the first place to enter into such agreements thus preventing a prisoner from "satisfactorily complet[ing]" the programs required by such an agreement – KPRB is not even legally empowered to release a prisoner on parole. *See Pruitt v. Heimgartner,* 620 F. App'x 653, 654 (10th Cir. 2015) (unpublished) ("Kansas has enacted a law *requiring* inmates to enter into program plan agreements…"); *see also* Kan. Atty. Gen. Op. No. 92-61, 1992 WL 613423 ("We do not consider the provisions [of K.S.A. §§ 22-3717 and 75-5210a] to be merely procedural or remedial in nature. They operate to allow imposition of specific requirements on inmates, thus effecting [sic] their eligibility for parole, and they restrict the authority of the parole board.").

Only inmates convicted prior to the enactment of this statute may avoid this prerequisite to parole due to the U.S. Constitution's ban on ex post facto laws.

*Pruitt*, 620 F. App'x at 654; *see also Payne v. Kan. Parole Bd.*, 20 Kan.App.2d 301, 887 P.2d 147, 150 (1994); *Reed v. McKune*, 298 F.3d 946, 952–53 (10th Cir. 2002).

Therefore, as a matter of Kansas law, the authority to parole any person sentenced to life lies first in the hands of the Secretary of Corrections, an appointee of the Governor, who must make an agreement and plan for the prisoner to meet in order to be paroled, and then exclusively the Prisoner Review Board, who serves at the Secretary of Corrections' pleasure and also is responsible for recommending pardons and other clemency to the Governor.  The authority to parole Mr. Makthepharak is exclusively in the hands of the Secretary of Corrections, a gubernatorial appointee, and three of his appointees, without any transparency, constraints, standards, or mechanisms for review and without regard for an individual's juvenile status at time of offense.

Rather than affording Mr. Makthepharak a meaningful and realistic opportunity for release, Kansas's parole scheme functions as a system of *ad hoc* clemency, are governed by no substantive, enforceable standards, and are unreviewable.  Kansas's statutory parole scheme is indistinguishable from the discretionary system of executive clemency explicitly disapproved of in *Graham*. *Graham*, 560 U.S. at 70.

The defendants' reliance on *Rainer v. Hansen*, 952 F.3d 1203 (10th Cir. 2020), is misplaced because that case dealt with a parole system that was designed from the ground up to properly account for youth factors (Doc. 47 at 38-39).  *Rainer* was a 28 U.S.C. § 2254 habeas case challenging a Colorado state sentence of 112 years for a juvenile convicted of attempted murder as violating *Graham*.  952 F.3d at 1205. Among other things, the petitioner argued that Colorado's sentence did not provide a meaningful opportunity for relief because, ultimately, the decision to release him was a discretionary decision by the Governor.  *Id.* at 1209.

The similarities between *Rainer* and this case end there.  Under Colorado law, the petitioner in *Rainer* would first have an opportunity for release under Colorado's Juveniles Convicted as Adults Program ("JCAP"), beginning when he turned 42 years old, and later through Colorado's general parole program.  *Id.* at 1208-09.  As its name implied, JCAP was designed specifically to address the unique characteristics of juvenile offenders.  *Id.* at 1208-09.  If Mr. Rainer completed JCAP, his release decision would go to the governor of Colorado.  *Id.* at 1209.  The governor had discretion to grant early release, but that discretion was constrained by the requirement to consider several special factors including the existence of extraordinary mitigating circumstances.  *Id.* at 1209.  Further, after he had served 25 years of his sentence (at age 45), Mr. Rainer would qualify for a presumption in favor of early parole.  *Id.*

The Tenth Circuit found this JCAP program, *combined with* Colorado's general parole program, satisfied *Graham*.  *Id.* at 1211.  The design of the JCAP program, including the constraints placed on the governor's release decision and the deliberate attention to the unique characteristics of juvenile offenders was critical to this determination.  *Id.* at 1210.  The Court in *Rainer* explicitly declined to decide whether the general parole program alone – which did not share those design elements of JCAP – would satisfy *Graham. Id.* at 1210-11 ("We need not decide whether Colorado's general parole program satisfies *Graham*.").

The defendants therefore paint with too broad a brush when they take the Tenth Circuit's statement in *Rainer* out of context that "[a] discretionary parole system can [] comply with *Graham*."  *Id.* at 1210.  Discretion comes in varying degrees; it may be unconstrained, but it is typically limited – for example by requirements to consider certain factors in exercising that discretion.  A certain amount of discretion in a parole program is certainly compatible with *Graham*, but

*Graham* was clear that an *entirely discretionary* system of clemency does not suffice. *Graham*, 560 U.S. at 70.

*Rainer* does not control the outcome in this case because the Kansas parole system shares none of the qualities of Colorado's parole system. Kansas does not have a juvenile-specific parole scheme like JCAP, and Kansas's parole scheme simply does not even attempt to provide any attention to the special characteristics of juvenile offenders that JCAP provided. As the Kansas Legislature has set it out, Kansas's parole scheme is one of essentially standardless executive clemency.

### C. Secretary Zmuda's and the KPRB's failure to comply with Kansas's statutory parole scheme only makes Kansas's statutory system even more lawless.

As Mr. Makthepharak explained above, statutorily, a 5210a Agreement – and the Secretary's report to the KPRB regarding the inmate's fulfillment of that agreement – is a legal requirement before the KPRB may parole Mr. Makthepharak in the normal course of parole (as opposed to release to answer to a warrant, deportation, or for hospitalization).

Apparently fearing the consequences of the argument set out above, the defendants have insisted that Secretary Zmuda and his predecessors have not entered or revised any such agreements with inmates, nor reported on them to the KPRB (PSMF ¶¶ 13-14). Instead, they insist that they have created a separate system in which the KPRB uses some factors of its own to make parole decisions. The problem is that this is even more *ad hoc* and lawless than the system the Kansas Legislature has created. Indeed, when asked where in § 22-3717 the statute allowed the KPRB to ignore whether the Secretary of Corrections reported the 5210a Agreement had been satisfied, Mr. Ogletree, the KPRB Chair, answered, "It doesn't" (Ex. I at 27).

Secretary Zmuda's abject abandonment of a clear statutory duty prevents Mr. Makthepharak from being *legally* paroled under Kansas's statutes by the KPRB – **ever**.  As the defendants' counsel, the Kansas Attorney General's Office, points out, if the KPRB proceeded to parole Mr. Makthepharak despite lacking this prerequisite for their exercise of that statutory authority, the Governor or Attorney General himself could bring *quo warranto* actions against those KPRB members to prevent it.  *See* Doc. 47 at 26.

The declaration by Secretary Zmuda that he has not, does not, and does not plan to ever fulfill these duties is exactly what the district court in *Heredia* said would fulfill its "not a sham" standard.  *Heredia*, 638 F. Supp.3d at 999-1000 ("Offenders could meet that standard with evidence that parole officials have communicated by word or deed that they will never be paroled …").  So, under the standards the defendants advance, their system is a sham.

The system the defendants appear to have created outside the law simply has no standards at all, certainly none the meaningful opportunity to demonstrate maturity and rehabilitation the Supreme Court requires.

Mr. Ogletree in his deposition testified that the KPRB only uses factors identified in § 22-3717(h) (PSMF ¶ 19).  But none of those factors include maturity and rehabilitation for juvenile offenders.  Besides providing youthful offenders a packet of their file, which is not provided to other offenders, there are no different assessments that the KPRB uses in assessing their parole than any other offender (PSMF ¶ 19).  The KPRB does not substantively differentiate between inmates who committed underlying crimes as juveniles and those who committed underlying crimes as adults (PSMF ¶ 21).

This total lack of standards in the *ad hoc* system the Secretary and the KPRB appear to have created outside the Legislature's guidelines is further evident in the files of the youthful offenders the defendants disclosed in discovery they had

paroled, compared to Mr. Makthepharak.  The defendants spend a great deal of time arguing that Mr. Makthepharak was not paroled because he had several internal violations for having a cell phone, and that this suit is just a red herring. But of the juvenile offenders the defendants identified in discovery has having been paroled between 2012 and 2024, many of them had numerous corrections offenses in the time shortly before their release, including level one offenses – even *violent* ones, unlike Mr. Makthepharak – within a year before their release (PSMF ¶ 29). In fact, not all of the youthful offenders the defendants listed as parole actually were (PSMF ¶ 30), calling into question all their supposed statistics.

Based on this, and drawing inferences in Mr. Makthepharak's favor, it appears the only standard the KPRB uses is what side of the bed two out of three members of the KPRB got up on the morning of a given parole hearing.  Regardless of whether the youthful offender has recent prison violations, if they feel like it they parole him.  If they do not feel like it, they do not.  The KPRB waives its wand. Some youthful offenders do not receive parole.  Others who have the same or worse violations magically do not.  The decision is final and unreviewable.

Mr. Makthepharak filed this suit prepared to challenge the system the Kansas Legislature created, based on statutes and regulations.  But what the defendants have disclosed is even worse: a system totally outside the law, with no standards whatsoever, certainly none fitting the meaningful opportunity to show maturity and rehabilitation that the U.S. Supreme Court requires.

### D. The defendants effectively prevent Mr. Makthepharak from achieving the maturity and rehabilitation necessary to achieve release.

Compounding the totally lawless and *ad hoc* nature of Kansas's present, extra-statutory parole system, Secretary Zmuda's Department of Corrections implements numerous policies that *prevent* Mr. Makthepharak from developing the

maturity and rehabilitation necessary to obtain release.  Therefore, these policies operate to *de facto* deny Mr. Makthepharak a meaningful and realistic opportunity to obtain release.

The first such policy is Secretary Zmuda's blanket refusal to enter into 5210a Agreements.  These agreements specify programming that an inmate must – and should – complete to be prepared for release.  Secretary Zmuda is statutorily required to administer the Department of Corrections in a manner that directs efforts to the "rehabilitation and return [of prisoners] to the community as safely and promptly as practicable."  K.S.A. § 75-5210(a).  To that end, the Secretary is charged with establishing programs ranging from education to counseling, vocational training, prerelease programs that emphasize re-entry skills, and more.  *Id.*  Secretary Zmuda's failure to enter into *any* such agreement means that Mr. Makthepharak is not provided the guidance and programming that would help him to develop maturity and rehabilitation.

Second, Secretary Zmuda's security classification policies categorically prohibit prisoners serving life sentences from moving to minimum security classification, which would permit them access to important programs, such as work release, through which they could display the maturity and rehabilitation necessary to obtain release (PSMF ¶¶5-7).  The classification policies further *penalize* youthful offenders because of their age (PSMF ¶8) and provide no recognition of their progress towards rehabilitation (PSMF ¶9).  Only a recommendation from the KPRB can (potentially) change this, but the KPRB has never discussed or considered the necessity for such a matriculation (PSMF ¶14).

**E. The defendants, through their policies and failure to adequately reform the parole process for youthful offenders, fail to provide Mr. Makthepharak with a meaningful opportunity to obtain release by demonstrating his maturity and rehabilitation.**

The defendants operate a parole scheme that has failed to take any substantive steps to provide youthful offenders the meaningful and realistic opportunity for release that the Eighth Amendment requires. As they stand, Kansas's parole policies and practices make no meaningful distinction between youth and adults, fail to adequately consider the attributes of youth, and rely on risk assessment tools that penalize those who were young at the time of offense.

Except for the furnishing of a "Youthful Offender Packet" to inmates whose offenses occurred while they were juveniles, the Prisoner Review Board's policies make no distinction between those whose offenses occurred as youth and those whose offenses occurred as adults (PSMF ¶ 17). Even if the Secretary of Corrections reports to the Prisoner Review Board that a juvenile sentenced to life has satisfied his agreement, none of the further statutory factors in K.S.A. § 22-3717(g)(2) and (h)(2) to be considered in determining whether an individual is suitable for parole includes consideration of youth at the time of the offense, and the KPRB does not consider any factors outside the statute (PSMF ¶18). To the extent maturity is considered, it is not considered any differently for those whose offenses occurred as youth as opposed to those whose offenses occurred as adults (PSMF ¶20). Members of the KPRB do not even receive any training pertaining to adolescent psychological development or any other training that would assist members in contextualizing offenses committed by youth, other than occasional programming they may choose to view at conferences (PSMF ¶¶ 21-24).

**F. Kansas's parole procedures deny Mr. Makthepharak the ability to prove his maturity and rehabilitation necessary to achieve release.**

The defendants claim that inmates are permitted a panoply of procedural rights (or at least privileges), but these claims conflict directly with the KPRB's own regulations. This Court may take judicial notice of those regulations, just as it does statutes.

By regulation, the discretionary parole process provides no evidentiary rules, no right to obtain expert assistance or testimony, no right to cross-examine witnesses, no compulsory process – or even right to have witnesses *present* at the parole hearing – and no right to the assistance of counsel. *See* KAR 45-200-1 (strictly limiting who may be present at a parole hearing, and not including witnesses, experts, or counsel for an inmate). Mr. Ogletree openly admitted all of this: inmates cannot bring witnesses, subpoena witnesses, hire an expert, or cross-examine the witnesses the authorities bring (Ex. I at 30).

To the extent the defendants claim or have established that inmates *are* allowed the presence and assistance of counsel at parole hearing, they not only fail to actually inform inmates of this fact in a timely manner, nor have they taken steps to correct the clearly contradictory language in their own regulations. In any case, an inmate does not have the *right* to counsel.

The conflict between the defendants' self-serving claims in affidavits and their own regulations creates a material dispute of fact that precludes summary judgment.

The defendants have done nothing to show that Kansas's parole system in any way provides Mr. Makthepharak a meaningful opportunity to demonstrate maturity and rehabilitation. Viewed in the light most favorable to Mr. Makthepharak, taking all disputes in his favor and drawing inferences in his favor, the defendants' system is a lawless, standardless, *ad hoc* system of essentially

executive clemency.  It violates the Eighth Amendment.  Relief under 42 U.S.C. § 1983 lies.

## II.    Mr. Makthepharak has standing to challenge Kansas's parole scheme, and the Eleventh Amendment does not bar his claims.

The defendants largely repeat their arguments from their motion for judgment on the pleadings, which this Court already denied, that Mr. Makthepharak somehow lacks standing to bring his claims or that the Eleventh Amendment bars his claims.  Both contentions are in error.

### A. Standards

U.S. Const. Art. III requires a plaintiff to have sufficient standing to pursue his claims against a defendant.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  A plaintiff has standing when (1) he has suffered an "injury in fact," (2) there is a "causal connection between the injury and the conduct complained of," and (3) it is "likely" the injury can "be redressed by a favorable decision" from the court.  *Id.* at 560-61 (internal quotation marks and citations omitted).

As the Supreme Court explained in *Lujan*:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.  If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Id.* at 561-62.

Relatedly, the Eleventh Amendment limits federal judicial power, providing, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  This proscription "has been interpreted to bar suits against states and state agencies for

money damages in federal court." *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 911 (10th Cir. 2008) (citing *Hans v. Louisiana*, 134 U.S. 1, 20-21 (1890)).

But this immunity is not absolute; it "does not extend to a state official sued in his official capacity when the plaintiff seeks only prospective, injunctive relief," the so-called *Ex Parte Young* exception. *Id.* (citing *Ex Parte Young*, 209 U.S. 123 (1908)). "To satisfy this exception, the named state official 'must have some connection with the enforcement' of the challenged statute." *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quoting *Ex parte Young*, 209 U.S. at 157).

**B. Mr. Makthapharak has standing to pursue his claims.**

Mr. Makthepharak concedes that, having not sought or received class certification, he is unable to seek relief on behalf of other individuals who are similarly situated. Plaintiff therefore does not oppose this Court limiting the scope of relief that it may grant.

But this does not limit the Court's ability to consider the manner in which similarly situated individuals have been treated as evidence of patterns, practices, or informal policies of the defendants.

Regardless, Mr. Makthepharak does have standing to pursue his own claim. He suffers the continuing injury of being incarcerated under a life sentence without a realistic, meaningful opportunity for release due to the defendants' actions and inactions, and this court is capable of providing redress for this injury.

*Howard v. Coonrod* is directly on point. 546 F. Supp. 3d 1121 (M.D. Fla. 2021). There, state prisoners who, like Mr. Makthepharak, were sentenced to life *with* the (theoretical) possibility of parole for crimes committed as juveniles challenged Florida's parole scheme on the basis that it did not provide a realistic and meaningful opportunity for release. *Id.* at 1125. The court held the plaintiffs sufficiently pleaded injuries and that the defendants' actions caused those injuries,

when they alleged "the [d]efendants, through their 'current policies, procedures, and customs with respect to the parole review process' violate their constitutional rights by, among other things, 'fail[ing] to provide a realistic and meaningful opportunity for release upon demonstrated maturity and rehabilitation….'" *Id.* at 1128-29. Further, the plaintiffs in *Howard* showed redressability because if they prevailed, they would receive a favorable decision leading to the declaratory relief they sought – "a declaration that the parole process is unconstitutional." *Id.* at 1129.

The defendants' arguments against an injury-in-fact are predicated on the same misapprehension of the nature of Mr. Makthepharak's injury they attempted to apply in their motion for judgment on the pleadings. Mr. Makthepharak's injury is not a single decision such as a denial of parole on a particular date. Rather, he suffers an injury-in-fact because his continued imprisonment without a meaningful and realistic opportunity to obtain release by demonstrating maturity and rehabilitation violates a legally-protected interest: the right to be free from cruel and unusual punishment, which the Eighth Amendment guarantees. Those unlawful conditions of imprisonment are caused by the defendants' actions – and, in some cases, inactions – in the manner they administer the parole system in Kansas.

The defendants argue that Mr. Makthepharak must show a "credible threat of enforcement" in order to show causation (Doc. 47 at 32-33) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). This argument is in error.

At the outset, the "credible threat" requirement actually applies to the injury prong of standing, not the causation prong. *Driehaus*, 573 U.S. at 158-59 ("we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder'") (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

29

This is important because *Driehaus* involved plaintiffs who had not been prosecuted or had sentences imposed upon them. *Id.* at 152-53. Instead, they challenged a statute they merely *feared* would be applied to them and infringe on their freedom of speech. *Id.* Because those plaintiffs could show a credible threat of enforcement, they in fact had an injury-in-fact. *Id.*

Secretary Zmuda and the KPRB cause Mr. Makthepharak's injury-in-fact through their actions and inactions detailed above. Kansas's statutes create an *ad hoc* executive clemency system for parole that violates the Eighth Amendment. But the Secretary and the KPRB have gone outside the statutes to create a different system with no standards of any kind, which is even more violative. This violates Mr. Makthepharak's Eighth Amendment rights on an ongoing basis. Mr. Makthepharak has standing.

## C. Defendants are not entitled to immunity under the Eleventh Amendment because the *Ex Parte Young* exception permits this suit.

Mr. Makthepharak's claims are also permissible under the *Ex Parte Young* exception to the Eleventh Amendment. *See Ex Parte Young*, 209 U.S. 123 (1908). In short, while the Eleventh Amendment "has been interpreted to bar suits against states and state agencies for money damages in federal court," *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 911 (10th Cir. 2008) (citing *Hans v. Louisiana*, 134 U.S. 1, 20-21 (1890)), this immunity "does not extend to a state official sued in his official capacity when the plaintiff seeks only prospective, injunctive relief." *Id.* (citing *Young*, 209 U.S. at 123).

As Mr. Makthepharak already showed in opposition to the defendants' motion for judgment on the pleadings, the Western District of Oklahoma, confronted with a near-identical challenge to Oklahoma's parole scheme for juvenile offenders sentenced to life in prison, recently held the Eleventh Amendment does not shield state officials from suits in federal seeking prospective injunctive relief

under state law.  *Thomas v. Stitt*, 653 F. Supp. 3d 1084, 1088-89 (W.D. Okla. 2023).
The defendants instead point to the prior Tenth Circuit in *Stitt* from 2022, which
reversed a Fed. R. Civ. P. 12(b)(6) dismissal that had been entered on different
grounds.  *See* Doc. 47 at 36.  But the 2023 district court ruling, as explained above,
in fact decide Eleventh Amendment and *Ex Parte Young* issues.

Secretary Zmuda has a very direct connection to the enforcement of the
statutes in this case: as discussed above, he is *supposed to* enter into agreements
under K.S.A. § 75-5210a, but admits that he fails to do so.  Governor Kelly has both
a general constitutional duty to enforce the law, Kan. Const. Art. I § 3, and in fact
has executive authority over the Department of Corrections (PSMF ¶1).  These are
enough to permit the *Ex Parte Young* exception to immunity.

In *Petrella v. Brownback*, a group of students and their parents challenged
Kansas's statutory scheme to fund its public schools, naming then-Governor
Brownback as a defendant in the case.  697 F.3d 1285, 1289 (10th Cir. 2012).
Specifically, the plaintiffs challenged a statute permitting local school districts to
levy additional property taxes beyond those statutorily required but placing a cap
on how much extra funding those taxes could raise.  *Id.* at 1290-91.  The Governor
argued the plaintiffs lacked standing to sue him because they could not "identify
any specific action on [the Governor's] part that has caused them harm."  *Id.* at
1293.  The Tenth Circuit quickly rejected that argument, noting "the Governor … of
the state of Kansas [has] responsibility for the enforcement of the law of the state."
*Id.* at 1294 (citing Kan. Const. Art. I § 3).

The defendants misread *Hendrickson v. AFSCME Council 18*, 992 F.3d 950
(10th Cir. 2021), by ignoring the critical fact that distinguished it from *Petrella*.
*Hendrickson* involved a public employees' union's former member's challenge to
actions of that union.  *Id.* at 954.  The plaintiff also sued the Governor of New
Mexico and its Attorney General in their official capacities.  *Id.* at 965.  The New

Mexico laws challenged in the case were enforced by the Public Employee Labor Relations Board, *not* the governor or Attorney General. *Id.* In fact, the board was insulated from the Governor. *Id.* In *Petrella*, as here, it is the Governor and the Secretary who are directly responsible for enforcement of the laws at issue.

Two cases the Court in *Hendrickson* discussed illustrate the contrast and clearly show that this independence is the critical fact for the *Ex Parte Young* exception. In both *Bishop v. Oklahoma*, 333 F. App'x 361 (10th Cir. 2009), and *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014), the plaintiffs included the governor and attorney general of their respective states in their challenge to same-sex marriage prohibitions. In *Bishop*, those defendants were *not* proper because Oklahoma's marriage licenses were issued by court clerks – members of the judicial branch, not the executive branch. *Bishop*, 33 F. App'x at 365; *accord Hendrickson*, 992 F.3d at 967. In *Kitchen*, though, the governor and attorney general were proper defendants "because in Utah, unlike in Oklahoma, 'marriage licenses are issued not by court clerks but by county clerks.'" *Hendrickson,* 992 F.3d at 967 (quoting *Kitchen*, 744 F.3d at 1199-1202).

Therefore, the proper reading of *Hendrickson* is that a governor's duty to enforce state law *is* normally sufficient. That generalized duty only fails when enforcement power is explicitly vested in a body separate from the governor. *Id.* at 968.

The logic the Tenth Circuit applied in *Petrella* directly applies even more here. In *Petrella*, the only direct action the Governor took was signing the challenged statutes into law. Here, not only did the Governor or her predecessors sign the applicable parole statutes into law, but she directly appointed the Secretary of Corrections, who personally oversees and appoints the KPRB and serves at her pleasure. Under *Petrella*, this is more than a sufficient connection to merit standing against Governor Kelly in this case. And Defendants cannot show

that some other arm of the government of Kansas – much less one that is insulated from Governor Kelly or Secretary Zmuda – is charged with incarcerating Mr. Makthepharak or with the enforcement of Kansas's parole scheme. Lacking such separation or insulation as in *Hendrickson*, Governor Kelly's duty to enforce the law and the fact that executive branch agencies fully subject to her control is sufficient to establish the *Ex Parte Young* exception.

### III. Mr. Makthepharak's claims are ripe and have not been mooted.

Defendants argue that Mr. Makthepharak's claims are not ripe because his parole was denied due to disciplinary reports (Doc. 47 at 37). They also argue that a superseding parole decision moots Mr. Makthepharak's claims (Doc. 47 at 37).

This is in error.

First, according to Kansas law, neither the 2021 nor the 2024 parole hearing could have legally led to Mr. Makthepharak's parole because no Secretary of Corrections has ever entered into the prerequisite 5210a Agreement, nor made an appropriate report on the fulfillment of that agreement to KPRB.

Second, even under the extra-statutory, *ad hoc* system the Secretary and the KPRB have created, it is unclear from any standards what Mr. Makthepharak must do to obtain parole. Numerous other youthful offender parolees have had far worse internal disciplinary records but still been paroled. The point is that the *ongoing system* to which Mr. Makthepharak is continually subject fails to provide the meaningful opportunity to demonstrate maturity and rehabilitation that the U.S. Supreme Court requires to satisfy the Eighth Amendment. What happened at Mr. Makthepharak's 2021 and 2024 hearings are only a symptom of the problem.

Defendants' arguments here are, once more, a product of their failure to grasp the nature of Mr. Makthepharak's injury, which is broader than simply challenging a single, isolated parole decision. Mr. Makthepharak's claims are ripe because his *continuing incarceration* without being provided a *meaningful*

*opportunity* to obtain release violates the Eighth Amendment.  That continued incarceration has not stopped, nor has that meaningful opportunity been provided.  Therefore, his claims are both ripe and not moot.

Finally, Mr. Ogletree's retirement does not moot any of the claims in this action.  "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party."  Fed. R. Civ. P. 25(d).  Mr. Makthepharak has sued Defendant Ogletree in his official capacity.  Complaint, ECF No. 1 at ¶8.  Therefore, rather than mooting the claims, Mr. Ogletree's retirement only means that his successor is automatically – that is, without need for a motion by any party or even an order by the Court – substituted as a party.  *See* Rule 25(d).  And if the defendants are suggesting that Kansas's parole standards (or lack of them) will somehow change because a single official has changed, that only means Kansas's parole scheme is just as lawless as Mr. Makthepharak has argued.

## IV.    Considerations of comity do not entitle the defendants to judgment as a matter of law.

Finally, the defendants' reliance on *Lewis v. Casey*, 518 U.S. 343 (1996) to support a motion for summary judgment *in their favor* is wildly misplaced.

In moving for summary judgment, the defendants must show that they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The comity and deference to state prison officials that the Court commanded in *Lewis* is not a basis for summary judgment in Defendants' favor.  The comity holding (though not the rest of the holdings in that case) in *Lewis* was about the degree to which a federal court injunction *in favor of plaintiff prisoners* intruded upon the operations of a state prison system.  It was about the scope and process of devising a *remedy* for

prevailing plaintiffs, not about prison administration defendants being entitled to judgment as a matter of law. *Lewis*, 518 U.S. at 362.

The Court in *Lewis* guided district courts to engage in a collaborative and deferential process in which the district court had engaged in *Bounds v. Smith*, 430 U.S. 817 (1977): soliciting a proposal for how to remedy the problem from the state prison administration, reviewing that with input from the prevailing plaintiffs, and approving it with minor changes. *Lewis*, 518 U.S. at 362. That process stood in contrast to the intrusive and nearly unilateral remedy the lower court devised in *Lewis*. *Id*.

Mr. Makthepharak does not oppose a *Lewis* process if the Court finds in his favor on any of his claims.

## <u>Conclusion</u>

The Court should deny the defendants' motion for summary judgment.

Respectfully submitted,

*Jonathan Sternberg, Attorney, P.C.*

by /s/Jonathan Sternberg
    Jonathan Sternberg, Kan. #25902
    Bryan Cox, Kan. #28429
    2323 Grand Boulevard #1100
    Kansas City, Missouri 64108
    (816) 292-7020
    jonathan@sternberg-law.com
    bryan@sternberg-law.com

    COUNSEL FOR PLAINTIFF
    SASHADA MAKTHEPHARAK

Certificate of Service

I certify that on January 21, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF, which sent electronic notification of that filing to the following:

Mr. Matthew L. Shoger                          Counsel for Defendants
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
(785) 296-2215
matt.shoger@ag.ks.gov

/s/Jonathan Sternberg
Attorney