## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SASHADA MAKTHEPHARAK,

     **Plaintiff,**

v.

LAURA KELLY, et al.,

     **Defendants.**

                        **Case No. 23-2121-DDC**

_____

## MEMORANDUM AND ORDER

Plaintiff Sashada Makthepharak is serving a life sentence for a homicide offense he committed as a juvenile. After serving 20 years, he became eligible for parole. Since reaching that mark, the Kansas Prisoner Review Board (KPRB) twice has denied parole. Plaintiff sues Governor Laura Kelly, Secretary of Corrections Jeff Zmuda, KPRB members Jeannie Wark and Mark Keating, and now-former KPRB member Jonathan Ogletree—in their official capacities. Plaintiff theorizes that Kansas's parole system deprives youthful offenders—those serving sentences for offenses committed as juveniles—of a meaningful opportunity for release, violating the Eighth Amendment.

Plaintiff's theory stems from a line of Supreme Court cases recognizing juveniles' diminished culpability and defining the contours of "cruel and unusual punishment" as it applies to youthful offenders. Key to plaintiff's cause is *Graham v. Florida*, where the Supreme Court held the Eighth Amendment requires states to give juvenile offenders serving life sentences a "meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation." 560 U.S. 48, 75 (2010). This rule applies—at least—to those convicted of *nonhomicide*

offenses.  *Id.*  Later, in *Miller v. Alabama*, the Court concluded it also violated the Eighth

Amendment to impose a *mandatory* sentence of life without parole on juvenile *homicide*

offenders.  567 U.S. 460, 479 (2012).

Taken together, plaintiff argues the Supreme Court's juvenile Eighth Amendment cases

require Kansas to provide him a meaningful opportunity for release.  And he argues various

parole policies deprive him of that opportunity.  While plaintiff is eligible for parole, he argues

Kansas's system imposes a de facto life without parole sentence.  He argues that the Kansas

parole statute confers unfettered discretion on the Secretary of Corrections to set parole

eligibility.  And, because the KPRB doesn't follow that part of the statute, the KPRB operates a

system of ad hoc clemency.  He also asserts that Kansas, when making parole decisions, relies on

risk assessment tools that discriminate against youthful offenders.  In parole hearings, plaintiff

argues the KPRB doesn't provide inmates an opportunity to be heard, present evidence, or

confront adverse witnesses.  At bottom, he argues that Kansas's parole inquiry doesn't focus on

rehabilitation or youth.  And the KRPB decisions are unappealable.  So, plaintiff argues, he lacks

a meaningful opportunity for release based on maturity and rehabilitation.

Defendants moved for summary judgment, asserting jurisdictional defenses of standing,

ripeness, and mootness.  They also argue the merits, contending that Kansas's parole system

provides plaintiff a meaningful opportunity for release.  The court ultimately grants defendants'

summary judgment motion.  It concludes that though plaintiff has standing to seek some of his

requested relief, no reasonable factfinder could conclude Kansas's parole system for youthful

offenders offends the Eighth Amendment.

Plaintiff also moved to strike defendants' summary judgment motion.  He argues

defendants filed their motion one hour too late.  The court denies plaintiff's Motion to Strike

(Doc. 51) because it concludes defendants have shown excusable neglect. In this Order, the court addresses defendants' Motion for Summary Judgment (Doc. 47) first, before explaining its Motion to Strike (Doc. 51) conclusion. It also resolves a sealing motion (Doc. 50). The court begins with the facts.

## I.     Facts

The following facts are uncontroverted for purposes of defendants' summary judgment motion, unless otherwise noted. Where controverted, the court views the facts in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court takes judicial notice of any statutes or regulations.

### *Plaintiff's Conviction and Sentence*

In October 2001, a jury convicted then 16-year-old plaintiff of first-degree murder (on a felony-murder theory), aggravated burglary, and criminal possession of a firearm. Doc. 44 at 2 (Pretrial Order ¶ 2.a.i., Stipulations). Plaintiff was sentenced to life in prison without parole for 20 years, a mandatory sentence for felony murder. *Id.* He also was sentenced to 64 consecutive months for the other counts. *Id.*

Plaintiff challenged his conviction in a direct appeal, and, later, via motion to correct illegal sentence and habeas petition—each of which the state courts denied. *See State v. Makthepharak*, 78 P.3d 412 (Kan. 2003) (direct appeal); *Makthepharak v. State*, 314 P.3d 876 (Kan. 2013) (motion to correct); *Makthepharak v. State*, 472 P.3d 1148, 2020 WL 5994108 (Kan. Ct. App. 2020) (state habeas).

These outcomes left plaintiff with one more option: parole.

### *Kansas's Parole Process*

The KPRB is the sole decision-making authority for parole decisions in Kansas. Doc. 47-

9 at 2 (Keating Decl. ¶ 8). Each month, the KPRB conducts parole eligibility hearings. *Id.*

(Keating Decl. ¶ 9). Inmates up for parole are allowed to retain counsel for these hearings. Doc.

44 at 3 (Pretrial Order ¶ 2.a.vi., Stipulations). Counsel isn't appointed. *Id.*

A parole hearing is treated as a conversation with the inmate. Doc. 47-6 at 2 (Def. Ex.

G). The inmate's accomplishments and institutional record are discussed with the inmate. *Id.* at

5. The KPRB also considers an inmate's youth at the time of the offense. Doc. 47-5 at 13 (Def.

Ex. F); Doc. 47-6 at 3 (Def. Ex. G); Doc. 47-8 at 38 (Ogletree Dep. 37:22–25); Doc. 47-9 at 8,

10 (Keating Decl. ¶¶ 49, 68). The KPRB considers statutory factors including—but not limited

to—completed programs, circumstances of the offense, previous social history and criminal

record, conduct, employment, and attitude while in prison, physical and mental examination

reports, victim comments, and staff recommendations.[1] Kan. Stat. Ann. § 22-3717(h).

The inmate can submit written evidence to the KPRB, including expert reports. Doc. 47-

8 at 32 (Ogletree Dep. 31:3–10); Doc. 47-9 at 6 (Keating Decl. ¶¶ 30, 32). The KPRB evaluates

any written evidence from inmates. Doc. 47-9 at 6 (Keating Decl. ¶ 31). Plaintiff emphasizes,

though, that inmates aren't informed about their ability to submit evidence.[2] Doc. 47-7 at 40

---

[1]    The parties dispute whether the statutory factors are the only factors the KPRB considers. Doc.
47-8 at 38 (Ogletree Dep. 37:3–6) (the "only factors" the board considers "in granting parole [are] the
ones . . . in Section H of the statute"); *id.* at 38–39 (Ogletree Dep. 37:22–38:16) (explaining the KRPB
considers factors outside the statute, including age and employment). But, as defendants emphasize, the
dispute stems from later testimony in the same deposition. Doc. 64 at 7. And the statute itself states
explicitly that the factors are nonexclusive. Kan. Stat. Ann. § 22-3717(h). "The mere existence of
scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is
genuine; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable
jury could find in favor of the nonmovant." *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997)
(quotation cleaned up). Here, no reasonable jury could find that the statutory factors are the sole factors
considered by the KPRB—the same testimony plaintiff relies on later provides that the KPRB evaluates
more than just the factors in the statute. Thus, this isn't a genuinely disputed fact.

[2]    Plaintiff uses this fact to dispute many of the facts listed in this paragraph. But it doesn't dispute
the facts about inmates' entitlement to submit written evidence, have experts submit reports, or the KPRB
consider the evidence. He just adds this extra fact. Thus, these facts aren't disputed.

(Makthepharak Dep. 40:14–19). Inmates can't subpoena witnesses, hire experts, or cross-examine witnesses at the parole hearing itself. Doc. 47-8 at 31–32 (Ogletree Dep. 30:9–31:2); Kan. Admin. Regs. § 45-200-1 (2025) (restricting attendance at parole hearing, not including witnesses or experts). But the KPRB can subpoena witnesses and documents "necessary for the investigation of the issues before it." Kan. Stat. Ann. § 22-3720.

For youthful offenders, the KPRB applies a few other procedures that adult offenders don't receive: (1) the full board participates; (2) the hearings are recorded; and (3) 30 days before the hearing, the inmate receives a packet of information the KPRB will consider. Doc. 47-6 at 3 (Def. Ex. G ¶ 5). Defendants maintain that the KPRB doesn't deny parole based on youthful offenders' criminal history, objections by the public, or the serious or violent nature of the offense. *Id.* Plaintiff disputes this proposition, however, explaining that in his 2021 hearing, the KPRB spent much time evaluating his criminal history and underlying conviction. Doc. 47-9 at 19–35 (Def. Ex. J) (hearing transcript 7:15–23:16).

After the hearing, the KPRB reviews its notes and deliberates. Doc. 47-6 at 2 (Def. Ex. G). Two members must agree on the decision, but usually the outcome is unanimous. *Id.* The KPRB then delivers a Final Action Notice to the inmate. *Id.* at 3. It identifies any reasons parole was denied and any recommendations for improving the inmate's chances of parole in the future. *Id.* Inmates may request reconsideration by the KPRB because of new evidence. Kan. Admin. Regs. § 45-200-2(b). And inmates can seek judicial review through a habeas corpus action. Doc. 47-8 at 33 (Ogletree Dep. 32:9–25); *Peltier v. Booker*, 348 F.3d 888, 892 (10th Cir. 2003) (outlining standard for judicial review of parole board decisions in habeas action).

Since 2012, the KPRB has granted parole to at least 49 youthful offenders sentenced to life. Doc. 47-9 at 5 (Keating Decl. ¶ 26). And since 2020, the KPRB has granted parole to 15

youthful offenders sentenced to life. *Id.* (Keating Decl. ¶ 27).

### *Plaintiff's Parole Decisions*

The KPRB conducted a parole hearing for plaintiff on March 31, 2021. Doc. 44 at 2 (Pretrial Order ¶ 2.a.v., Stipulations). Plaintiff commented on the evidence presented. Doc. 47-7 at 22 (Makthepharak Dep. 22:2–12); Doc. 47-9 at 15–60 (Def. Ex. J) (hearing transcript 3:12–48:13). The youthful offender packet plaintiff received before the hearing contained the written evidence discussed during the hearing. Doc. 47-4 at 2, 3 (Def. Ex. E ¶¶ 3–6, 12). The KPRB denied plaintiff parole in 2021 and listed two reasons why: plaintiff "[d]enies responsibility" and he has had "[d]isciplinary reports[.]" Doc. 12-1 (Def. Ex. 1) (KPRB Action Notice passing parole to May 1, 2024). Plaintiff had received a number of disciplinary reports before his hearing. *See* Doc. 47-1 at 4–5 (Def. Ex. A) (outlining disciplinary record, including recent disciplinary history).

The KPRB conducted a second parole hearing with plaintiff on April 4, 2024. Doc. 44 at 3 (Pretrial Order ¶ 2.a.xvii., Stipulations). The KPRB again denied plaintiff parole based on his disciplinary reports. Doc. 47-9 at 9 (Keating Decl. ¶¶ 60–61); *id.* at 71–73 (notice of parole decision). Plaintiff had received two new disciplinary reports between his 2021 parole hearing and 2024 parole hearing. Doc. 47-4 at 8 (Def. Ex. E ¶¶ 43–44).

### *Eligibility for Parole & Program Agreements*

Inmates' eligibility to enter this parole process turns on the parties' varied interpretations of the parole statutes. They provide that the Secretary of Corrections "shall enter into a written agreement with the inmate specifying those educational, vocational, mental health or other programs which the secretary determines the inmate must satisfactorily complete in order to be prepared for release on parole supervision." Kan. Stat. Ann. § 75-5210a(a). And the KPRB

"may release on parole" eligible inmates when:  (1) the inmate needs hospitalization, deportation, or to answer a warrant or other process of court and the KPRB believes there's a reasonable probability the inmate won't cause detriment to the community, or (2) the Secretary of Corrections reports that the inmate has completed the programs required by any § 75-5210a agreement (and the KPRB believes the inmate is able to abide the law and there's a reasonable probability the inmate won't cause detriment to the community).  Kan. Stat. Ann. § 22-3717(g). The parties disagree—as a legal matter—whether these statutes require the Secretary of Corrections to enter into § 75-5210a(a) agreements.  Doc. 62 at 17–18; Doc. 64 at 18.  And they disagree whether the KPRB may parole inmates who have not entered such an agreement.  Doc. 62 at 17–18; Doc. 47 at 5.

The current Secretary never has entered an agreement under § 75-5210a(a).  Doc. 47-11 at 2 (Zmuda Decl. ¶¶ 7–10) (Secretary explaining he has never entered an agreement under § 75-5210a(a)).  But Department of Corrections staff—not the Secretary himself—enter those agreements and the KPRB has reviewed them in the past.  Doc. 47-8 at 20–21 (Ogletree Dep. 19:16–20:14).[3]  The KPRB paroles individuals even though they don't have a § 75-5210a(a) agreement in place.[4]  Doc. 47-9 at 5 (Keating Decl. ¶¶ 21–22) (explaining he hadn't "seen any

---

[3]    Defendants object to this fact based on foundation—Mr. Ogletree isn't a lawyer, and he admits he doesn't have personal knowledge about how these agreements are formed.  Doc. 64 at 9.  Defendants contend his statement that the program-plan agreements fall under Kan. Stat. Ann. § 75-5210a thus isn't admissible.  The court overrules defendants' objection.  Mr. Ogletree has personal knowledge of the types of agreements he's seen in his capacity as a KPRB member.  At best, defendants highlight a dispute of fact—whether the agreements Mr. Ogletree has seen are the same agreements contemplated by § 75-5210a.  *Compare* Doc. 47-8 at 20–21 (Ogletree Dep. 19:16–20:14) (discussing program plan agreements the Department of Corrections enters with inmates); *with* Doc. 47-11 at 2 (Zmuda Decl. ¶¶ 7–10) (Secretary explaining he and predecessors have never entered an agreement under § 75-5210a(a)).  The court must resolve this dispute to favor the nonmoving party, plaintiff.

[4]    Again, plaintiff disputes the legal conclusion whether KPRB can grant parole without an agreement but doesn't appear to dispute the underlying fact:  that KPRB *does* grant parole without an agreement.  While disputing the purported fact, plaintiff argues "the declarations of the Secretary and Mark Keating, only establish that the defendants are not even following the Kansas statutes that govern

program agreements that condition the granting of parole to an inmate on the completion of

certain programs" and KPRB doesn't deny parole on failure to complete programs); Doc. 47-8 at

24–25 (Ogletree Dep. 23:24–24:2) (inmates needn't complete agreement conditions before

parole consideration).  In February 2002, plaintiff signed an Inmate Program Plan with the

Kansas Department of Corrections.  Doc. 12-2.  But plaintiff and the Secretary of Corrections

never entered an agreement expressly conditioning parole-eligibility on completion of certain

programs, under § 75-5210a.[5]  Doc. 47-4 at 9 (Def. Ex. E ¶ 50).

### Governor's & Secretary of Corrections's Involvement

Secretary Zmuda manages the state-operated prison system.  Kan. Stat. Ann. § 75-5205.

He hasn't had any involvement with granting or denying parole for any inmates.  Doc. 47-11 at 1

(Zmuda Decl. ¶ 3).  The Secretary appoints members of the KPRB, who serve at his pleasure.

Kan. Stat. Ann. § 75-52,152.  Secretary Zmuda hasn't appointed or terminated any KPRB

member.  Doc. 47-11 at 1 (Zmuda Decl. ¶ 5).  He provides the KPRB with necessary personnel

and accounting services.  Kan. Stat. Ann. § 22-3713(b).

Governor Kelly hasn't acted on matters involved in this case other than appointing the

Secretary of Corrections.  Doc. 47-7 at 35–36 (Makthepharak Dep. 35:5–36:8).

### The Security Classification System

Plaintiff identifies one last procedure as problematic:  the security classification system.

The Kansas Department of Corrections uses the Custody Classification Manual for Men to

---

parole."  Doc. 62 at 4.  So, it appears the parties agree that in practice, KPRB paroles inmates even
without a § 75-5210a agreement.  Whether that practice complies with the statute is another matter
entirely—and not one the court need address at this juncture.

[5]     Plaintiff admits that this program plan itself doesn't condition parole on his participation, but
doubles down on his argument that Kan. Stat. Ann. § 22-3717(g) requires participation for parole
eligibility.  *See* Doc. 62 at 3.

determine each inmate's custody level.  Doc. 44 at 2 (Pretrial Order ¶ 2.a.iv., Stipulations); Doc. 47-10 at 2 (Waldock Decl. ¶ 9).  The Custody Classification Manual allows the Department of Corrections to depart from the classification criteria "if the criteria do not accurately reflect the level or types of risks presented by the individual, when supported by objective documentation[.]"  Doc. 47-2 at 5 (Def. Ex. C).

At some point while serving his current sentence, plaintiff was classified as "Medium-Low" custody.  Doc. 47-10 at 5 (Waldock Decl. ¶ 28); Doc. 48 at 17 (Def. Ex. B).  Plaintiff currently is classified as "special management," a higher classification based on his disciplinary history.  Doc. 47-1 at 2 (Def. Ex. A); Doc. 47-7 at 11–13 (Makthepharak Dep. 11:19–13:14). The Kansas Department of Corrections considers plaintiff an active and validated security threat group member—a label triggered by plaintiff's classification score and disciplinary reports. Doc. 47-10 at 7, 19 (Waldock Decl. ¶¶ 37, 92); Doc. 47-7 at 11–12 (Makthepharak Dep. 11:19–12:14).

The parties agree that plaintiff could move to minimum security on a recommendation by the KPRB.  Doc. 47-2 at 26 (Def. Ex. C); Doc. 47-10 at 5 (Waldock Decl. ¶ 30).[6]  But, it's disputed whether those serving life sentences are barred categorically from work release eligibility.  Doc. 47-8 at 47 (Ogletree Dep. 46:3–17) (prisoners eligible for work release with minimum custody classification); Doc. 47-2 at 12, 22, 24 (Def. Ex. C) (reflecting conviction severity minimum of 6 for "greatest" severity and time left to serve score minimum of 3 for life sentences, despite points range of 0–6 for minimum security qualification); Doc. 62-1 at 4 (Pl.

---

[6]    Plaintiff doesn't dispute, and therefore admits, this fact.  *See* Doc. 47 at 7 (Defendants' 23rd fact); Doc. 62 at 4–5 (not controverting or objecting to 23rd fact).  Inconsistently, though, plaintiff argues he categorically is barred from work release because he will never live in a minimum security facility for the required 30 days.  Doc. 62 at 5 (arguing defendants' 24th fact—that life sentence offenders aren't barred categorically from work release—is controverted).

Ex. 1) (reflecting minimum security housing requirement for work release). Plaintiff emphasizes that this classification system penalizes youthful offenders for their age.[7] Doc. 47-2 at 19 (Def. Ex. C.) (points for age reduced to zero once offender turns 43).

With that background, the court assesses defendants' Motion for Summary Judgment (Doc. 47).

## II.    Motion for Summary Judgment (Doc. 47)

### A.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 378. "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party' on the issue." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]" *Celotex*, 477 U.S. at 323. A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's

---

[7]    Defendants claim this fact is controverted, but never identify any facts to dispute plaintiff's statement of this fact. They simply argue a security classification can't penalize inmates and inmates don't have a constitutional right to dictate where they are housed. Doc. 64 at 11 (first citing *Jackson v. Ward*, 159 F. App'x 39, 41 (10th Cir. 2005); and then citing *Cox v. Zmuda*, No. 22-3154-SAC, 2022 WL 3646255, at *4 (D. Kan. Aug. 24, 2022)). Defendants also suggest that the KPRB can grant parole regardless of security classification. *Id.* But those legal principles and additional fact aren't helpful. They don't controvert plaintiff's record citation, which shows prisoners receive additional security classification points until turning 43 years old. The court thus treats plaintiff's fact as uncontroverted.

case." *Id.* at 325.  If the moving party satisfies its initial burden, the non-moving party "must set

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250

(citation and internal quotation marks omitted).  To satisfy this requirement, the nonmoving

party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers

to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex*, 477 U.S. at 324 (citation and internal quotation marks omitted).  When

deciding whether the parties have shouldered their summary judgment burdens, "the judge's

function is not . . . to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The court addresses defendants' jurisdictional arguments first.  It evaluates them in the

following order:  (1) standing; (2) ripeness; and (3) mootness.  The court then turns to the merits

of plaintiff's § 1983 claim—addressing whether the Kansas parole scheme violates the Eighth

Amendment by depriving plaintiff of a meaningful opportunity for release.

B.       **Standing**

Article III of the United States Constitution limits federal court jurisdiction to "cases"

and "controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To present a case

or controversy under Article III, a plaintiff must establish that he has standing to sue.  *Id.*  Article

III standing requires the plaintiff to demonstrate:  (1) an injury in fact to a legally protected

interest; (2) a causal connection, meaning the injury is fairly traceable to the challenged act of

the defendant; and (3) that the injury is likely redressable by a favorable decision.  *Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).

"To prevail at summary judgment on standing grounds, the defendant must show that the

record is devoid of evidence raising a genuine issue of material fact that would support the

plaintiff's ultimate burden of proving standing." *Day v. Bond*, 500 F.3d 1127, 1132 (10th Cir.

2007). But "[a]s the party seeking to invoke federal jurisdiction, the plaintiff . . . has the burden

of establishing each of these three elements of Article III standing." *Nova Health Sys. v. Gandy*,

416 F.3d 1149, 1154 (10th Cir. 2005). At summary judgment, "the plaintiff must set forth by

affidavit or other evidence specific facts that, if taken as true, establish each of these elements."

*Id.*[8]

Start with injury in fact.

### 1.    Injury in Fact

To establish the injury in fact requirement, a "plaintiff must show that he or she suffered

'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)

(quoting *Lujan*, 504 U.S. at 560). Article III demands that the plaintiff establish an injury for

each type of relief sought by each claim. *See Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th

Cir. 2007). When seeking prospective relief, the plaintiff must show a continuing injury. *PeTA,

People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir.

2002); *Hooper v. City of Tulsa*, 71 F.4th 1270, 1277 (10th Cir. 2023) ("Because Mr. Hooper's

declaratory judgment claim seeks prospective relief, he must demonstrate a continuing injury."

(quotation cleaned up)). If a plaintiff claims he has sustained constitutional injury in the past, he

can maintain a declaratory or injunctive action if he is able to "demonstrate a good chance of

being likewise injured in the future." *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991).

---

[8]       The parties agree that plaintiff lacks standing to seek relief on behalf of third parties. *See* Doc. 47
at 27–28 (defendants arguing plaintiff can't assert third party standing to seek relief "on behalf of other
inmates 'similarly situated' to him" (quoting Doc. 44 at 25 (Pretrial Order ¶ 5)); Doc. 62 at 28 (plaintiff
conceding point). The court thus grants this part of defendants' motion.

The seminal case on standing for prospective relief is *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Addressing standing on a motion for a preliminary injunction, the Court found a plaintiff lacked standing to seek prospective relief when challenging a police department's use of chokeholds. *Id.* at 105–07. According to *Lyons*, establishing an injury in fact in this procedural setting requires the plaintiff to satisfy two requirements. *First*, that he would have another encounter with police and, *second*, that either: (a) all police officers in the department always used chokeholds; or (b) the pertinent city ordered or authorized the procedure. *Id.* at 105–06. Essentially, the plaintiff must establish that "he was likely to suffer future injury" as a result of the policy or practice. *Id.* "Past exposure to illegal conduct does not in itself show a present case or controversy[,]" but "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). When assessing likelihood of future injury, a key consideration is whether the plaintiff challenges an existing statute or policy as unconstitutional. *See id.* at 496.

Defendants here contend plaintiff lacks standing to seek prospective injunctive and declaratory relief because he hasn't established ongoing injuries. Doc. 47 at 28. Plaintiff doesn't seek just one declaration that Kansas's parole scheme is unconstitutional. Instead, plaintiff asks the court to declare six specific things. Doc. 44 at 25 (Pretrial Order ¶ 5). And, likewise, he seeks eight specific injunctions. *Id.* at 25–26 (Pretrial Order ¶ 5). Defendants argue plaintiff can't produce facts of record supporting an injury in fact for each of these forms of relief. Doc. 47 at 29–32. In so doing, they argue mainly that the record is devoid of evidence that plaintiff was injured by the challenged procedures at his past parole hearings and present merits-based legal arguments whether Kansas's parole system is constitutional. *See id.* Plaintiff asserts one constitutional injury to support his requests for declaratory and injunctive relief: he's

13

"incarcerated under a life sentence without a realistic, meaningful opportunity for release" because of defendants' policies and procedures. Doc. 62 at 28. While plaintiff doesn't respond to each injury in fact argument defendants present, the court, independently, must ensure plaintiff has standing. *Colorado Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1078–79 (10th Cir. 2009) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." (internal quotation marks and citation omitted)). So, the court evaluates plaintiff's standing for each form of relief he seeks.

Plaintiff challenges Kansas's parole scheme—as it's applied to youthful offenders like plaintiff—as a whole. It's undisputed that plaintiff is incarcerated—for life, unless granted parole. Doc. 44 at 2 (Pretrial Order ¶ 2.a.i., Stipulations) (explaining plaintiff's sentence). Also it's undisputed that plaintiff will come up for parole again soon. *Id.* at 3 (Pretrial Order ¶ 2.a.xix., Stipulations) (action notice passed plaintiff's parole to May 2025). So, there's a likelihood plaintiff will sustain harm from parole procedures if the court holds those procedures unconstitutional. Plaintiff argues various policies and procedures combine to deprive him of a meaningful and realistic opportunity for release. There's record evidence supporting many of those policies and procedures. Recall that, under *Lyons*, an existing policy or practice suggests a plaintiff is "likely to suffer future injury" caused by the party implementing that policy or practice. 461 U.S. at 105–06. So, where plaintiff points to evidence in the record shoring up the existence of a policy or practice, future injury is likely. The court thus concludes that plaintiff has established a likelihood of future injury for the following forms of requested relief, as paraphrased below:

- Declare that Kan. Stat. Ann. §§ 75-5210a and 22-3717(g)–(h) are unconstitutional as applied to plaintiff, Doc. 44 at 25 (Pretrial Order ¶ 5);

- Declare that defendants' reliance on discriminatory risk assessment tools and automatic foreclosure of minimum security classifications for youthful offenders violate Eighth Amendment, *id.*;

- Enjoin KPRB to provide opportunity to be heard, present evidence, and hear and confront adverse witnesses, *id.* at 26 (Pretrial Order ¶ 5);

- Enjoin KPRB and Secretary to focus parole inquiry on youthful offenders' rehabilitation, instead of crime severity or older disciplinary history, make youth a central component of the inquiry, and create a "presumption of relief" for youthful offenders, *id.*; and

- Declare that defendants operate an unconstitutional parole scheme by depriving Mr. Makthepharak, a youthful offender, a meaningful opportunity for release and plaintiff is serving a de facto life without parole sentence, *id.* at 25 (Pretrial Order ¶ 5).

The parties dispute whether and how these policies and procedures apply. But for purposes of standing, it's sufficient that plaintiff has "set forth by affidavit or other evidence specific facts that, if taken as true, establish" an injury in fact from the challenged procedures. *Nova Health Sys.*, 416 F.3d at 1154. The court summarizes its standing conclusions in a chart providing record citations to support these requests for relief. *See* Standing Appendix (attached). It concludes plaintiff has established a likelihood of future injury in that he's still subject to the challenged parole scheme, including the procedures outlined above.

But to defendants' point, plaintiff hasn't established a likelihood of future injury supporting some forms of his requested relief.  For the following requests for declaratory and injunctive relief, plaintiff doesn't provide evidence of a policy causing the harm, or otherwise identify a likelihood of the conduct occurring.  *See Lyons*, 461 U.S. at 105–06 (suggesting plaintiff must show likelihood of future injury by future susceptibility to the harm and an order, policy, or practice of conduct imposing that harm).  The court concludes plaintiff hasn't established a likelihood of future injury, to the extent his § 1983 claim rests on the following, as paraphrased:

- Declare that Kan. Stat. Ann. §§ 75-5210a and 22-3717(g)–(h) are unconstitutional as applied to plaintiff and enjoin the Secretary's "unilateral determination" of parole conditions, Doc. 44 at 25 (Pretrial Order ¶ 5);

- Enjoin KPRB, requiring it to disclose all evidence in advance and record parole hearings, *id.* at 26 (Pretrial Order ¶ 5);

- Enjoin KPRB, requiring it to prepare comprehensible and sufficiently detailed written parole decisions, *id.*; and

- Enjoin the Governor, Secretary of Corrections, and KPRB, requiring them to institute "a meaningful administrative and judicial process to review" parole decisions, *id.*[9]

---

[9]    As plaintiff's brief makes clear, his argument about Kan. Stat. Ann. §§ 75-5210a and 22-3717(g) is two-fold.  *First*, he argues the Secretary's discretion to enter program agreements—thereby unilaterally setting parole eligibility—creates a system of ad hoc clemency.  Doc. 62 at 16–21.  *Second*, he argues the Secretary and KPRB's failure to abide the eligibility requirement under § 22-3717(g)—which plaintiff argues requires a § 75-5210a agreement—makes the system all the more ad hoc and lawless.  *Id.* at 21–23.  As explained in the Standing Appendix, attached to the end of this Order, below, plaintiff has established an injury in fact for the latter, but not the former.  That's because it's undisputed that defendants grant parole without such a program agreement.  Doc. 47-9 at 5 (Keating Decl. ¶¶ 24–28).  So, plaintiff hasn't shown a credible threat that KPRB will deny parole based on the absence of a program

Plaintiff hasn't provided record evidence showing these policies exist—or that the KPRB is likely to enforce them in the future. In fact, for some requests, record evidence shows the requested policies are in place already. The court, again, outlines that record evidence in the attached chart. *See* Standing Appendix (attached). Plaintiff thus hasn't established an injury in fact.

In sum, the court concludes plaintiff has established an injury in fact for some forms of his requested declaratory and injunctive relief. He properly has "set forth by affidavit or other evidence specific facts that, if taken as true, establish" an injury in fact from the challenged procedures. *Nova Health Sys.*, 416 F.3d at 1154. But for the other forms of relief, "the record is devoid of evidence raising a genuine issue of material fact that would support the plaintiff's ultimate burden of proving standing." *Day*, 500 F.3d at 1132. Next, the court addresses causation.

### 2.    Causation

To satisfy the causation element of standing, a plaintiff's injury must be "'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Nova Health Sys.*, 416 F.3d at 1156 (quoting *Lujan*, 504 U.S. at 560). That is, Article III requires "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Id.* Plaintiff must demonstrate causation by more than "speculative inferences." *Id.* at 1157 (quotation cleaned up).

"[T]he proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute." *Petrella v. Brownback*, 697 F.3d 1285, 1294 (10th Cir. 2012)

---

agreement. Plaintiff's requested declarations about Kan. Stat. Ann. §§ 75-5210a and 22-3717(g) thus appear in both the "injury in fact" and "no injury in fact" sections.

(finding plaintiff had established causation element of standing to sue Kansas Governor and Attorney General in a challenge to Kansas's school district financing act).[10]  And that's true, at least where the challenged statutory scheme falls within the official's general enforcement powers.  *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 967–68 (10th Cir. 2021) (distinguishing *Petrella* on basis that "statutory scheme vests enforcement power" in "body independent of the Governor and the Attorney General"); *Bishop v. Oklahoma*, 333 F. App'x 361, 365 (10th Cir. 2009) (finding "generalized duty to enforce state law" insufficient in standing inquiry against Attorney General and Governor, in setting where challenged statute was administered by judiciary employees, and citing cases requiring a "specific duty to enforce" the challenged statutes).  A "state official is a proper defendant if he is 'responsible for general supervision of the administration by the . . . officials' of a challenged provision." *Kitchen v. Herbert*, 755 F.3d 1193, 1204 (10th Cir. 2014) (quoting *Papasan v. Allain*, 478 U.S. 265, 282 n.14 (1986)).  "This is so even if the state officials are not specifically empowered to ensure compliance with the statute at issue, if they clearly have assisted or currently assist in giving effect to the law." *Id.* (quotation cleaned up).

---

[10]     Defendants ask the court to conclude the Supreme Court's "credible threat of enforcement" language in *Susan B. Anthony List v. Driehaus* abrogated *Petrella*.  Doc. 47 at 32–33 (citing 573 U.S. 149, 159 (2014)).  The court's research didn't turn up any authority reflecting this proposition.  And that's so for good reason.  The operative "credible threat of enforcement" language in *Driehaus* concerns an injury in fact—whether a statute previously unapplied to plaintiff presents a likelihood of future injury. 573 U.S. at 159.  The operative "official[] responsible for the enforcement" language in *Petrella* concerns causation—whether the injury is fairly traceable to the particular defendant.  697 F.3d at 1294.

     Defendants suggest this distinction doesn't matter, Doc. 64 at 15, but the court disagrees. *Driehaus* didn't concern *which* official threatened enforcement of a statute.  *See* 573 U.S. at 158–60.  It concerned whether *any* official or other circumstance threatened enforcement of the statute.  *Id.* at 159 ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." (internal citations and quotation marks omitted)).  *Driehaus* doesn't affect the relevant rule in *Petrella* and thus doesn't affect the court's causation analysis.

Defendants argue plaintiff can't establish causation, as that requirement applies to Governor Kelly or Secretary Zmuda. But they blend their standing argument with one centered on *Ex parte Young*. *See* Doc. 47 at 26 (arguing Eleventh Amendment immunity doesn't apply when "plaintiff lacks constitutional standing to raise the *Ex Parte Young* exception"); *id.* at 32–33 (discussing both *Ex parte Young* and standing's causation element). On that score, there's "a common thread between Article III standing analysis and *Ex parte Young* analysis." *Hendrickson*, 992 F.3d at 967 n.20 (quotation cleaned up). To avail the *Ex parte Young* exception to Eleventh Amendment Immunity, the state official "'must have some connection with the enforcement' of the challenged statute." *Id.* at 965 (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). The state official needn't have a "special connection[,]" but must "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Id.* (quotation cleaned up). "The 'necessary connection' language in *Ex parte Young* is the common denominator of both a standing inquiry and whether our jurisdiction over the defendants is proper under the doctrine of *Ex parte Young*." *Id.* at 967 n.20 (quotation cleaned up).

At times, our Circuit appears to have treated the causation and *Ex parte Young* inquiries coextensively on the necessary connection question. *Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013) (recounting causation conclusion that defendants had "a particular duty to enforce the challenged statute" and therefore were "proper state officials for suit under *Ex parte Young*"); *Frank v. Lee*, 84 F.4th 1119, 1135 (10th Cir. 2023) ("Whether the Defendants have enforcement authority [for causation prong of standing] is related to whether, under *Ex parte Young*, they are proper state officials for suit." (quotation cleaned up)). To the extent those inquiries aren't *always* coextensive, it doesn't matter to this case. The court concludes plaintiff

has satisfied both standards for all defendants.  The court thus trains its analysis on standing but refers to both standing and *Ex parte Young* cases.

Take the easiest analysis—the KPRB defendants—first.  There's no room for doubt that the KPRB defendants owe a specific duty to enforce the parole statutes at issue here.  *See* Kan. Stat. Ann. § 22-3709 (granting KPRB panels "full authority and power of the board to order the denial, grant or revocation of an inmate's parole"); § 22-3717(g) (outlining when the KPRB may release inmates on parole).  So, plaintiff easily establishes causation as applied to the KPRB's members.

Next, consider both Governor Kelly and Secretary Zmuda.  Recall that our Circuit concluded in *Petrella* that causation was satisfied because the defendant official had a general enforcement power over the challenged statute.  *See* 697 F.3d at 1294 (discussing claims against Governor).  And in *Hendrickson*, the Circuit concluded the claims against the defendant officials didn't fit the *Ex parte Young* exception to Eleventh Amendment immunity because enforcement was committed to an insulated body—"a body independent of the Governor and the Attorney General."  992 F.3d at 968.  In *Petrella*, unlike *Hendrickson*, "there was no indication the statutory provisions at issue fell outside the scope of [the Governor and Attorney General's] general enforcement powers."  *Id.*

Here, the Governor of Kansas owes a general duty to enforce state law.  Kan. Const. Art. I § 3; *Petrella*, 697 F.3d at 1294.  And the Governor appoints (and may remove) the Secretary of Corrections, who in turn appoints and removes KPRB members.  Kan. Stat. Ann. § 75-5203(a) (secretary of corrections appointed by governor and serves at her pleasure).  The Secretary of Corrections, in turn, manages the prison system and possesses authority to appoint and remove KPRB members, who serve at his pleasure.  Kan. Stat. Ann. § 75-5205 (manages prison system);

Kan. Stat. Ann. § 75-52,152 (appoints KPRB members and supervises them); Kan. Stat. Ann. § 22-3713(b) (provides personnel and accounting services). So, Governor Kelly and Secretary Zmuda have some supervisory power that's "passed down" to the KPRB. *See Bishop*, 333 F. App'x at 365 (concluding Attorney General and Governor didn't cause plaintiff's injury because "supervisory control" was vested in the judiciary, and "passed down to the Administrative District Judge" (quotation cleaned up)); *Kitchen*, 755 F.3d at 1202–03 (distinguishing *Bishop* and emphasizing Governor and Attorney General's supervisory authority over tax commission). What's more, plaintiff has challenged how the KPRB and Secretary's noncompliance with Kan. Stat. Ann. §§ 75-5210a and 22-3717(g)(2) affect parole proceedings. Doc. 62 at 21–23; *Ex parte Young*, 209 U.S. at 157 ("The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact[.]"); *Kitchen*, 755 F.3d at 1203–04 (finding causation element satisfied in part because supervisory state official has "assisted or currently assists in giving effect to the law" and can "initiate proceedings to remove [tax commissioners] from office" (quotation cleaned up)). And it's not clear here that the KPRB is insulated from the Governor's influence entirely, as in *Hendrickson*. *See Hendrickson*, 992 F.3d at 966 (citing state court decision concluding board was free from Governor's influence). In sum, plaintiff has satisfied the causation element of standing for both Secretary Zmuda and Governor Kelly.

The court concludes plaintiff has established the requisite causation for standing and necessary connection for *Ex parte Young*,[11] as applied to all defendants. Now, the court evaluates whether plaintiff's requested relief would redress his injuries.

---

[11]    For causation, it's sufficient to sue "state officials responsible for the enforcement of [the challenged] statute." *Petrella*, 697 F.3d at 1294. For *Ex parte Young*, the officer needn't have a "special connection to the unconstitutional act or conduct." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007) (quotation cleaned up). The officer merely needs a "duty to enforce the

### 3.    Redressability

Standing "requires a likelihood that the injury-in-fact will be redressed by a favorable decision." *Bronson*, 500 F.3d at 1111. A "plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve [plaintiff's] every injury." *Nova Health Sys.*, 416 F.3d at 1158. What makes a declaratory judgment "a proper judicial resolution of a 'case or controversy' . . . [is] the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*." *Id.* at 1159 (emphasis added) (quoting *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994), *superseded by statute on other grounds*). "The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." *Bronson*, 500 F.3d at 1111. Likewise, "the connection between causation and redressability is very practical—if the injury is not caused by the challenged acts, an order directed to them will not redress it." *Id.* at 1111–12 (quotation cleaned up).

Here, the parties don't dispute that plaintiff's requested declaratory and injunctive relief would redress his constitutional injury, at least as it applies to the KPRB. The court agrees with them. Declaring that certain policies deprive plaintiff of his Eighth Amendment rights or enjoining defendants would correct those constitutional deficiencies. And it would affect the KPRB's behavior when it evaluates plaintiff's eligibility for parole. The same applies to Secretary Zmuda and Governor Kelly. Defendants' redressability argument repeats their "no authority to enforce parole procedures" argument that the court rejected on the causation prong. The court already has decided that Secretary Zmuda and Governor Kelly were involved in

---

statute and a demonstrated willingness" to do so. *Id.* (quotation cleaned up). "'The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact[.]'" *Id.* (quoting *Ex parte Young*, 209 U.S. at 157). Plaintiff here has established the necessary link between the challenged statute and all defendants.

enforcing the parole statutes, and so now it likewise concludes the relief plaintiff seeks against the defendants is likely to redress plaintiff's purported constitutional injury.[12]

On to defendants' next jurisdictional challenge: ripeness.

## C.     Ripeness

Defendants assert that plaintiff's claims aren't ripe because he hasn't suffered a constitutional violation in the past—his parole was denied due to his disciplinary record—and any potential constitutional violation in the future is uncertain. Doc. 47 at 37. But, plaintiff asserts, defendants misunderstand plaintiff's alleged harm. Doc. 62 at 33.

"In determining whether a claim is ripe, a court must look at [1] the fitness of the issue for judicial resolution and [2] the hardship to the parties of withholding judicial consideration." *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1237 (10th Cir. 2004) (quotation cleaned up). For the fitness prong, the court must "determine whether the matter involves uncertain events" and "whether the issues involved are based on legal questions or factual ones." *Id.* If the issues are factual, "the matter may not be fit for resolution." *Id.* For the hardship prong, the court evaluates "whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* (quotation cleaned up).

---

[12]     Defendants also suggest that it would prove impossible for Secretary Zmuda to comply with any court order because he doesn't have "legal authority to provide redress by making changes to the parole process." Doc. 47 at 34. But whether Secretary Zmuda personally could institute regulatory or legislative changes to the parole process is irrelevant to the redressability question. *See Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1158, 1173 (W.D. Okla. 2024) (explaining plaintiffs can satisfy both causation and redressability requirements against state officials, "even if the official is powerless to change the state law"); *cf. also Prairie Band*, 476 F.3d at 828 (addressing *Ex parte Young*-based argument that defendants weren't proper parties because they couldn't "change state law" to provide the requested remedy, and explaining "the essence of an *Ex parte Young* action is seeking relief against the state officials who are responsible for enforcing the violative state laws, not against the state officials who drafted the violative legislation" (internal quotation marks and citation omitted)).

This case doesn't turn on uncertain future events: plaintiff is incarcerated and will face the KPRB again. Plaintiff has produced evidence that certain parole policies exist. The issues predominantly are legal ones—whether the policies used to evaluate plaintiff's parole deprive him of a meaningful opportunity for release. And plaintiff's alleged injury is his ongoing exposure to a parole scheme that violates the Eighth Amendment, not that any particular past parole decision is unconstitutional. "Assuming for the moment that [plaintiff's] legal theory is correct, [his] alleged injury does not depend on any uncertain, contingent future events, and the court[] would gain nothing by allowing the issues in the case to develop further." *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1098 (10th Cir. 2006). The court concludes plaintiff's claims are ripe for adjudication.

### D.    Mootness

The doctrine of mootness "addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." *West Virginia v. EPA*, 597 U.S. 697, 719 (2022) (quotation cleaned up); *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) ("An actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." (quotation cleaned up)). Claims for prospective injunctive relief "become[] moot once the event to be enjoined has come and gone." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 907 (10th Cir. 2014). And a "claim for declaratory relief that does not settle some dispute which affects the behavior of the defendant toward the plaintiff is moot." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (quotation cleaned up). That's so "because it fails to seek more than a retrospective opinion that the plaintiff was wrongly harmed by the defendant." *Id.* (quotation cleaned up). Defendants here make two mootness arguments.

*First*, defendants assert that plaintiff's Eighth Amendment-based claim—to the extent it "alleges that parole decisions are based on him denying responsibility" for his underlying offenses—is moot. Doc. 47 at 37. Defendants identify plaintiff's 2021 denial of parole, showing that one reason for denying plaintiff's parole was his denial of responsibility. Doc. 12-1 ("Pass Reasons: Denies responsibility; Disciplinary reports"). But in 2024, the sole reason listed for denying plaintiff's parole was disciplinary reports. Doc. 47-9 at 9 (Keating Decl. ¶ 61). Seeing this rationale, defendants assert mootness. Plaintiff identifies no factual dispute on this point. *See* Doc. 62 at 34. But the court finds defendants' argument unavailing as a matter of law.

For starters, defendants' argument assumes plaintiff challenges his 2021 parole decision. But plaintiff has clarified that his injury is his ongoing exposure to Kansas's parole system—one that deprives him of a meaningful opportunity for release. Doc. 62 at 33–34; *see also* Doc. 44 at 10 (Pretrial Order ¶ 3.a.iii.) ("As a result of this system, Kansas and the defendants . . . lack policies that protect the constitutional rights of Mr. Makthepharak . . . to a meaningful and realistic opportunity for release[.]"). Plaintiff asserts in the Pretrial Order that the 2021 decision "illustrate[s]" the "policies and practices of Defendants" that "denied [plaintiff] any meaningful and realistic opportunity to obtain release based on demonstrated maturity and rehabilitation." Doc. 44 at 12 (Pretrial Order ¶ 3.a.iii.). The court doesn't find plaintiff's Eighth Amendment claim moot simply because plaintiff asserted a different reason for his denial of parole at a later hearing. The "event to be enjoined"—here, application of defendants' allegedly unconstitutional polices that fail to focus on rehabilitation and youth—hasn't "come and gone." *Citizen Ctr.*, 770 F.3d at 907. And the sought after declaratory relief—establishing whether defendants' parole scheme is unconstitutional—would "affect the behavior of the defendant toward the plaintiff."

*Prison Legal News*, 944 F.3d at 880 (quotation cleaned up).  Plaintiff's claims thus aren't moot

because of a single parole decision that occurred after this lawsuit began.

Also, defendants confusingly argue that because defendant (and former KPRB member)

Ogletree has retired, any claims against him are moot.  Doc. 47 at 38.  But as plaintiff points out,

defendant Ogletree was sued in his official capacity as a KPRB member.  Doc. 62 at 34.  Under

Fed. R. Civ. P. 25(d), "when a public officer who is a party in an official capacity . . . resigns

. . . while the action is pending[, t]he officer's successor is automatically substituted as a party."

Defendants claim in their Reply that Mr. Ogletree doesn't have a successor.  Doc. 64 at 17.  They

argue, "[r]elief cannot be granted against a vacant position[,]" so those claims are moot.  *Id.*  But

in similar situations our Circuit has substituted the title of the office the departed defendant has

vacated as the defendant.  *See Ribadeneira v. Dir. of Taxation*, 161 F.3d 18, 1998 WL 694466, at

*1 n.1 (10th Cir. 1998) (substituting title of the office as defendant when Director of Taxation

had left office and position remained vacant).  So, the court denies summary judgment for

defendants on this basis.  Defendants aren't entitled to judgment as a matter of law on either

mootness theory.

To recap, the court has concluded plaintiff has established injuries in fact for some—but

not all—of his requested declaratory and injunctive relief.  Both causation—and the necessary

connection requirement of *Ex parte Young*'s exception—exist for all defendants.  And the court

has concluded plaintiff's requested relief would redress his injuries.  So, plaintiff has standing to

seek some of the relief he seeks.  The court also has rejected defendants' ripeness and mootness

arguments.  The court is satisfied that the case presents a justiciable controversy.  It now turns to

the meat of the parties' dispute:  whether Kansas's parole system violates the Eighth Amendment

as applied to plaintiff, a youthful offender.

### E.    Eighth Amendment Based § 1983 Claim

#### 1.    Legal Landscape

"[C]hildren are constitutionally different from adults for purposes of sentencing."

*Montgomery v. Louisiana*, 577 U.S. 190, 206–07 (2016) (internal quotation marks and citation

omitted).  Because children are less culpable, the Supreme Court has developed rules for juvenile

offenders' sentences and the Eighth Amendment.  Start with *Roper v. Simmons*, where the Court

held that the Eighth Amendment prohibits sentencing juveniles to death.  543 U.S. 551, 568

(2005).  Five years later, in *Graham v. Florida*, the Court expanded the rule in *Roper* and held

that the Eighth Amendment prohibits sentencing juveniles—who haven't committed a homicide

offense—to life in prison without the possibility of parole.  560 U.S. 48, 74 (2010).  While states

aren't "required to guarantee eventual freedom[,]" they must provide "some meaningful

opportunity to obtain release based on demonstrated maturity and rehabilitation."  *Id.* at 75.

The Court later extended *Graham* to juvenile homicide offenders in *Miller v. Alabama*,

where it held the Eighth Amendment prohibits sentencing juvenile homicide offenders to a

mandatory sentence of life without parole.  567 U.S. 460, 479 (2012).  Instead, sentencing judges

must "take into account how children are different, and how those differences counsel against

irrevocably sentencing them to a lifetime in prison."  *Id.* at 480.  And, in 2016, in *Montgomery v.

Louisiana*, the Court made retroactive *Miller*'s prohibition against sentencing juvenile homicide

offenders to a mandatory sentence of life in prison without possibility of parole.  577 U.S. at 208,

212.  Most recently, in *Jones v. Mississippi*, the Court clarified that a juvenile homicide offender

*may* be sentenced to life without parole, but only if the sentence isn't mandatory and the party

making the sentencing decision has discretion.  593 U.S. 98, 106–07 (2021).

This landscape doesn't provide easy answers for some questions in this case. Two questions present: (1) whether the Eighth Amendment applies to parole decisions and, more particularly, to § 1983 challenges to parole procedures; and (2) whether *Graham* applies to *homicide* offenders sentenced to life *with possibility* of parole, like plaintiff.

### a.    Eighth Amendment Applies to Parole

The Eighth Amendment prohibits cruel and unusual punishments. U.S. Const. amend. VIII. Defendants argue—"[t]o preserve the argument"—that the Eighth Amendment doesn't apply here because parole decisions aren't punitive. Doc. 47 at 38 (citing *Diaz v. Lampela*, 601 F. App'x 670, 676 (10th Cir. 2015)). They assert that the Supreme Court cases outlined above concern criminal sentencing, not the parole process. *Id.* And they cite out of Circuit authority to support their notion that those Supreme Court cases thus aren't controlling over this one. *Id.* (first citing *Bowling v. Dir., Va. Dep't of Corr.*, 920 F.3d 192, 197 (4th Cir. 2019); then citing *United States v. Sparks*, 941 F.3d 748, 754 (5th Cir. 2019); and then citing *Brown v. Precythe*, 46 F.4th 879, 886 (8th Cir. 2022) (en banc)). The court rejects defendants' argument.

In a habeas action, our Circuit has explained that "the Court [in *Graham*] did not just hold that it violated the Eighth Amendment to sentence a juvenile nonhomicide offender to life without parole[.]" *Budder v. Addison*, 851 F.3d 1047, 1056–57 (10th Cir. 2017). The Circuit also held that "when a state imposes a sentence of life on a juvenile nonhomicide offender, it must provide that offender with a 'meaningful opportunity to obtain release.'" *Id.* (quoting *Graham*, 560 U.S. at 75) (concluding sentencing youthful offender to three consecutive life sentences plus 20 years, making him parole-eligible after serving 131 years, violated Eighth Amendment under *Graham*); *Rainer v. Hansen*, 952 F.3d 1203, 1208 (10th Cir. 2020) (evaluating on habeas petition whether Colorado's parole scheme for youthful offenders

28

constitutes a "meaningful opportunity for release based on demonstrated maturity and rehabilitation"). So, parole schemes are relevant to the question of a meaningful opportunity for release under *Graham*.

But does *Graham* apply in a § 1983 action challenging parole procedures? Or, to say it another way, does *Graham* only apply when a party challenges their sentence in a habeas action? *See* Doc. 47 at 38 (defendants asserting *Roper*, *Graham*, *Miller*, and *Montgomery* are cases about criminal sentencing, not the parole process, and citing out-of-Circuit cases addressing § 1983 challenges to parole procedures). The Fourth and Eighth Circuits have answered that question in the negative—*Graham* doesn't apply to § 1983-based actions challenging parole procedures. *See Bowling*, 920 F.3d at 196–97 (construing habeas petition as § 1983-based claim and declining to extend *Roper*, *Graham*, and *Miller* "beyond sentencing proceedings" to parole procedures); *Brown*, 46 F.4th at 886 ("*Miller* and *Montgomery* did not purport to go further and direct federal courts to scrutinize in a civil rights action whether a State's parole procedures afford 'some meaningful opportunity' for release of a juvenile homicide offender.").

The Eleventh Circuit recently reached the opposite conclusion in *Howard v. Coonrod*, No. 23-10858, 2025 WL 1109094 (11th Cir. Apr. 15, 2025). There, the Eleventh Circuit addressed a meaningful-opportunity-for-release challenge to state parole procedures in a § 1983 action. *Id.* at *5. It concluded that a "state may not evade Eighth Amendment scrutiny simply by labeling a sentence 'life with parole' when, in substance, it is a life-*without*-parole sentence." *Id.* And in *Thomas*, our Circuit observed that such an interpretation is at least plausible. *See Thomas v. Stitt*, No. 21-6011, 2022 WL 289661, at *3 (10th Cir. Feb. 1, 2022) (concluding in § 1983 action that "a fair reading of the [Supreme Court] cases does not foreclose" argument that "the Eighth Amendment requires the State to operate a parole system that affords a meaningful

29

opportunity to obtain release based on demonstrated maturity and rehabilitation" instead of "simply making a juvenile lifer eligible for parole"). What's more, a number of district courts have applied *Graham*'s meaningful-opportunity-for-release language to parole scheme challenges.[13]

Without applying these Supreme Court cases to parole schemes, the opportunity for release requirement could exist in name only. *See Heredia v. Blythe*, 638 F. Supp. 3d 984, 993 (W.D. Wisc. 2022) (recognizing that if *Graham* didn't apply to parole, "a court could sentence a juvenile offender to life with the possibility of parole, but then parole officials could give the offender the functional equivalent of a life sentence without parole by categorically refusing to grant him parole regardless of the circumstances[.]").

Given the Tenth Circuit's implication in *Thomas*, and compelling logic applied in other district court opinions such as *Heredia*, the court concludes that *Graham* applies to § 1983-based challenges to parole procedures, and not just sentencing.

---

[13]     *See Flores v. Stanford*, No. 18 CV 2468 (VB), 2019 WL 4572703, at *9 (S.D.N.Y. Sept. 20, 2019) ("The Court holds that *Graham*, *Miller*, and *Montgomery* vest in juvenile offenders sentenced to a maximum term of life imprisonment an Eighth Amendment right that attaches to those offenders' parole proceedings, which the Constitution mandates must amount to a meaningful opportunity to obtain release." (quotation cleaned up)); *Swatzell v. Tenn. Bd. of Parole*, No. 18-cv-01336, 2019 WL 1533445, at *5 (M.D. Tenn. Apr. 9, 2019) ("[T]o the extent that the Complaint attempts to allege that Defendant's policies, procedures, and customs violate the [Eighth Amendment] because they do not provide him, a juvenile offender, with a meaningful opportunity for release, such allegations may also state a colorable § 1983 claim[.]"); *Md. Restorative Just. Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, at *26 (D. Md. Feb. 3, 2017) (declining to dismiss plausible claim that state parole system deprived juvenile homicide offenders sentenced to life with parole "of the right to a meaningful opportunity for release" under the Eighth Amendment); *Wershe v. Combs*, No. 12-CV-1375, 2016 WL 1253036, at *3 (W.D. Mich. Mar. 31, 2016) (explaining "[t]he Court's discussion of a meaningful opportunity to obtain release . . . suggests that the decision imposes some requirements after sentencing" and assuming without deciding "that *Graham* requires the State to provide [plaintiff] with a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"); *cf. also Godinez v. Williams*, No. 21-cv-00695-RBJ, 2022 WL 1642497, at *17 (D. Colo. May 24, 2022) (explaining on sentencing challenge that "if the Colorado parole board or other state actors fail to allow Mr. Godinez a meaningful opportunity for parole or fail to consider his youth and rehabilitation, he could potentially pursue a § 1983 claim [under *Graham*] against them when such a claim is ripe").

> **b.** ***Graham*'s Application to Homicide Offenders Sentenced to Life with the Possibility of Parole**

*Graham* plainly applies to nonhomicide offenders. 560 U.S. at 75. But the parties don't address whether *Graham* applies to *homicide* offenders sentenced to life with the possibility of parole—offenders like plaintiff. Three circuits have declined to extend *Graham* to homicide offenders. *See Brown*, 46 F.4th at 886 (Eighth Circuit declining to extend "the Supreme Court's juvenile-specific Eighth Amendment protections" to "juvenile homicide offenders sentenced to life *with* the possibility of parole" (emphasis in original)); *Bowling*, 920 F.3d at 198 (Fourth Circuit, same); *Howard*, 2025 WL 1109094, at *5 (Eleventh Circuit concluding *Graham*'s meaningful opportunity standard doesn't extend to homicide offenders). But our Circuit has recognized that *Graham*'s "meaningful opportunity to obtain release" standard may extend to juvenile *homicide* offenders, at least ones sentenced to life *without* parole. *Thomas*, 2022 WL 289661, at *3 ("'*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar [against life sentences without parole] relates only to nonhomicide offenses.'" (alteration in original) (quoting *Miller*, 567 U.S. at 473)). *But see Rainer*, 952 F.3d at 1207 (Tenth Circuit explaining "*Graham*'s holding is limited to offenders convicted of non-homicide offenses").

In *Thomas*, a case involving a juvenile homicide offender sentenced to life *with the possibility of* parole, our Circuit explained that the Supreme Court hasn't resolved "whether the Eighth Amendment requires the State to operate a parole system that affords a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation, or whether simply making a juvenile lifer eligible for parole is enough." *Thomas*, 2022 WL 289661, at *3. If the latter, then the court's inquiry would end—plaintiff plainly was eligible for parole, which would prove sufficient to satisfy the Eighth Amendment. But if the former, the court must

decide the bounds of the "meaningful opportunity for release" standard, and whether Kansas's parole scheme is up to Eighth Amendment snuff.

The court assumes, without deciding, that *Graham*'s "meaningful opportunity for release" standard applies to youthful homicide offenders sentenced to life with the possibility of parole. And the court assumes, without deciding, that merely including an opportunity for parole in the sentence isn't enough—that opportunity must prove *meaningful*. The parties don't address these points directly, and our Circuit has *implied* that: (a) this standard may apply to youthful homicide offenders; and (b) simply making a youthful offender eligible for parole might not qualify as a meaningful opportunity for release. *See Thomas*, 2022 WL 289661, at *3 (concluding youthful homicide offender stated plausible claim for relief challenging whether Oklahoma's parole procedures provided him a meaningful opportunity for release under *Graham*). And, as explained in detail below, even if the court applies the *Graham* standard, the court concludes the KPRB parole process provides plaintiff a meaningful opportunity for release.

### 2.    Appling the Meaningful Opportunity for Release Standard

Defendants ask the court to apply the Western District of Wisconsin's meaningful opportunity for release standard: that the "'parole process cannot be a sham.'" Doc. 47 at 38 (quoting *Heredia*, 638 F. Supp. 3d at 999). Plaintiff suggests a different standard. Doc. 62 at 15–16. Plaintiff argues the "appropriate rule" is *Graham*'s: "the defendants must allow Mr. Makthepharak a realistic and meaningful opportunity to obtain release based on demonstrating maturity and rehabilitation." *Id.* at 16. And, given the disputes of material fact here, plaintiff maintains, that's a fact question requiring a trial to decide. *Id.*

a.    Defining "Meaningful Opportunity for Release"

The definition of "meaningful opportunity for release" is hard to pin down.  In *Graham*,

the Court explained that while the "Eighth Amendment does not foreclose the possibility" that a

juvenile offender "will remain behind bars for life[,]" it prohibits states "from making the

judgment at the outset that those offenders never will be fit to reenter society."  560 U.S. at 75;

Beth Caldwell, *Creating Meaningful Opportunities for Release:*  Graham*, Miller and*

*California's Youth Offender Parole Hearings*, 40 N.Y.U. REV. L. & SOC. CHANGE 245, 257

(2016) ("[A] meaningful opportunity requires more than a 'remote possibility' of release; the

opportunity must be 'realistic.'" (quoting *Graham*, 560 U.S. at 70, 82)).

Recently, the Eleventh Circuit distilled principles from the Supreme Court's juvenile

offender cases to craft a "meaningful opportunity for release" framework.  *See Howard*, 2025

WL 1109094, at *7.[14]

The Eleventh Circuit inferred the following "basic characteristics" for this framework:

*First*, the decisionmakers in the state's release system must have the ability to
incorporate "demonstrated maturity and rehabilitation" into their assessment of
whether to release a juvenile . . . offender.  *Graham*, 560 U.S. at 75, 130 S.Ct.
2011 (explaining that states "must" provide for non-homicide juvenile offenders a
chance for release "based on demonstrated maturity and rehabilitation").  *Second*,
the decisionmakers must actually exercise that authority.  After all, the
"opportunity" for release "based on" maturity and rehabilitation isn't very
"meaningful" if, in fact, the relevant decisionmakers just ignore those criteria.
And *third*, a juvenile . . . offender must have some mechanism for making his
views known—for pointing out (or, as *Graham* phrases it, "demonstrat[ing]") to
the decisionmakers his maturity and rehabilitation.  *Id.*

---

[14]    The Eleventh Circuit's framework applies merely to non-homicide offenders.  *See Howard*, 2025
WL 1109094, at *7.  For homicide offenders, it uses a less onerous, "not a sham" standard based on
*Miller*.  *See id.*  But, because this Order assumes without deciding that *Graham*'s meaningful opportunity
for release standard applies to homicide offenders, the court applies *Howard*'s framework here.

*Howard*, 2025 WL 1109094, at *7 (emphasis added) (quotation cleaned up). So, the Eleventh Circuit's framework concludes the following factors that define the term "meaningful opportunity for release": (1) ability to incorporate maturity and rehabilitation into parole decisions; (2) actual incorporation of maturity and rehabilitation; and (3) the offender's opportunity to demonstrate maturity and rehabilitation.[15]

The Eleventh Circuit applied *Howard*'s framework and concluded Florida's parole system didn't offend the Eighth Amendment. *Id.* at *8. *First*, Florida's parole commissioners had "authority to consider maturity and rehabilitation." *Id. Second*, those commissioners exercised that authority. *Id.* (recounting testimony that commission "considered factors relating to youth when setting or modifying the presumptive parole release date" (quotation cleaned up)). And, *third*, Florida inmates could "make their case" for maturity and rehabilitation. *Id.* (explaining that inmate was allowed retained counsel and experts, could speak directly to commission at hearing, and could provide written submissions to the commission). *Howard* explained that "[u]nder *Graham*, the Eighth Amendment demands a *meaningful opportunity* for release—not a *likelihood* of release." *Id.* at *9 (emphasis in original). And, the Eleventh Circuit explained, Florida's parole commissioners actually had authorized release—albeit infrequently. *Id.* Ultimately, the Eleventh Circuit affirmed the district court's grant of summary judgment in defendants' favor. *Id.* at *10.

Absent controlling precedent from our Circuit, the court evaluates the present case, below, applying the Eleventh Circuit's three factors.

**(1) KPRB's Ability to Incorporate Maturity & Rehabilitation—**The Kansas parole statute includes a nonexhaustive list of factors the KPRB should consider at each parole hearing.

---

[15] The Eleventh Circuit explained that the Fourth and Eighth Circuits also take a similar approach, although neither has articulated a specific test. *See Howard*, 2025 WL 1109094, at *7 n.9.

Kan. Stat. Ann. § 22-3717(h)(2).  While the statute doesn't name "maturity" and "rehabilitation" expressly, the factors include "the conduct, employment, and attitude of the inmate in prison[.]"  *Id.*  And the parole statute mandates the KPRB to consider "all pertinent information" about the inmate.  *Id.*  Plaintiff identifies no facts suggesting the KPRB can't incorporate maturity and rehabilitation into parole decisions.  So, the statute itself leaves room for evaluating the progress a youthful offender has made while incarcerated.  *See Bowling*, 920 F.3d at 198 (factors including safety, character, conduct, vocational training, and development, although not directly considering maturity and rehabilitation, satisfied *Graham* standard).

And plaintiff acknowledges KPRB's ability to consider maturity and rehabilitation. Plaintiff theorizes that because defendants don't follow Kan. Stat. Ann. §§ 75-5210a and 22-3717(g), the parole system is "even more . . . lawless" than the statutory system indicates.  Doc. 62 at 21.  Plaintiff argues the KPRB thus "uses some factors of its own to make parole decisions."  *Id.*  In essence, plaintiff contends the KPRB can do whatever it wants in the "ad hoc system" falling "outside the Legislature's guidelines[.]"  *Id.* at 22.  Even under plaintiff's own ad hoc theory, no reasonable factfinder could conclude the KPRB isn't *able to* incorporate maturity and rehabilitation into parole decisions.  *See Howard*, 2025 WL 1109094, at *8 (concluding first prong met where commissioners could consider youth, restitution provided to victims, and program achievement, as well as other factors "based on any competent and persuasive evidence relevant to aggravating or mitigating circumstances" (quotation cleaned up)).  The first "meaningful opportunity for release" factor favors defendants.

**(2) KPRB's Actual Incorporation of Maturity and Rehabilitation**—The record is less clear whether the KPRB *actually* incorporates maturity and rehabilitation into parole decisions. The parties agree that in practice the inmate's *youth* at the time of the offense is evaluated in

discretionary parole decisions. *See* Doc. 47-5 at 13 (Def. Ex. F); Doc. 47-6 at 3 (Def. Ex. G);

Doc. 47-8 at 38 (Ogletree Dep. 37:22–25); Doc. 47-9 at 8, 10 (Keating Decl. ¶¶ 49, 68). The

parties dispute, though, whether the KPRB incorporates the inmate's *maturity*. *See* Doc. 47-8 at

40 (Ogletree Dep. 39:15–18) (responding "no" to question about existence of "special account

for" youthful offenders' "maturity"); Doc. 47-9 at 4 (Keating Decl. ¶¶ 18, 20) (explaining

"[m]aturity and rehabilitation can be demonstrated for purposes of parole regardless of" inmate's

custody classification or participation in work release programs); Doc. 47-8 at 49–50 (Ogletree

Dep. 48:22–49:12) (describing ability to participate in job training and education programs).

But while the parties dispute these facts genuinely, they're not material. *See Nahno-*

*Lopez*, 625 F.3d at 1283 (genuine dispute of fact if "reasonable jury could return a verdict for the

nonmoving party" on issue (quotation cleaned up)); *Anderson*, 477 U.S. at 248 (fact material if it

has ability to "affect the outcome of the suit under the governing law"). After all, youth is

evaluated. And other statutory factors account for things like previous social history and

conduct, employment, and attitude while in prison. Kan. Stat. Ann. § 22-3717(h)(2). Even

drawing the inferences in plaintiff's favor, these other factors encompass a youthful offender's

maturity and rehabilitation. Assume plaintiff's right—there aren't special assessments

concerning maturity. *See* Doc. 47-8 at 39–40 (Ogletree Dep. 38:17–39:22) (discussing absence

of special parole assessments for youthful offenders). KPRB nonetheless evaluates youth and

development.

Given the nonexhaustive list of factors in Kan. Stat. Ann. § 22-3717(h)(2), no reasonable

factfinder could conclude that the KPRB doesn't incorporate maturity and rehabilitation into its

parole decisions sufficiently to provide a meaningful opportunity for release. S*ee Howard*, 2025

WL 1109094, at *8 (concluding second factor was satisfied where "factors relating to youth" and

"age" were evaluated throughout the proceedings); *Bowling*, 920 F.3d at 198 (concluding

existing parole factors—including character, conduct, vocational training and development,

personal history, institutional adjustment, attitude, and release plans—"allowed the Parole Board

to fully consider the inmate's age" and maturation); *Wershe*, 2016 WL 1253036, at *4

(concluding parole board evaluated maturity and rehabilitation by considering his youth at the

time of the original offense, other offenses committed while incarcerated, and his willingness to

cease criminal behavior).

This second factor thus favors defendants as well.

**(3) Youthful Offender's Ability to Demonstrate Maturity and Rehabilitation**—In

this case, the third factor considers the procedural safeguards employed during the parole process

and whether risk assessment tools discriminate against youthful offenders.  It also evaluates

whether those things deprive youthful offenders of the ability to demonstrate maturity and

rehabilitation to the KPRB.  This third factor is often determinative.  Indeed, most "courts that

have held that a state's parole system did not satisfy *Graham*'s requirements focused on the lack

of opportunity for an offender to demonstrate that he had matured and changed."  *Wershe*, 2016

WL 1253036, at *4.

The parties have stipulated that inmates are entitled to retain counsel and have their

chosen counsel attend parole hearings.  Doc. 44 at 3 (Pretrial Order ¶ 2.a.vi., Stipulations).  Also,

they have stipulated that plaintiff was allowed to participate in and speak during his previous

parole hearings.  *Id.* (Pretrial Order ¶¶ 2.a.viii., x., Stipulations).  It's also uncontroverted that an

inmate's accomplishments and institutional record are reviewed and discussed at parole hearings.

Doc. 47-6 at 5 (Def. Ex. G); Doc. 47-9 at 46–49 (2021 Hearing Tr. ¶¶ 34:13–37:25) (discussing

plaintiff's disciplinary record); *id.* at 54–56 (2021 Hearing Tr. ¶¶ 42:25–44:9) (discussing how

plaintiff has changed during his incarceration, having come in as a "young man" 20 years earlier). And defendants show that inmates can submit written evidence to the KPRB, including expert reports. Doc. 47-8 at 32 (Ogletree Dep. 31:3–10); Doc. 47-9 at 6 (Keating Decl. ¶¶ 30, 32). Plaintiff doesn't dispute this proposition but counters that inmates aren't informed about their ability to submit evidence. Doc. 47-7 at 40 (Makthepharak Dep. 40:14–19). And inmates can't subpoena witnesses, hire experts, or cross examine witnesses at the parole hearing itself. Doc. 47-8 at 31–32 (Ogletree Dep. 30:9–31:2); Kan. Admin. Regs. § 45-200-1 (2025) (restricting attendance at parole hearing, not including witnesses or experts).

One disputed fact emanates from this inquiry. The parties disagree whether the Security Classification System discriminates against youthful offenders. Plaintiff argues the Custody Classification Manual categorically prevents youthful offenders serving life sentences from scoring within the range required to earn a minimum security risk. Doc. 47-2 at 12, 22, 24 (reflecting conviction severity minimum of 6 for "greatest" severity and time left to serve score minimum of 3 for life sentences, despite point range of 0–6 for minimum security qualification). And plaintiff suggests this classification system penalizes youthful offenders for their age. *Id.* at 19 (points for age zero out once offender turns 43). Plaintiff also argues inmates can't participate in work release without a minimum security classification for 30 days, so youthful offenders sentenced to life in prison are never eligible for work release. Doc. 62-1 at 4 (reflecting minimum security housing requirement). Defendants dispute plaintiff's interpretation of the Security Classification System, but defendants adduce evidence that someone in the highest security classification still can participate in job training and education, just not work release.[16] Doc. 47-8 at 49–50 (Ogletree Dep. 48:22–49:12). While a reasonable factfinder could

---

[16]     Defendants frame this fact as "[m]aturity and rehabilitation can be demonstrated for purposes of parole regardless of an inmate's security classification or participation in work release[.]" Doc. 47 at 7.

find that the Security Classification Manual categorically forecloses work release for youthful offenders, there's no evidence that work release is a prerequisite to parole or requirement to demonstrate maturity and rehabilitation.

Once again, the disputed facts are not material.  KPRB's parole procedures allow an inmate to have counsel, participate in, and speak at parole hearings.  At the parole hearing, the inmate's institutional record and accomplishments are discussed by the participants—including the inmate.  Inmates can submit written materials.  All these things provide ample opportunities for a youthful offender to demonstrate his maturity and rehabilitation.

The undisputed facts suffice to preclude a reasonable factfinder from concluding that the KPRB's procedures deprive plaintiff of the ability to do so.  *See Howard*, 2025 WL 1109094, at *8 (finding inmates could "make their case" for maturity and rehabilitation because they were allowed retained counsel and experts throughout the process, counsel could speak at the hearing, and anyone could provide written submissions to the parole commission); *Brown*, 46 F.4th at 887 (assuming for analysis-sake that the Eighth Amendment applied to parole proceedings and finding no constitutional violation, describing how inmate could submit documents of support and had opportunity to describe his growth—"a topic that readily allows for information about the inmate's maturity and rehabilitation").

### b.    Ad Hoc Clemency

The gist of plaintiff's argument is that the KPRB operates a system of ad hoc clemency.  According to plaintiff, defendants admit they don't follow Kan. Stat. Ann. §§ 75-5210a and 22-3317(g), which allows them to create a standard-free parole scheme.  Doc. 62 at 21–23.  Plaintiff

---

Plaintiff objects that this is a legal conclusion.  Doc. 62 at 5.  But plaintiff never explains why that's so.  And he doesn't dispute the underlying fact—that those with security classifications above the minimum can participate in programs other than work release.

argues the "only standard the KPRB uses is what side of the bed two out of three members of the KPRB got up on the morning of a given parole hearing." *Id.* at 23.  Trying to support this argument, plaintiff advances evidence suggesting that some youthful offenders who were released had disciplinary reports shortly before their parole—much like plaintiff, whose parole was denied because of disciplinary issues. *See id.*; *see also* Doc. 62-3 (Pl. Ex. 3).  Plaintiff argues, regardless "of whether the youthful offender has recent prison violations, if they feel like it they parole him" Doc. 62 at 23.  But uncontroverted evidence reflects the various standards the KPRB uses to evaluate parole.  So, even if the KPRB doesn't follow Kan. Stat. Ann. § 22-3717(g)'s statutory bases for parole, that doesn't equate to operating a standardless system that deprives youthful offenders of a meaningful opportunity for release. *Cf. Md. Restorative Just. Initiative*, 2017 WL 467731, at *26 (concluding system where governor may reject parole recommendation for any reason or no reason operated like executive clemency and thus wasn't a meaningful opportunity for release).

### c.    Eighth Amendment Conclusion

At bottom, it's "for the State, in the first instance, to explore the means and mechanisms for compliance" with the meaningful opportunity for release standard. *Graham*, 560 U.S. at 75.  A court mustn't "undertake a full review of the State's parole procedures and substitute its own judgment for the State's[.]" *Wershe*, 2016 WL 1253036, at *4.  Simply put, it's "not for this Court to determine whether the [KPRB's] procedures reflect best practices, or whether the [KPRB] could institute procedures that provide juvenile offenders with better opportunities" for release. *Id.*  The "Eighth Amendment demands a *meaningful opportunity* for release—not a *likelihood* of release." *Howard*, 2025 WL 1109094, at *9 (emphasis in original).  The uncontroverted evidence reflects that since 2012, KPRB has granted parole to at least 49

youthful offenders sentenced to life in prison.  Doc. 47-9 at 5 (Keating Decl. ¶ 26).  No reasonable factfinder could conclude the KPRB's parole policies deprive youthful offenders of a meaningful opportunity for release.  So, even assuming *Graham*'s standard applies to homicide offenders sentenced to life with the possibility of parole, the KPRB system doesn't offend that standard.

## F.    Summary Judgment Conclusion

To recap, the court concludes plaintiff doesn't have standing to assert *some* of his requested declaratory and injunctive relief because he hasn't established an injury in fact.  It concludes that plaintiff established causation against all defendants.  And the court concludes plaintiff's remaining requested relief is redressable by an order of the court.  Thus, plaintiff has standing to assert his remaining requested relief.  The court also concludes plaintiff's claim is ripe.  And the court rejects both of defendants' mootness arguments.

On the merits of plaintiff's Eighth-Amendment-based § 1983 claim, the court rejects defendants' argument that the Eighth Amendment doesn't apply to parole.  And it concludes that the Supreme Court's youthful offender Eighth Amendment cases apply beyond the sentencing phase and extend to challenges to parole procedures asserted in a § 1983 action.  The court assumes, without deciding, that *Graham*'s meaningful opportunity for release standard applies to youthful homicide offenders.  And it also assumes, without deciding, that merely including the opportunity for parole in a sentence isn't enough—the state must provide a *meaningful* opportunity.  But even when the court applies *Graham*'s standard to the parole scheme at issue here, it doesn't violate the Eighth Amendment.  The court concludes defendants' parole procedures provide plaintiff a meaningful opportunity for release.  The court thus grants defendants' Motion for Summary Judgment (Doc. 47).

Now, the court takes up the Motion to Strike (Doc. 51), it previewed earlier in this Order.

## III.   **Motion to Strike (Doc. 51)**

This case isn't known for strict procedural compliance.  Defendants filed two untimely motions for time or page extensions.  *See* Doc. 46 (granting untimely motion due to extenuating circumstances); Doc. 65 (noting defendants' untimely request to exceed pages—filed contemporaneously with noncompliant brief—and explaining "this case isn't known for punctuality").  Plaintiff filed three time-extension motions, hoping the court would rule the Motion to Strike and he thus wouldn't have to respond to defendants' Motion for Summary Judgment.  Doc. 54; Doc. 58; Doc. 60; s*ee also* Doc. 61 (granting third motion for extension of time but explaining "[a]waiting a ruling on another pending motion doesn't excuse plaintiff's obligation to respond timely to defendants' summary judgment motion").

The latest procedural sideshow emanates from an inexplicable filing glitch, a one-hour delay, and a filing-date discrepancy.  CM/ECF lists the filing date of defendants' summary judgment motion as November 15, 2024—the dispositive motion deadline.  Doc. 46 (extending deadline); Doc. 47 ("Filed 11/15/24").  But CM/ECF also lists the motion as having entered on November 16, 2024.  Doc. 47 ("Entered: 11/16/2024").  A closer look reveals a notice of electronic filing issued at 1:00 AM on November 16.  Doc. 51-3 at 1 (Notice of Electronic Filing explaining motion was "entered . . . on 11/16/2024 at 1:00 AM CST and filed on 11/15/2024").  On this record, plaintiff asks the court to strike defendants' untimely summary judgment motion, along with defendants' contemporaneously filed provisionally sealed exhibits, notice of proposed sealed record, and motion to seal.  Doc. 51 at 1.  Defendants report that they "understand their Motion for Summary Judgment (Doc. 47) to have been filed November 15[.]"  Doc. 56 at 1.  But, alternatively, defendants request leave to file out of time.  Doc. 56 at 6–11.

The court has discretion to strike untimely filings. *See Palzer v. CoxCom, LLC*, 833 F. App'x 192, 198 (10th Cir. 2020) ("[D]istrict court acted well within its discretion in striking [untimely] response."). But here, to confirm the obvious, the court grants leave and declines to strike defendants' summary judgment motion. Here's why.

### A.    Excusable Neglect

"[T]he court may, for good cause, extend the time" for a party to perform a time-sensitive act. Fed. R. Civ. P. 6(b). If the time has expired already, the court may grant the motion only upon a finding of "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). "Excusable neglect" is "a somewhat elastic concept and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'Ship*, 507 U.S. 380, 392 (1993) (quotation cleaned up) (applying "excusable neglect" standard from bankruptcy rule); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1494 (10th Cir. 1995) (applying *Pioneer* rules to Fed. R. Civ. P. 6(b)).

*Pioneer* established four factors that inform the "excusable neglect" analysis: (1) the risk of prejudice to nonmovant; (2) the delay's length and its effect on proceedings; (3) the reason for delay and whether it was within the movant's "reasonable control[;]" and (4) the movant's good or bad faith. 507 U.S. at 395. "'The most important factor is the third' and 'an inadequate explanation for delay may, by itself, be sufficient to reject a finding of excusable neglect.'" *Babakr v. Fowles*, No. 23-3026, 2024 WL 1479693, at *4 (10th Cir. Apr. 5, 2024) (quoting *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1253 (10th Cir. 2017)). But the court must consider "'all relevant circumstances[.]'" *Id.* (quoting *Pioneer*, 507 U.S. at 395).

Defendants have shown excusable neglect here.  *First*, plaintiff's sole prejudice allegation is needing to respond to the summary judgment motion.[17]  Doc. 57 at 5.  But that's not prejudice caused by the delay—it's prejudice that comes with filing a lawsuit.  Plaintiff hasn't shown that he is "somehow more prejudiced [after the one-hour delay] than if [defendants] had filed the motion by its original deadline."  *ClaimSolution, Inc. v. Claim Sols., LLC*, No. 17-2005-JWL-GEB, 2017 WL 2225225, at *3 (D. Kan. May 22, 2017) (where only prejudice alleged was case delay and increased litigation costs from defendant filing answer or dispositive motion).  *Second*, the one-hour delay has a negligible effect on the proceedings.  *Guang Dong Light Headgear Factory Co. v. ACI Int'l, Inc.*, No. 03-4165-JAR, 2007 WL 1341699, at *3 (D. Kan. May 4, 2007) (denying motion to strike responses to motions to dismiss and explaining the "Court sincerely doubts that [the parties] would have been in any better position to reply had the responsive documents been filed at 11:59 p.m. on November 13 [instead of after midnight on November 14].").  The court suspects plaintiff's counsel was standing by his computer at midnight on Friday, November 15, 2024, waiting for defendants' motion to arrive.  The first two factors favor defendants.

The last two factors present a closer call.  Defendants' reasons for the delay—the *third* factor—aren't convincing.  Doc. 56 at 6, 7–8 (explaining counsel understood the motion was filed on November 15 and had pressing other business, requiring counsel to work late to meet the deadline); *Pioneer*, 507 U.S. at 392 ("[I]nadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect[.]").  And meeting the November 15 deadline was an outcome within defendants' control.  But—for the *fourth* factor—

---

[17]    At the court's direction, plaintiff responded to the Motion for Summary Judgment.  *See* Doc. 61 (granting third and final time-extension motion to avoid delaying case before court could resolve Motion to Strike); Doc. 62 (summary judgment response).  In fairness, the court thus evaluates prejudice notwithstanding plaintiff already filing his response.

it's evident defense counsel was conscientious, working late on the Friday evening of the deadline. And there's no indication that the "failure to make a timely response . . . [was] the result of conscious indifference [or] any purposeful omission[.]" *White v. O'Dell Indus., Inc.*, No. 99-2315-JWL, 2000 WL 127267, at *2 (D. Kan. Jan. 14, 2000) (concluding there were "no instances in which [movants] have failed to act in good faith").

The court is puzzled by defendants' noncommittal explanation for the timing discrepancy. But given the short delay, the negligible prejudice to plaintiff, and the absence of any effect on the proceedings, the court finds defendants have shown excusable neglect here. To strike defendants' Motion for Summary Judgment is far too severe a sanction for an hour-long delay. *Cf. Celotex Corp.*, 477 U.S. at 327 (summary judgment isn't "a disfavored procedural shortcut," but "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action'" (quoting Fed. R. Civ. P. 1)); *Rogers v. Unified Gov't of Wyandotte Cnty.*, No. 23-2143-JAR, 2024 WL 4512411, at *2 (D. Kan. Oct. 17, 2024) (same). And both parties have colored outside the procedural lines.[18] Granting lenity to both sides of the caption, the court denies plaintiff's Motion to Strike (Doc. 51).

## IV.    Motion to Seal (Doc. 50)

On a final housekeeping matter, the court decides defendants' sealing motion. A "party seeking to file court records under seal must overcome a presumption, long supported by courts, that the public has a common-law right of access to judicial records." *Luo v. Wang*, 71 F.4th 1289, 1304 (10th Cir. 2023) (citation and internal quotation marks omitted). "The Court may order the sealing of documents if competing interests outweigh the public's interest." *Parker v.*

---

[18]    For example, plaintiff's Motion to Strike itself wasn't free of procedural error. Plaintiff's reply brief exceeded the page limit. *Compare* D. Kan. Rule 7.1(d)(3) (replies mustn't exceed 5 pages); *with* Doc. 57 (plaintiff's 11-page reply). Plaintiff never sought the court's leave to file extra pages.

*United Airlines, Inc.*, 49 F.4th 1331, 1343 (10th Cir. 2022).  However, when documents "inform [the court's] decision-making process[,]" the movant "'must articulate a real and substantial interest that justifies depriving the public of access[.]'"  *JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs*, 754 F.3d 824, 826 (10th Cir. 2014) (quoting *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135–36 (10th Cir. 2011)).

Defendants move to redact health information, financial information, and a third-party's home address from Doc. 48.  Doc. 50 at 1.  Our court regularly has sealed parties' medical information—parties have a privacy interest in their health records.  *See, e.g.*, *United States v. Dewey*, No. 14-10059-JWB, 2022 WL 1500663, at *1 n.1 (D. Kan. May 12, 2022) (granting motion to seal medical records); *Watson v. Ebert*, No. 23-1120-HLT-GEB, 2023 WL 5672251, at *1 (D. Kan. Sept. 1, 2023) (concluding privacy interest in medical diagnoses outweighed public's right to access).  And the court regularly seals personal financial information, often sealing information in applications to proceed *in forma pauperis*.  *See, e.g.*, *Bell v. Leavenworth U.S. Penitentiary*, No. 24-3085-JWL, 2024 WL 2803079, at *4 (D. Kan. May 31, 2024) (directing Clerk to maintain *in forma pauperis* motion under seal).  While this filing doesn't involve an *in forma pauperis* application, the financial information in Doc. 48 here is irrelevant to the matters resolved in this motion.  Finally, the court may authorize sealing or redacting third-party addresses.  *McWilliams v. Dinapoli*, 40 F.4th 1118, 1133 (10th Cir. 2022) (authorizing redaction of witness's personal information, including home address); *Gomez v. Epic Landscape Prods., L.C.*, No. 22-2198-JAR-ADM, 2024 WL 1741102, at *1 (D. Kan. Apr. 23, 2024) (authorizing redaction of third-party personal addresses).

Reviewing the record and the proposed redactions, the court concludes the corresponding interest in privacy outweighs the public interest in disclosure of this information.  The court thus

grants defendants' Motion to Seal (Doc. 50).  It directs the Clerk of the Court to remove the provisional designation and maintain permanently under seal Doc. 48.  The court directs defendants to file the redacted version of Doc. 48.

## V.    Conclusion

The court concluded, at the start, that plaintiff had presented a justiciable controversy— he'd established standing to seek some of his requested relief, his claims were ripe, and they weren't moot.  But plaintiff fared differently on the merits of his claim.  It's not for the court to decide whether Kansas employs best practices in its parole process—even for youthful offenders. Instead, the court is confined to decide only whether Kansas's parole process meets the constitutional floor of the Eighth Amendment, assuming the *Graham* line of cases applies to youthful homicide offenders like plaintiff.  The court concludes Kansas's parole procedures satisfy that constitutional floor.  No reasonable factfinder could conclude otherwise.  The court thus grants defendants' Motion for Summary Judgment (Doc. 47).

This Order also resolves two other motions.  It declines to strike defendants' summary judgment motion.  Defendants established excusable neglect—the one-hour delay didn't affect the proceedings or meaningfully prejudice plaintiff.  And, finally, the court grants defendants' sealing motion.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 47) is granted.  And this case is closed.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion to Strike (Doc. 51) is denied.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Seal or Redact (Doc. 50) is granted.  The court directs the Clerk of the Court to remove the provisional designation and leave permanently under seal Doc. 48.  The court directs defendants to file the redacted version of

Doc. 48—previously submitted to chambers by email.

**IT IS SO ORDERED.**

**Dated this 2nd day of May, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

*Standing Appendix*

| **Injuries in Fact** |
|---|
| Declare that defendants operate an unconstitutional parole scheme by depriving Mr. Makthepharak, a youthful offender, a meaningful opportunity for release and plaintiff is serving a de facto life without parole sentence.  Doc. 44 at 25 (Pretrial Order ¶ 5).<br><br> • Overarching declaration, supported by the facts for the other specific relief. |
| Declare that Kan. Stat. Ann. §§ 75-5210a and 22-3717(g)–(h) are unconstitutional as applied to plaintiff.  Doc. 44 at 25 (Pretrial Order ¶ 5).<br><br> • To the extent plaintiff's claim involves defendants' decisions to grant parole without following Kan. Stat. Ann. § 22-3717(g)(2) —thus supporting an argument that the parole scheme is ad hoc and lawless—plaintiff has standing.  Kan. Stat. Ann. § 75-5210a (challenged parole procedure about Secretary's involvement); Kan. Stat. Ann. § 22-3717(g)–(h) (challenged parole procedure, including Secretary's involvement); Doc. 47-9 at 5 (Keating Decl. ¶¶ 21–22) (explaining he hadn't "seen any program agreements that condition the granting of parole to an inmate on the completion of certain programs" and KPRB doesn't deny parole on failure to complete programs); Doc. 47-11 at 2 (Zmuda Decl. ¶¶ 7–10) (Secretary explaining he has never entered an agreement under § 75-5210a(a)). |
| Declare that defendants' reliance on discriminatory risk assessment tools and automatic foreclosure of minimum security classifications for youthful offenders violate Eighth Amendment.  Doc. 44 at 25 (Pretrial Order ¶ 5).<br><br> • There's record evidence to substantiate an allegation that the Custody Classification Manual—a risk assessment tool used in parole decisions—discriminates against |

youthful offenders.  Doc. 47-2 at 12, 19, 22, 24 (Def. Ex. C) (Custody Classification

Manual outlining custody level based—in part—on age, conviction severity, and time

left to serve points); Doc. 62-2 at 2–3 (Def. answers to interrogatories identifying Kan.

Stat. Ann. § 22-3717(h)(2) and Custody Classification Manual as "risk assessment

tools").

Enjoin KPRB to provide inmates opportunity to be heard, present evidence, and hear and

confront adverse witnesses.  Doc. 44 at 26 (Pretrial Order ¶ 5).

- Plaintiff identifies a Kansas regulation limiting attendance at parole hearings.  *See* Kan.

  Admin. Regs. § 45-200-1 (2025) (regulation limiting attendance at parole hearings to

  specific individuals, not including experts or witnesses).

Enjoin KPRB and Secretary to focus parole inquiry on youthful offenders' rehabilitation,

instead of crime severity or older disciplinary history, make youth a central component of the

inquiry, and create a "presumption of relief" for youthful offenders.  Doc. 44 at 26 (Pretrial

Order ¶ 5).

- Kan. Stat. Ann. § 22-3717(h)(2) provides a list of factors considered in parole

  decisions.  That list doesn't identify "maturity" or "rehabilitation" expressly.  § 22-

  3717(h)(2).  The parties dispute whether the KPRB focuses on "maturity" in parole

  decisions.  *See* Doc. 47-8 at 40 (Ogletree Dep. 39:15–18) (no special accounting for

  youthful offenders' maturity); Doc. 47-9 at 4 (Keating Decl. ¶¶ 18, 20) (offender may

  demonstrate maturity and rehabilitation in ways other than work release).  And plaintiff

  emphasizes how the KPRB evaluated his criminal history and underlying conviction

  during his parole hearing.  Doc. 47-9 at 19–35 (Def. Ex. J) (hearing transcript 7:15–

  23:16).  These facts support his injury in fact for the requested injunction.

| **No Injury in Fact** |
|---|

Declare that Kan. Stat. Ann. §§ 75-5210a and 22-3717(g)–(h) are unconstitutional as applied to plaintiff and enjoin the Secretary's "unilateral determination" of parole conditions.  Doc. 44 at 25 (Pretrial Order ¶ 5).

- To the extent plaintiff challenges the requirement that the Secretary of Corrections unilaterally decides whether an inmate has satisfied a program agreement before he becomes eligible for parole, plaintiff lacks standing.  It's undisputed that defendants grant parole without such a program agreement.  Doc. 47-9 at 5 (Keating Decl. ¶¶ 21–22) (explaining he hadn't "seen any program agreements that condition the granting of parole to an inmate on the completion of certain programs" and KPRB doesn't deny parole on failure to complete programs); *id.* (Keating Decl. ¶¶ 24–28) (outlining percentages of inmates who were granted parole); *see above* n.4.  Plaintiff thus hasn't shown that there's a credible threat that the KPRB will enforce this statute, denying parole based on the absence of a program agreement or for failure to comply with agreed conditions.  "The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue[.]"  *Winsness v. Yocum*, 433 F.3d 727, 732 (10th Cir. 2006).

Enjoin KPRB, requiring it to disclose all evidence in advance and record parole hearings.  Doc. 44 at 26 (Pretrial Order ¶ 5).

- Plaintiff never presents evidence that KPRB fails to do either of these things, at least for inmates like plaintiff, who are youthful offenders.  Uncontroverted evidence reflects those policies already exist.  *See* Doc. 47-6 at 3 (Def. Ex. G) (interrogatory

response explaining in youthful offender parole decisions "the resident is provided a packet of information to be considered at the parole hearing 30 days prior to the hearing"); Doc. 47-8 at 39–40 (Ogletree Dep. 38:22–39:10) (explaining board provides youthful offender packet before hearing); Doc. 48 at 1 (2021 Youthful Offender Information Acknowledgment signed by plaintiff); *see also* Doc. 47-6 at 3 (Def. Ex. G) (parole hearings are recorded for youthful offenders); Doc. 47-9 at 11 (Keating Decl. ¶ 78) ("The KPRB continues to record all parole hearings for youthful offenders."); *id.* at 7, 11 (Keating Decl. ¶¶ 40–41, 75) (reflecting recording of plaintiff's past parole hearings).

Enjoin KPRB, requiring it to prepare comprehensible and sufficiently detailed written parole decisions.  Doc. 44 at 26 (Pretrial Order ¶ 5).

- Again, plaintiff hasn't put forth any evidence that the parole board fails to provide written decisions, or that the written decisions provided aren't detailed sufficiently. The uncontroverted evidence shows the KPRB provides written parole decisions.  Doc. 47-6 at 3 (Def. Ex. G) (explaining written Final Action Notice reflects reasons for the decision and is delivered to inmate).

Enjoin the Governor, Secretary of Corrections, and KPRB, requiring them to institute "a meaningful administrative and judicial process to review" parole decisions.  Doc. 44 at 26 (Pretrial Order ¶ 5).

- But, once more, plaintiff never presents evidence that the KPRB decisions are unreviewable.  In fact, the evidence shows that parole decisions are reviewable judicially through a habeas petition, Doc. 47-8 at 33 (Ogletree Dep. 32:9–18), and the inmate can request reconsideration from the KPRB based on new evidence, *id.*

(Ogletree Dep. 32:2–8); Kan. Admin. Regs. § 45-200-2(b) (request to reconsider based on new information).